1    **District Court of the United States**
2    **District of Columbia**
3
4    ----------------------------------------------------
5    |
6    John S. Barth,                                    |
7    Plaintiff                                          |
8    v.                                                 |
9                                                       |
10   MABRY CARLTON RANCH INC.;                          |
11   LONGINO RANCH INC,                                 |
12   BERRYMAN LONGINO JR,                               |
13   JOHN LONGINO, THOMAS L CURRY;                      |
14   BARBARA CARLTON, LISA CARLTON,                     |
15   KIMBERLY (CARLTON) BONNER;                         |
16   JOHN MINTON JR, JOHN MINTON SR,                    |
17   MICHAEL ALLEN WALTON,                              |
18   JAMES J WALTON TRUST,                              |
19   WYONA JUNE WALTON TRUST;                           |
20   ERIC SUTTON, AMY MEESE;                            |
21   UNITED STATES GOVERNMENT;                          |
22   John Does 1-10, Jane Does 1-10,                    |
23   Defendants                                         |
24   _____|

Case: 1:25-cv-01136 JURY DEMAND
Assigned To : Friedrich, Dabney L.
Assign. Date : 03/31/2025
Description: Pro Se Gen. Civil (F-DECK)

Case No. _____

**COMPLAINT**
**of**
**RACKETEERING,**
**ABUSE OF PUBLIC OFFICE,**
**PERJURY, AND DENIAL OF CIVIL RIGHTS**

**with Demand for Jury Trial**

For the Plaintiff:
        John Barth, Plaintiff, pro se
        P.O. Box 88, Springvale, ME 04083
        207-608-1741

**NOTICE**: Although the Plaintiff has no political party preferences, this complaint involves operatives of a party (Republican) with which the assigned judge may not have social, financial, or career connections or sympathies without violation of the Code of Conduct for federal judges.

**RECEIVED**
MAR 31 2025
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

i

# CONTENTS

JURISDICTION, VENUE, AND ASSIGNMENT .......................................................................... iii
AUTHORITIES ................................................................................................................................ v
PARTIES ........................................................................................................................................ xiii
STATEMENT OF CLAIMS ........................................................................................................ xvii
PATTERN OF RACKETEERING CRIME AND STATUTES OF LIMITATIONS ............. xxviii
FACTS ................................................................................................................................................ 1
Facts of False Land Appraisals for Defendant Groups A, B, and C (App. D, E) ............................. 2
    General Facts of Land Appraisal ................................................................................................... 2
    State and County Officials Should Have Known that Private Appraisals were Falsified ............. 3
    Statewide Overpayments for "Conservation Land" Under Lisa Carlton ....................................... 5
Facts of Conservation Land Funding and Misappropriation in Florida (App. D, E) ........................ 7
    Common Methods of Fraud in Conservation Land Funding .......................................................... 7
        Lack of Conservation Value of Ranch Land ............................................................................ 7
        False Claims of Conservation Value by Rancher Associations and Officials ........................... 7
        False Claims of Migration Corridors for Non-Migratory Species .......................................... 8
        Falsification of Species Data by State and County Officials .................................................... 8
        False Claims of Imminent Urbanization of Remote Ranch Land ............................................. 9
    Misappropriation of Florida State Conservation Funds ................................................................. 9
        State Process of Acquisition of Conservation Lands ................................................................. 9
        Facts of Broad Corruption of State Government in Florida ................................................... 10
        State Definition of "Conservation Easements" Excludes the Subject Lands ........................... 11
    Misappropriation of State Water District Funds .......................................................................... 12
        Delegated Declaration of Conservation Value of Land Purchases Invited Corruption ............ 13
    Misappropriation of County Conservation Funds ........................................................................ 13
        County Process of Acquisition of Conservation Lands ........................................................... 13
        Influence Upon County Process by Beneficiaries of Land Purchases ..................................... 14
    Misappropriation of Federal Funds ............................................................................................. 14
Facts of Fraudulent Misappropriation of Funds to Defendant Groups A, B, C (App. A - F) .......... 15
    Fraudulent Misappropriation of Funds to Carlton Group A 1998-2008 (Fact Appendix A) ....... 16
        The Land Areas and Payments (Appendix A) ........................................................................ 17
        Corrupt Relationships of Carlton Group A (Appendix A, D, E, and F) ................................. 17
        Influence of the Defendants Upon the State BOT Purchase Process (Appendix A, D, E) ........ 21
        Influence of the Defendants Upon the State SWFWMD Purchase Process (Appendix E) ....... 21
        Influence of the Defendants Upon the County Purchase Process ............................................ 23
        Unlawful Influence Upon the Subject Decisions by Election Funding Sources ..................... 27
        County Officials and Their Campaign Donors ....................................................................... 29
        Group A Benefits Distributed to Persons Obstructing Investigation ...................................... 32
    Fraudulent Misappropriation of Funds to Longino Group B 2002-2011 (Fact Appendix B) ...... 32
    Fraudulent Misappropriation of Funds to Walton Group C 2007-2010 (Fact Appendix C) ........ 35
        The Walton Land Was Purchased for Five Times the Known Land Value .............................. 36
Facts of Federal Agency Obstruction of Investigation 2018-2025 (App. G) .................................. 36
Facts of The Plaintiff and His Damages 2011-2021 ...................................................................... 38
SUMMARY OF FACT .................................................................................................................... 40
PETITION FOR RELIEF ................................................................................................................ 42

1  **JURISDICTION, VENUE, AND ASSIGNMENT**

2  Jurisdiction is based upon federal issues and federal defendant. This action is brought for

3  violations of rights guaranteed by the Constitution of the United States, and violations of federal

4  laws, including 18 U.S.C. §§ 1961–1968 (Racketeering Influenced and Corrupt Organizations Act

5  or RICO). This Court has original jurisdiction under 28 USC §1331 (federal issue) of the claims

6  herein of violations of these statutes of the United States, and under 28 USC § 1332 (diversity) of

7  all claims herein, as well as jurisdiction of claims of interference with interstate commerce, as the

8  Plaintiff is a citizen of Maine, whereas all defendants are federal entities, or entities of other states.

9  This district court has original jurisdiction under 28 USC §1343(1 and 2) (conspiracy) of

10  the claims herein of deprivations of civil rights by acts of conspiracy in violation of 42 USC §1985

11  (Civil Rights Act), or failure to prevent such deprivations, and under 28 USC §1343(3) (color of

12  state law) of all claims herein of deprivations of civil rights under color of state law.

13  Venue in RICO action is proper under 18 USC §1965 (a) in any district where a defendant

14  "resides, is found, has an agent, or transacts his affairs." The defendant federal government and

15  agencies meet all of these criteria. The racketeering enterprise also "transacts affairs" in DC by

16  taxing Florida property with out-of-state owners, to cover interest on bonds issued for corrupt

17  payments. Property there owned by D.C. residents is above-average in value, but even using

18  average values, residents here lost $56,437 to the racketeering scheme, several times that amount

19  with long-term interest, far exceeding 56 felony crimes here. Residing in DC during this period,

20  Donald Trump alone lost about $1,830 in additional taxes on his Palm Beach home due to this

21  racketeering, and several times that amount with long-term interest. More than 56 felony crimes in

22  D.C. including multiple felonies against U.S. presidents, establish that the racketeering enterprise

23  "transacts affairs" in D.C. Venue in the D.C. district is therefore clear.

24  The assigned judge should not be appointed by or sympathetic with the political party

25  found to be that of the Florida racketeering defendants (Republican), to avoid violation of the

26  Code of Judicial Conduct. The Plaintiff does not prefer any major political party.

27  **False Claims of Immunity**

28  The United States is barred from immunity in this matter by the nature of the acts.

29  **Jury Demand**

30  Trial by jury is demanded for all issues of the complaint.

**Summary**

This complaint involves the actions of rogue factions within the United States investigative agencies, and is not to be construed as a complaint against the entirety of duly constituted agencies. This is an action to obtain compensation for damages to the plaintiff and others caused by the defendants, by their collusion in the operation of a criminal enterprise. This pattern of racketeering is coupled with a pattern of abuse of office, and perjuries to suppress investigation.

The defendants have engaged in (1) collusion in a racketeering enterprise which has injured the Plaintiff, the theft of about $120 million in federal, state, and local conservation funds by wealthy ranchers and politicians of one political party in Florida, and (2) the defendant agencies have refused over three years to investigate this racketeering, despite having convicted about 70 public officials in Florida annually for claims less than one percent the size of this case, and despite many plaintiff requests and provision of reams of evidence, six Appendices of Fact and seven Memoranda of Law to local, central, and OIG offices of each defendant agency under administrations of both major political parties, several times over this period, even as they investigated an opposing-party politician for one-thousandth of this amount, and have sought to obstruct plaintiff prosecution by denying FOIA requests regarding their refusal to investigate.

The Plaintiff has been severely injured financially by the loss of income due to obstruction of justice in his prosecution of the original racketeering defendants. The Plaintiff has suffered loss of real property tax revenue paid by him on property in Florida to cover debt service on bonds financing the racketeering thefts of public funds, and the loss of years of income from his usual employment due to intensive and prolonged investigation and litigation.

The defendants are in extensive and willful violation of federal laws including RICO, and laws penalizing perjury, the abuse of federal office, subversion of the Constitution and Laws of the United States, and denial of the rights of the Plaintiff thereunder, and are subject to compensatory and exemplary punitive damages and criminal penalties.

Whereas many of the defendant officials are members or beneficiaries of a criminal faction of the same political party, the Plaintiff is not a member or beneficiary of any political party.

For (1) the theft of $120 million in conservation funds in Florida, reference is made to Fact Appendices A - F and Memoranda of Law 1 - 7. For (2) defendant agency refusal to investigate or prosecute these groups, and obstruction of Plaintiff FOIA investigation of the defendant agencies, Fact Appendix G and Memorandum of Law 8 are provided.

**AUTHORITIES**

**Cases are referenced and listed primarily in the Memoranda of Law**

**Statutes of Florida**

F.S. 817         Fraud
F.S. 837         Perjury in Official or Other Proceedings
F.S. 838.016   Unlawful Reward to Influence Official Action
F.S. 838.021   Unlawful Harm to Influence Official Action
F.S. 838.022   Tampering Public Records
F.S. 838.15-16 Bribery of Agents, Employees, Advisors, Appraisers
F.S. 895         State Racketeering Offenses
F.S. Ch. 112    State Code of Ethics (no criminal penalties)

**Statutes of the United States**

        18 USC § 242 Denial of Constitutional Rights under color of law
        18 USC § 371 Fraud and Conspiracy Against the United States (see Mem. Of Law 3)
        18 USC § 1341 Fraud and Violation of Honest Services
        18 USC §§ 1952–1968 Racketeer Influenced Corrupt Org's Act (RICO)
                These claims are brought under 18 USC §§ 1962 (c) and (d)

**Provisions of the United States Constitution**

Amendment V:

"No person shall…be deprived of life, liberty, or property, without due process of law; nor shall
        private property be taken for public use without just compensation."

Amendment XIV Section 1:

"… No state shall make or enforce any law which shall abridge the privileges or immunities of
citizens of the United States; nor shall any State deprive any person of life, liberty, or property,
without due process of law; nor deny to any person within its jurisdiction the equal protection of
the laws."

**Other Authorities**

80. *Federal Liability for Takings and Torts* Abend, 31 Fordham Law Review 481        30,40
81. *Manual of Federal Practice*, U.S. Dept Justice  41,42

**Statement of Related Cases**

89. *Conrad Diehm*, Sarasota Probate,  2010 CP 000322 NC        13
90. *Barth v. McNeely*, Sarasota Cnty 2012-003638        10,13
91. *Barth v. McNeely*, Sarasota Cnty 2012-006843        10,13

92. *Barth v. McNeely*, Fl 12th Cir 13-01257,03585                           10,13
93.     state appeal, No. 2D15-5267 (Fla. 2D 2015)                           10,13
94.     state supr ct, No. 16-2247 (Fl Supr Ct),                            10,13,24
95.     US Supr Ct No. 16-1247 (2017)                                     10,13,24,27
96. *Barth v. McNeely*, Fl.MD No. 8:14-cv-118-T-17
97.     appeal No. 14-13182 (11th Cir, 2014);
98.     US Supr Ct No. 15-92 (2015)                                       12,22,24,27,28
99. *Barth v. U.S.*, No. 17-635 (Fed.Cl. 2017)
100.    appeal No. 17-2238 (Fed.Cir. 2017)
101.    US Supr Ct No. 17-1254
102. *Barth v. U.S.*, No. 2:18-cv-00201 (ME, 2015),
103.    No. 18-2199 (1st Cir. 2018)
Efforts To Overcome Agency Refusals To Investigate Obstructed By Judiciary Partisans
104.    *John Barth v. Mabry Carlton Ranch et al*, No. CV20 00104 (HI, 2020)
105.    *John Barth v. Mabry Carlton Ranch et al*, No. 3:20-cv-01164-AC (OR, 2020)
106.    *John Barth v. Mabry Carlton Ranch et al*, No. 5:20-cv-09288 (CAND, 2020)
107.    appeal No. 0:2021cv15119  (9th Cir. 2021) (search case no. 21-15119)
108.    *John Barth v. United States Dept. of Justice et al*, No. 1:22-cv-00955 (DC, 2022)
109.    appeal No. 22-5338 (DC Cir., 2022)
110.    petition No. 23-379 (U.S. Supreme Court, 2023)
Efforts To Investigate Agency Corruption By FOIA Meet Only Further Corruption
111.    *John Barth v. United States Dept. of Justice et al*, No. 1:23-cv-2920 (DC, 2023)
Widespread Corruption Forces Prosecution Of Racketeering Without Agency Investigation
112.    *John Barth v. Mabry Carlton Ranch et al*, (present case) (DC, 2025)

**Public Records and Publications**

Government documents
201. *Advisory Boards and Councils*, Sarasota County website www.scgov.net
202. *Florida Forever's Land Acquisition Using Less-Than-Fee Methods*, Florida Senate, Issue Brief 2011-217, (2011) Committee on Environmental Preservation and Conservation
203. *Conservation Easement Program,* Florida DEP, Div of State Lands white paper
204. *Land Acquisition Programs*, Sarasota County website, http://www.scgov.net/government parks-recreation-and-natural-resources/things-to-do/get-involved/land-acquisition-programs
205. *The Florida Handbook*, Peninsula Publishing, Tallahassee (annual)
206. SWFWMD Article 835, (deleted from the SWFWMD website in 2018).
207. *Florida Forever Project Evaluation Report*, Florida Natural Areas Inventory, 11/2007
208. *Sarasota County Water Atlas*, *Myakka Ranchlands,* USF, updated 4/2012 http://www.sarasota.wateratlas.usf.edu/upload/documents/Myakka-Ranchlands-Fla-Forever-Project-Description.pdf
209. *Florida Forever Priority List*, Acquisition and Restoration Council, February 2008
210. *Agenda*, Board of Trustees of the Internal Improvement Trust Fund, 2/26/2008
211. *Partnerships Will Protect and Preserve*, Water Matters Magazine, SWFWMD, 12/2007
212. *Minutes*, Board Of County Commissioners, November 27, 2007
212B. *Appraisals and Resolution Requesting Funds*, Eric Sutton to SWFWMD Governing Board

213. *Phase I Environmental Site Assessment, Carlton Ranch*, EC&T for SWFWMD, 11/2007

214. *Governing Board approves major conservation land acquisition*, SWFWMD, 11/26/2007
https://www.swfwmd.state.fl.us/about/newsroom/news/governing-board-approves-major-conservation-land-acquisition Easement: $20,135,000 SWFWMD, $31,678,488 County
"The closing is scheduled to occur no later than Dec. 31, 2007"

215. ESLOC slide show, June 7, 2012, http://slideplayer.com/slide/7258664/

216. *Land Acquisition in Florida*, Comm. Environmental Preservation, Florida Senate, 1/2008

217. *Land Acquisition Decision Process*, Florida DEP website, FAQ 10/24/2017

218. *Florida Forever's Land Acquisition Using Less-Than-Fee Methods*, Florida Senate, Issue Brief 2011-217, (2011) Committee on Environmental Preservation and Conservation, cites [219]

219. *Office of Program Policy Analysis and Government Accountability Review* (Fl Senate Oct. 2007) (OPPAGA) reviews DSL and its land acquisition procedures.

220. *District partnering with Sarasota County on purchase*, SWFWMD news, 11/26/2007
http://www.swfwmd.state.fl.us/news/article/835/

221. *Interim Florida Forever List*, Acquisition & Restoration Council, 2005-2008, DEP

222. *Baseline Documentation Report*, Sarasota county, quoted in deed [603]

223. *Conservation Needs Assessment Report*, Florida Natural Areas Inventory, 12/2000.

224. *Longino Ranch: Joint Environmental Lands Acquisition with SWFWMD*, Sarasota County

225. *Minutes of the Meeting*, SWFWMD Governing Board, 11/16/2010

226. *Water Matters* magazine, SWFWMD, May-June 2008 (caption of photo)
http://www.swfwmd.state.fl.us/documents/publications/watermatters/may-jun2008/5.html

227. *Minutes of the Meeting*, SWFWMD Governing Board, 2/21/2006

228. *Minutes of the Meeting*, SWFWMD Governing Board, 11/30/2006

229. *District partnering with Sarasota County on purchase*, SWFWMD news, 4/27/2010
https://www.swfwmd.state.fl.us/about/newsroom/news/governing-board-approves-major-conservation-land-acquisition, easements on Walton and Longino ranches, $37.4 million total, county $11.5 million "Sarasota County Commission unanimously approved the Walton Ranch acquisition at its April 14 meeting and the Longino Ranch acquisition at its meeting today."

230. *Naming of the Walton Ranch Preserve Site*, Recommendations of Sarasota County Parks and Recreation officials to County Commission, 10/13/2015

231. *Myakka Ranchlands Project Evaluation Report v.3*, FNAI, 7/2007

Corruption in Florida

301. *A brief history of Florida environmentalism*, Farrago, Counterpunch 11/10/2007

302. *Corruption Risk Report: Florida Ethics Laws*, Ben Wilcox and Dan Krasner,
http://www.scribd.com/doc/96178516/Corruption-Risk-Report-Florida-Ethics-Laws

303. *Florida Corruption Risk Report Card*, State Integrity Investigation,
http://www.stateintegrity.org/florida

304. *Study of Public Corruption in Florida*, 19th Statewide Grand Jury, SC-09-1910, 12/17/10

305. *Corruption report*, http://sarasotacrookedlawyers.com/tag/lisa-carlton/
http://northportfloridacorruption.blogspot.com/

306. *Business As Usual*, Florida Politics, 8/23/2008 http://flapolitics.blogspot.com/2008_08_17_archive.html
(refers to Tampa Bay Times article http://www.tampabay.com/SearchForwardServlet.do?articleId=781614 deleted)

307. *Executive Summary*, Brennan Center for Justice, 2013
http://newpoliticsreport.org/report/2013-14/executive-summary/

308. *Skewed Justice*, American Constitution Society for Law and Policy, 2014

309. *Race and politics influence judicial decisions*, Josh Salman, Herald Tribune 12/8/16
http://projects.heraldtribune.com/bias/politics/
310. *What Is Greenwashing?*, Hoffman, Scientific American, 4/1/2009
311. *25 Most Influential Men and Women in Sarasota*, Sarasota magazine, 8/31/2016
https://www.sarasotamagazine.com/articles/2016/8/31/meet-the-25-most-influential-men-and-women-in-sarasota-today
312. *Protesters take aim at Robinson*, Josh Salman, Sarasota Herald Tribune
313. *Eric Robinson Announces Election Bid*, Sarasota Herald Tribune
314. *Eric Robinson: Beyond dark money*, Sarasota Herald Tribune, 8/26/2016
See also:  http://sarasotavision2050.blogspot.com/2018/01/pac-money-dark-money-in-sarasota-fl.html

Conservation Fraud
400. *Panther Recuperating*, Veterinary Page, Univ. Florida, 5/12/2014
http://veterinarypage.vetmed.ufl.edu/2014/05/12/panther-recuperating-after-surgery-at-uf/
401. *FWC collects evidence of a female panther north of Caloosahatchee River*, Florida FWC
https://content.govdelivery.com/accounts/FLFFWCC/bulletins/172613c
402. *Panther sighted on Carlton Reserve*, Sarasota Herald Tribune, 2/17/2010
http://www.heraldtribune.com/news/20100217/panther-sighted-on-carlton-reserve
403. *Saving the Best of Florida*, Nature Conservancy, (4/27/18)
http://www.nature.org/ourinitiatives/regions/northamerica/unitedstates/florida/howwework/florida-forever-saving-the-best-of-florida.xml
404. *Environmental Lands Are Growing*, Wade Matthews, Sarasota Audubon Society, 5/1/2010
http://sarasotaaudubonblog.blogspot.com/2010/05/thanks-sarasota-county-great-move-for.html

Defendants
500. article, YourObserver 6/1/2009
501. *Senator Leaving the Spotlight*, Sarasota Herald Tribune, 5/2/2008
https://www.heraldtribune.com/article/LK/20080502/News/605215028/SH/
502. Website of defendant Lisa Carlton at lisacarlton.net 2018 (removed by 12/2019)
503. *Water Matters*, Florida SWFWMD website, May-June 2008
http://www.swfwmd.state.fl.us/documents/publications/watermatters/may-jun2008/5.html
504. *Handing over the reins*, SceneSarasota.com, May 2013
http://www.scenesarasota.com/recent/123-may-2013/330-handing-over-the-reins.html
505. Website of The Joerger Group, LLC  http://www.joerger.com/about/
506. *The Social Detective*, Sarasota Magazine, 4/1/2008
https://www.sarasotamagazine.com/articles/2008/4/1/the-social-detective-2
507. *Annual Report*, GCCF, 2009
Carlton was a member of the senate Legislative Budget Commission [508]
508. *Calendar*, Florida Senate, 4/17/2008
509. GCCF website  http://conservationfoundation.com/about-us/our-boards/
510. *Barbara Carlton, Woman of the Year*, Fl. Dept. of Agriculture, FreshFromFlorida.com
http://www.freshfromflorida.com/Divisions-Offices/Marketing-and-Development/Agriculture-Industry/Agricultural-Awards-and-Honors/Woman-of-the-Year-in-Agriculture-Award/Barbara-Carlton
511. *Adam Putnam committee raises $431K in February*, FloridaPolitics.com 2/2/2018
http://floridapolitics.com/archives/tag/barbara-carlton
512. Ballotpedia reference *Lisa Carlton*, https://ballotpedia.org/Lisa_Carlton
513. *Scott picks loyalists to fill Constitution Revision Commission*, Miami Herald, 3/3/2017
514. *Application for Nomination to the 12th Circuit Court*, Kimberley Bonner, 4/16/13 (exh 102)

515. *State's purchase of land from senator's family criticized*, Tampa Bay Times , 8/22/2008
http://www.tampabay.com/news/politics/state/states-purchase-of-land-from-senators-family-criticized/781614
516. *Florida farmers squeezed*, Victor Hull, The Ledger, 1/1/2002
http://www.theledger.com/article/LK/20020101/News/608109912/LL/
517. *Sarasota County buys Longino Ranch*, Longboat Key News, 4/30/2010
http://www.lbknews.com/2010/04/30/sarasota-county-buys-longino-ranch/
518. *Land Deal Worth Millions*, Zac Anderson, Sarasota Herald Tribune, 4/28/2010
http://www.heraldtribune.com/news/20100428/land-deal-worth-millions
519. *Buster Longino of Longino Ranch*, Florida Agriculture Hall of Fame, website at
http://floridaaghalloffame.org/2007/11/buster-longino/
520. *Naming of the Walton Ranch*, Carolyn Brown, memo to county comm., 10/13/15
521. *Longino Ranch opposes Isles of Athena plan*, Will Rothschild, Herald Tribune, 9/6/05
http://www.heraldtribune.com/article/LK/20050916/news/605238049/SH/
522. *Buster Longino, Florida Agriculture Hall of Fame*,
https://sarasotaoralhistory.com/2018/01/12/buster-longino/
523. *Why is Carlos "Bully" Beruff a member of SWFWMD?*, SWFWMD Matters, 7/15/2013
http://swfwmdmatters.blogspot.com/2013/07/why-is-carlos-bully-beruff-member.html
524. *Beruff resigns from Swiftmud board*, Sarasota Herald Tribune, 8/26/2015
http://www.heraldtribune.com/article/LK/20150826/News/605202334/SH/
525. *Who is Carlos Beruff?*, Kate Flextor, My Suncoast, 3/4/2016
http://www.mysuncoast.com/news/local/who-is-carlos-beruff-a-profile-of-the-man-
running/article_231e867a-e230-11e5-9fb5-379036002fdb.html
526. *Senate candidate Carlos Beruff's journey*, Jeremy Wallace, Miami Herald, 5/27/16
https://www.miamiherald.com/news/politics-government/state-politics/article80205562.html
527. *Moran and Detert join Sarasota County Commission*, Ocala Star Banner, 11/22/16
528. *State Constitution commission devolves into farce*, Tampa Bay Times, 10/28/17
https://www.bradenton.com/opinion/editorials/article181357046.html
529. *A SLAPP at Free Speech*, Cathy Antunes, 4/21/2018
https://www.srqmagazine.com/srq-daily/2018-04-21/8226_A-SLAPP-at-Free-Speech
530. *SCF Trustees Want Respect But Earn Laughter*, Cathy Antunes, Bradenton Times,
http://thebradentontimes.com/scf-trustees-want-respect-but-earn-laughter-p14788-137.htm
540. *Christine Robinson*, Business and Professional Women,
http://www.bpwev.org/index.php/meetings-events/speaker-profiles/315-christine-robinson-sarasota-county-
commissioner.html
541. *25 Most Influential Men and Women in Sarasota*, Sarasota, 8/31/2016
https://www.sarasotamagazine.com/articles/2016/8/31/meet-the-25-most-influential-men-and-women-in-sarasota-today
542. *Protesters take aim at Robinson*, Josh Salman, Sarasota Herald Tribune
http://www.heraldtribune.com/article/LK/20150401/News/605192487/SH/
543. *Eric Robinson Announces Election Bid*, Sarasota Herald Tribune
https://www.questia.com/newspaper/1P2-38387628/eric-robinson-announces-election-bid
544. *Eric Robinson: Beyond dark money*, Sarasota Herald Tribune, 8/26/2016
http://extra.heraldtribune.com/2016/08/26/eric-robinson-beyond-dark-money/
545. *Did Eric Robinson purposely obscure his text messages?*, Herald Tribune, 4/11/2018
http://www.heraldtribune.com/news/20180411/did-eric-robinson-purposely-obscure-his-text-messages
546. *Eric Robinson Campaign for School Board was a Fraud*, Sarasota Phoenix, 10/5/16
https://www.thescoopradioshow.com/eric-robinson-campaign-for-school-board-was-a-fraud-part-ii-sarasota-phoenix/
547. *Scam Bilks Mayor Curry's Committee*, Nate Monroe, Florida Times Union, 7/9/18
http://news.wjct.org/post/international-scam-bilks-mayor-lenny-curry-s-committee-120000
548. *Sarasota School Board for Sale?*, Cathy Antunes, The Detail, 8/27/17

1  https://thedetail.net/2016/08/27/sarasota-school-board-for-sale/
2  549. *Unusual Funding in Board Bid*, Jeremy Wallace, Sarasota Herald Tribune
3  https://www.questia.com/newspaper/1P2-38289345/unusual-funding-in-board-bid
4  550. *Prince of Dark Money*, Cathy Antunes, The Detail, 6/10/15
5  http://thedetail.net/2015/06/10/prince-of-dark-money/
6
7  **Deeds and Payments (see Appendices A, B, and C for details)**
8  Abbreviations
9      MCRI            Mabry Carlton Ranch Inc
10     MCSRI           Mabry Carlton & Sons Ranch Inc
11     SWFWMD          Southwest Florida Water Management District
12     LRI             Longino Ranch, Inc.
13
14  Carlton Deeds and Payments
15      (See Appendix A for deed, parcel, and valuation details)
16  600. 1982 **Deed** T. Mabry Carlton, Jr. to Sarasota County, 24,565 acres,  $1,221 per acre
17  600b. Payment Sarasota County to T. Mabry Carlton, Jr, est. $30 million
18  601. 12/31/1998 **Easement** MCRI to SWFWMD, 4,743.95 acres, OR 1998175092
19  601b. Payment SWFWMD to MCRI $2,299,774 (est.) ($522.68 per acre, 24.5% of value).
20  602. 11/19/2002 **Deed MCRI to Harrison** OR 2002193050 567A $301,980 532.50 per acre.
21      Purchase shows that MCRI knew the land was worth no more than the 1998 easement price.
22  603. 12/20/2007 **Deed** MCRI, MCSRI to SWFWMD, Sarasota County, OR 2007188019 for
23      [601], $12,588,756 plus $2,299,774 for $9,396,791 Fair Market Value sworn by Assessor.
24  603b. Payment SWFWMD and County to MCRI $12,588,756 + $2,299,774 = total **$14,884,090**
25      paid for $3,423,290 Fair Market Value 2012-14 sworn by County ($9,396,791 in 2007).
26      Purchase was made during a real estate price boom (why?), for six times the 2002 MCRI
27      sales price per acre, over four times the recession 2012-14 land value, and 58% more than
28      the County's sworn current 2007 value, a **deliberate overpayment of $11,460,800**.
29  604. 12/20/2007 **Easement** MCRI and MCSRI to SWFWMD, OR 2007188021, 7,630 acres.
30  604b. Payment SWFWMD to MCRI **$39,124,692 paid for easement alone** on land with
31      $8,060,700 Fair Market Value 2012-14 sworn by County ($12,187,384 in 2007).
32      Purchase was made during a real estate price boom (why?), for twenty times the 1998
33      easement fraction of land value, ten times the 2002 MCRI land price per acre, four times the
34      recession 2012-14 land value, and over three times the County's sworn current 2007 land
35      value (for easement only), a **deliberate overpayment of $37,155,843**.
36  605. 12/31/2012 **Easement** MCRI to SWFWMD and County, OR 2013007020 (minor).
37
38  Longino Deeds and Payments
39      (See Appendix B for deed, parcel, and valuation details)
40  610. 7/26/2002  **Easement** LRI to SWFWMD and County, OR 2002122011 3,422.11 acres.
41      County and state paid LRI **$2,139,000 for an easement alone** on land with a 2001
42  Total Fair Market Value of $3,384,000 sworn by the County itself. Payment for a mere easement
43  was $625 per acre, more than the 2002 MCRI full land price ($532 per acre), and was 62.3% of the
44  total land value. An easement payment of 24.5% of land value as paid in 1998 for the adjacent
45  land, would have been $829,080, so this was a **deliberate overpayment of $1,309,920**. Even
46  these valuations assume that the easement had conservation value, which it did not. See

Appendices D and E establishing absence of conservation value, and the extensive political corruption that led to these payments, and payments to the Carlton and Walton groups.

611. 11/11/2004 **Easement** LRI to SWFWMD and County, OR 2004219065 (Nora Patterson)
County and state paid LRI $238,327.24 (plus federal mitigation credits) for the right to
spend public funds on 380.00 acres of land to correct pollution problems caused by LRI.

612. 8/23/2010 **Easement** LRI to SWFWMD and County, OR 2010102430, (minor area)

613. 8/23/2010 **Easement** LRI to SWFWMD and County, OR 2010102429 3,981.77 acres
County and state paid LRI $14,499,000 for an easement on land with a County-sworn value of
$4,051,771, over three times its total value, and fifteen times the fraction of land value (24.5%)
paid for the 1998 easement, a **deliberate overpayment of $13,506,316**.
These valuations assume that the easement had conservation value, which it did not. See
Appendices D and E establishing absence of conservation value, and the extensive political
corruption that led to these payments, and payments to the Carlton and Walton groups.

Minor easements in 2011 and 2019:

614. 2/14/2011 Easement, LRI to County OR 2011017427 doc stamps $378.00 (est $54,000)

615. 4/06/2011 Easement, LRI to County, OR 2011039737

616. 7/18/2011 Easement cons., LRI to FFWCC, OR 2011082577 $(unknown)

617. 3/26/2019 Easement add'n, LRI to FFWCC, OR 2019041195 $(unknown)

Walton Deeds and Payments
    (See Appendix C for deed, parcel, and valuation details)

620. 7/16/2010 Deed, Michael Walton as trustee of two parent trusts to County, OR2010102429.
3,757 acres. The County paid $22,559,100 for land for which the County had sworn a total current
market value of $4,434,376, over five times the total market value, and **deliberately overpaid
$18,124,724.** If it had waited for a recession, it would have paid the 2012-14 value of $2,334,300,
so the County **deliberately overpaid as much as $20,224,800**.
These valuations assume that the land had conservation value as required for the funds used, which
it did not. See Appendices D and E establishing the absence of conservation value, and the
extensive political corruption that led to the payments to the Carlton, Longino, and Walton
defendants.

Other Exhibits

700. Letter of Amy Meese to Plaintiff, 12/2014 (Exh 100 in original)

**Authorities on Misappropriation of Government Funds**

"The administration of government, like a guardianship ought to be directed to the good of those who confer, not of those who receive the trust."
    Marcus Tullius Cicero (attributed)

"The same prudence which in private life would forbid our paying our own money for unexplained projects, forbids it in the dispensation of the public moneys."
    Thomas Jefferson, *letter to Shelton Gilliam*, 1808

"The functionaries of every government have propensity to command at will the liberty and property of their constituents."
    Thomas Jefferson, *letter to Col. Charles Yancey*, 1816

"To pillage the public purse, and to vend the favors of the state, are acts which the meanest villain may comprehend, and hope to practice in his turn."
    Alexis De Toqueville, *Democracy in America*, 1835

"If we… sink into a nation… putting gain over national honor… then we shall indeed reach a condition worse than that of the ancient civilizations in the years of their decay."
    Theodore Roosevelt, *The Law of Civilization and Decay*, 1926

"Nothing is easier than spending the public money. It does not appear to belong to anybody. The temptation is overwhelming to bestow it on somebody."
    Calvin Coolidge (attributed)

**Authorities on Violations of Law by Public Officials**

"When bad men combine, the good must associate; else they will fall one by one, an unpitied sacrifice in a contemptible struggle."
    Edmund Burke, *Thoughts on the Cause of the Present Discontents*, 1770

"Let us raise a standard to which the wise and honest can repair."
    George Washington, *remarks at first Continental Congress*, 1787

"Power over a man's support is power over his will."
    Alexander Hamilton, *The Federalist*, 1787

"That we may deceive others with a tranquil conscience, we begin with deceiving ourselves."
    William Godwin, *Enquiry Concerning Political Justice*, 1793

"Power, lodged as it must be in human hands, will ever be liable to abuse."
    James Madison, *speech at the Virginia constitutional convention*, 1829

"Whatever government is not a government of laws, is a despotism…"
    Daniel Webster, *at a reception in Maine*, 1835

"Here let those reign, whom pensions can incite, to vote a patriot black, a courtier white, Explain their country's dear-bought rights away, and plead for pirates in the face of day."
    -Samuel Johnson, *London: A Poem, Ad Ricardum Savage*

1 "I think I can say, and say with pride, that we have some legislatures that bring higher prices than
2 any in the world."
3              Mark Twain, *After-Dinner Speech*, 1875

4 "Power tends to corrupt, and absolute power corrupts absolutely. ,..There is no worse heresy than
5 that the office sanctifies the holder of it."
6              Lord Acton, *letter to Creighton*, 1887

7 "If government becomes a lawbreaker, it breeds contempt for law; it invites every man to become
8 a law unto himself; it invites anarchy."
9              Justice Louis Brandeis, dissenting in *Olmstead et al v. United States* (1928)

10 **PARTIES**

11 1.  Plaintiff John S. Barth, jr. is an engineer and philanthropist, a resident of Maine, injured

12 financially by the subject acts of the defendants, who is not affiliated with a political party, and

13 generally supports agriculture and conservation. Plaintiff able to brief and argue the issues pro se.

14 2.  The state of Florida and Sarasota County thereof, were exploited as racketeering enterprises by

15 the defendants. These entities are not charged under RICO, and the Plaintiff demands that they be

16 compensated for public funds misappropriated by their public officials and employees.

17 **Agencies Of The Defendant Federal Government**

18 3.  The Department Of Justice, Federal Bureau Of Investigation, Department Of Homeland

19 Security, and thereby the United States, denote rogue factions or cabals within these agencies, who

20 have (1) refused to investigate the racketeering enterprise or even reply to the Plaintiff, (a) despite

21 the Complaint, six Appendices of Fact and seven Memoranda of Law being sent to the local, state,

22 headquarters, *and* OIG offices of each agency in multiple salvos repeated over three years under

23 the administration of both major political parties, (b) despite their securing about *70 convictions*

24 *annually* of public officials in Florida alone for twenty years, of less than *one percent* the size of

25 this case, and (c) despite their investigation of a political candidate of the *opposing* party for *six*

26 *years* for alleged mishandling of *one-thousandth* of the amount in this case. These rogue factions

27 may also have (2) compiled a falsified dossier to obstruct prosecution by the plaintiff, and have

28 refused to reveal any facts of these acts of obstruction upon FOIA prosecution. The complaint is

29 intended to remove the rogue factions, and does not apply to the entirety of these agencies. The

30 United States is liable to the Plaintiff for any and all injuries caused by this racketeering collusion

31 of agency factions, and the resulting denial of evidence to ensure proper and complete charging of

32 other defendants.

4.   Defendants John Doe 1-10 and Jane Doe 1-10 in any number include those persons and entities responsible for the misconduct of factions within these federal agencies, to be joined as needed.

**Defendant Group A**

5.   Mabry Carlton Ranch Inc. ("MCRI"), doc. no. 230938 (name change 1994), EIN Number 59-0884919, registered agent Barbara B. Carlton, is a Florida for-profit corporation with stock owned in whole or in part by defendant members of the Carlton family, its sole officers, sued for conspiracy to misappropriate state and county funds.

6.   Defendant Barbara B. Carlton, president, registered agent, and stockholder of MCRI, is sued for conspiracy to misappropriate state and county funds.

7.   Defendant Lisa Carlton, secretary and stockholder of MCRI, is a Florida politician, sued for fraud, abuse of public office, and conspiracy to misappropriate state and county funds, and for denial of constitutional rights.

8.   Defendant Kimberly Carlton Bonner of 9450 Sidell Rd., Sidell, FL 34266, VP and stockholder of MCRI, is a Florida local judge, sued in her individual capacity for conspiracy to misappropriate state and county funds, and for abuse of public office with intent to deny constitutional rights, and to obstruct and retaliate against the Plaintiff for his investigation of this racketeering crime.

9.   Defendants John Doe 1-10 and Jane Doe 1-10 include persons and entities related to the other entities of defendant Group A, sued for conspiracy to misappropriate state and county funds.

**Defendant Group B**

10. Defendant Longino Ranch, Inc., doc. no. 128707, EIN Number 59-0758782, director B. T. Longino jr, registered agent John Minton jr., is a for-profit corporation with stock owned in whole or in part by its officers and their relatives, sued for misappropriation of state and county funds. Details at http://search.sunbiz.org/Inquiry/CorporationSearch/ByName.

11. Defendants Berryman Longino Jr,, John L. Minton Jr, John L. Minton Sr, Thomas L Curry, and John Longino, part owners and/or officials of Longino Ranch Inc., are sued for fraud and conspiracy to misappropriate state and county funds.

12. Defendants John Doe 1-10 and Jane Doe 1-10 include persons and entities related to the other entities of defendant Group B, sued for conspiracy to misappropriate state and county funds.

**Defendant Group C**

13. Defendants James J Walton Trust, Wyona June Walton Trust, and Michael Allen Walton, Trustee thereof, are sued for conspiracy to misappropriate state and county funds.

14. Defendant MJW Ranch LLC, Florida doc. no. L15000096952, EIN Number 47-4744948, managers Michael Allen Walton and Julie M Walton, is a Florida LLC owned in whole or in part by its officers, sued for conspiracy to misappropriate state and county funds.

15. Defendants John Doe 1-10 and Jane Doe 1-10 include persons and entities related to the other entities of defendant Group C, sued for conspiracy to misappropriate state and county funds.

**Defendant Group D**

16. Defendant Eric Sutton was a state SWFWMD employee suddenly made Director of the state FWC, and defendant Amy Meese is or was a Sarasota county employee, who falsely stated to decision makers a conservation value in the subject payments to the defendant beneficiaries, who thereby acted as principals in racketeering crime.

17. Defendants John Doe 1-10 and Jane Doe 1-10 include other Florida state and Sarasota county employees and officials, to be joined for conspiracy to misappropriate state and county funds.

**Defendant Group E**

18. Defendant Group E consists of persons who have acted in collusion with the racketeering enterprise, but cannot be joined as defendants before analysis of the results of financial investigations that the named federal agencies have refused to conduct.

19. Defendants Eric Robinson and Carlos Beruff are political party funding operatives serving as conduits of funds and rewards between beneficiaries and public officials, for appointment to public offices abused by them for personal gain, who thereby acted as principals in racketeering crime.

20. Defendant Karen Rushing is or was comptroller of Sarasota county and clerk of the Circuit Court thereof, sued in her individual capacity for perjury, abuse of public office with intent to obstruct and retaliate for investigation of racketeering crime, and to gain favors of her political party, and for collusion to deny constitutional rights, acting as a principal in racketeering crime.

21. Defendants Jon Thaxton, Paul Mercier, and Nora Patterson were county commissioners who approved the subject land payments to the defendant beneficiaries, in anticipation of benefits to themselves and their friends and associates, and thereby acted as principals in racketeering crime.

**Other Defendants To Be Joined After Investigation**

22. Defendant Scott Ortner, director of sheriff Animal Services of Sarasota County, sued in his individual capacity for abuse of public office by dereliction of duty, collusion to violate and refusal to prevent violation of constitutional rights, destruction of public records, and perjury, who thereby acted as a principal in racketeering crime.

23. Defendant Rochelle Curley is a Florida local judge, sued in her individual capacity for abuse of public office by obstruction of justice with intent to obstruct and retaliate for investigation of racketeering crime, to gain favors received by promotion to the Circuit Court, who thereby acted as a principal in racketeering crime.

24. The remaining parties are private tortfeasors who may be joined as defendants, for protracted violations of constitutional rights, state law, and county ordinances prohibiting extreme nuisances, and for collusion to obstruct justice, deny constitutional rights, and advance the racketeering enterprise of other defendants. Defendant Starlet McNeely occupies 4317 Brazilnut Ave adjacent to property of Plaintiff, and Chantel Saunders a/k/a Hollman is the daughter of McNeely, both employees of Sarasota County, claiming to reside at times with McNeely and sex offender Frederic Hollman. Defendant Herbert Buck resides nearby at 4320 Almond Ave. Robert Lincoln is a crooked lawyer who has represented these defendants and himself for the same offenses, sued for fraud, perjury, denial of constitutional rights, and injuries to the Plaintiff.

25. Defendants John Doe 1-10 and Jane Doe 1-10, in any number include further owners, agents, accomplices, and other entities to be identified, involved in the subject acts and entities, or having handled funds or assets in connection therewith, or sought to obstruct this action or injure the Plaintiff in relation thereto, including any person or counsel who, in the course of these proceedings, makes any false statement, dilatory pleading, or back-channel efforts to influence judges or witnesses in this action.

**STATEMENT OF CLAIMS**

**Table of Paragraph References Per Defendant For All Counts**

| **Defendant** | **Appendices** | **Complaint paragraphs** |
| --- | --- | --- |

Defendant Group A
(MCRI, MCRSI, Barbara Carlton, Lisa Carlton, Kimberly (Carlton) Bonner):

| | | |
| --- | --- | --- |
| | A-F | 6-9, 14-19, 21-24, 30-31, 59, 65, 81, 84, 87, 94-101, 104-111, 114-120, 136-143, 146-150, 154-170, 173-177, 183-184, 189, 192, 198-207 |
| Barbara Carlton | A-E | 7, 87, 98, 106, 116-117, 123, 166 |
| Kimberly (Carlton) Bonner | A,B,F | 108-111, 143, 168-170, 189, 198-207 |
| Lisa Carlton | A-E | 6-7, 81, 84, 87, 94-101, 104-107, 111, 114-120, 136-143, 146-150, 154-166, 173-177, 183-184, 192, 205 |

Defendant Group B
(LRI, John Longino, Thomas Curry, John L Minton Jr, John L Minton Sr):

| | | |
| --- | --- | --- |
| | A-E | 17-20, 65, 68, 75, 79-81, 93-95, 98, 107-108, 113, 146, 154-160, 171-193 |
| Berryman Longino Jr | A-E | 68, 75, 79-81, 93-95, 98, 107-108, 113, 146, 154-160, 171-193 |

Defendant Group C
(Michael Allen Walton, James J Walton Trust, Wyona June Walton Trust):

| | | |
| --- | --- | --- |
| | A-E | 75, 79-81, 93-95, 107, 159, 172, 181, 186-196 |

Defendant Group D

| | | |
| --- | --- | --- |
| Eric Sutton | A,D | 8-11, 31, 35, 102, 140-141 |
| Amy Meese | A | 103, 125-134, 141 |

Defendant Group E

| | | |
| --- | --- | --- |
| Eric Robinson | A,C | 91, 147-155, 158-162 |
| Carlos Beruff | B | 91, 123, 147, 150-153, 160-161 |
| Karen Rushing | A | 88, 111, 143, 163-164, 170, 205 |
| Paul Mercier | A | 143, 157, 163-164 |
| Nora Patterson | A,B,E | 99, 120, 137, 143, 154, 163-4 |
| Jon Thaxton | A,B,C,E | 70, 99, 105, 137-138, 143, 155-156 |

Other Defendants To Be Named

| | | |
| --- | --- | --- |
| Rochelle Curley | F | 110, 169, 204 |
| Scott Ortner | F | 206 |
| Robert Lincoln, Starlet McNeely, Chantel Saunders, Herbert Buck | | |
| | F | 160, 199-200 |

## COUNT 1

The defendants have knowingly caused or assisted the selection of lands, for purchase of title or easements with funds dedicated to conservation purposes, which they knew to have little or no conservation value, in conspiracy to defraud the state of Florida, Sarasota county, and the United States, and to cause misappropriation of substantial public funds of those entities, restricted to conservation purposes. The paragraphs of *Common Elements Incorporated Into All Claims* of this Statement of Claims are incorporated hereunder.

Violations of Federal Law:
    18 USC §§ 1952–1968 Racketeer Influenced Corrupt Organizations Act (RICO)
        These claims are brought under 18 USC §§ 1962 (c) and (d)
    18 USC § 1341 Fraud and Violation of Honest Services
    18 USC § 371 Fraud and Conspiracy Against the United States (see Mem. Of Law 3)
Violations of State Law:
    F.S. 817     Fraud
    F.S. 837     Perjury in Official or Other Proceedings
    F.S. 838.15-16 Bribery of Agents, Employees, Advisors, Appraisers
    F.S. 838.016  Unlawful Reward to Influence Official Action
    F.S. 838.021  Unlawful Harm to Influence Official Action
    F.S. 895     State Racketeering Offenses

| **Defendant** | **Appendices** | **Complaint paragraphs** |
| --- | --- | --- |
| Defendant Group A | | |
| Barbara Carlton | A-E | 7, 87, 98, 106, 116-117, 123, 166 |
| Lisa Carlton | A-E | 6-7, 81, 84, 87, 94-101, 104-107, 111, 114-120, 136-143, 146-150, 154-166, 173-177, 183-184, 192, 205 |
| Defendant Group B | | |
| Berryman Longino Jr | A-E | 65, 68, 75, 98, 107-108, 114, 146, 154-160, 171-193 |
| Defendant Group D | | |
| Eric Sutton | A,D | 8-11, 31, 35, 102, 140-141 |
| Amy Meese | A | 103, 125-134, 141 |
| Defendant Group E | | |
| Karen Rushing | A | 88, 111, 143, 163-164, 170, 205 |
| Paul Mercier | A | 143, 157, 163-164 |
| Nora Patterson | A,B,E | 99, 120, 137, 143, 154, 163-4 |
| Jon Thaxton | A,B,C,E | 70, 99, 105, 137-138, 143, 155-156 |

# COUNT 2

The defendants have knowingly communicated false appraisals of value of lands proposed for purchase for conservation purposes, in conspiracy to defraud the state of Florida, Sarasota county thereof, and the United States, and to cause misappropriation of substantial public funds of those entities, for land and easements thereon, for payments of many times the total fair market value of the land as sworn to the state by the county itself. The section *Common Elements Incorporated Into All Claims* of this Statement of Claims is incorporated hereunder.

Violations of Federal Law:
    18 USC §§ 1952–1968 Racketeer Influenced Corrupt Organizations Act (RICO)
        These claims are brought under 18 USC §§ 1962 (c) and (d)
    18 USC § 1341 Fraud and Violation of Honest Services
    18 USC § 371 Fraud and Conspiracy Against the United States (see Mem. Of Law 3)
    18 USC § 981 Forfeiture of property and proceeds of crime
Violations of State Law:
    F.S. 817    Fraud
    F.S. 837    Perjury in Official or Other Proceedings
    F.S. 838.15-16 Bribery of Agents, Employees, Advisors, Appraisers
    F.S. 838.016, .021    Unlawful Reward or Harm to Influence Official Action
    F.S. 895    State Racketeering Offenses
    F.S. Ch. 112    State Code of Ethics (No Criminal Penalties)

| **Defendant** | **Appendices** | **Complaint paragraphs** |
|---|---|---|

Defendant Group A
(MCRI, MCRSI, Barbara Carlton, Lisa Carlton, Kimberly (Carlton) Bonner):

| Barbara Carlton | A-E | 6-24, 65, 87, 98, 116-117 |
|---|---|---|
| Lisa Carlton | A-E | 6-24, 65, 68-69, 87-88, 97-99, 111, 113-121, 135-143, 173-177, 184-185 |

(the Carltons were directly involved in SWFWMD which sought the false appraisals, and in the Nature Conservancy as transaction broker, and so were aware of lower County appraisals, and knew that proposed easement appraisals far exceeded their own recent prices for full land title)

Defendant Group B
(LRI, John Longino, Thomas Curry, John L Minton Jr, John L Minton Sr):

| Berryman Longino Jr | A-E | 19, 65, 68, 75-76, 93-95, 98, 108, 154-160, 171-193 |
|---|---|---|

(the Longinos were directly involved in SWFWMD which sought the false appraisals, and so were aware of County appraisals, and knew that the proposed easement appraisals far exceeded their Carlton friends' recent prices for full land title, and their own recent easement prices)

Defendant Group D

| Eric Sutton | A,D | 8-11, 31, 35, 102, 140-141 |
|---|---|---|
| Amy Meese | A | 103, 125-134, 141 |

Defendant Group E

| Karen Rushing | A | 88, 111, 143, 163-164, 170, 205 |
|---|---|---|
| Paul Mercier | A | 143, 157, 163-164 |
| Nora Patterson | A,B,E | 99, 120, 137, 143, 154, 163-4 |
| Jon Thaxton | A,B,C,E | 70, 99, 105, 137-138, 143, 155-156 |

**COUNT 3**

The defendants have received payments known by them to be the proceeds of criminal acts, in conspiracy to defraud the state of Florida, Sarasota county thereof, and the United States, and to cause misappropriation of substantial public funds of those entities. The defendants have defrauded and denied honest services to the people, abused public office for private gain, and have stolen public funds. The paragraphs of *Common Elements Incorporated Into All Claims* of this Statement of Claims are incorporated hereunder.

The proof is that the defendants received the payments, and knew them to be based upon false appraisals, and/or to be misappropriated from funds for purposes not thereby served.

Violations of Federal Law:

    18 USC §§ 1952–1968 Racketeer Influenced Corrupt Organizations Act (RICO)

        These claims are brought under 18 USC §§ 1962 (c) and (d)

    18 USC § 1341 Fraud and Violation of Honest Services

    18 USC § 371 Fraud and Conspiracy Against the United States (see Mem. Of Law 3)

    18 USC § 981 Forfeiture of property and proceeds of crime

Violations of State Law:

    F.S. 817      Fraud

    F.S. 895      State Racketeering Offenses

| **Defendant** | **Appendices** | **Complaint paragraphs** |
|---|---|---|

Defendant Group A

(MCRI, MCRSI, Barbara Carlton, Lisa Carlton, Kimberly (Carlton) Bonner):

| Barbara Carlton | A-E | 6-24, 65, 87, 98, 116-117, 166 |
|---|---|---|
| Lisa Carlton | A-E | 6-24, 65, 68-69, 81, 84, 87-88, 97-102, 107, 111, 113-121, 135-143, 173-177, 183-185 |

(the above defendants knew of the false appraisals, the false statements of conservation value, and the contrary purposes of the funds, and therefore knew the payments to be proceeds of crime)

Defendant Group B

(LRI, John Longino, Thomas Curry, John L Minton Jr, John L Minton Sr):

| Berryman Longino Jr | A-E | 19, 65, 68, 75-76, 79-81, 93-95, 98, 107-108, 154-160, 171-193 |
|---|---|---|

(the above defendants knew of the false appraisals, the false statements of conservation value, and the contrary purposes of the funds, and therefore knew the payments to be proceeds of crime)

Defendant Group C

(Michael Allen Walton, James J Walton Trust, Wyona June Walton Trust):

| | A-E | 75, 79-81, 93-95, 107, 159, 172, 181, 186-196 |
|---|---|---|

(the above defendants knew from the other defendants above of the false appraisals, false statements of conservation value, and contrary purposes of the funds, and therefore knew the payments to be proceeds of crime)

# COUNT 4

The defendants have committed fraud by making or causing false statements of the conservation value of lands, as or to public officials, causing wrongful payments, in conspiracy to defraud the state of Florida, Sarasota county, and the United States, to cause misappropriation of public funds restricted to conservation purposes, for land and easements thereon having no conservation value while the land remains deforested or in use as private cattle ranches. The section *Common Elements Incorporated Into All Claims* of this Statement of Claims is incorporated hereunder.

Violations of Federal Law:
      18 USC §§ 1952–1968 Racketeer Influenced Corrupt Organizations Act (RICO)
          These claims are brought under 18 USC §§ 1962 (c) and (d)
      18 USC § 1341 Fraud and Violation of Honest Services
      18 USC § 371 Fraud and Conspiracy Against the United States (see Mem. Of Law 3)
      18 USC § 981 Forfeiture of property and proceeds of crime
Violations of State Law:
      F.S. 817      Fraud
      F.S. 837      Perjury in Official or Other Proceedings
      F.S. 838.15-16 Bribery of Agents, Employees, Advisors, Appraisers
      F.S. 838.016, .021      Unlawful Reward or Harm to Influence Official Action
      F.S. 895      State Racketeering Offenses
      F.S. Ch. 112      State Code of Ethics (No Criminal Penalties)

| **Defendant** | **Appendices** | **Complaint paragraphs** |
| --- | --- | --- |
| Defendant Group A | | |
| Barbara Carlton | A-E | 7, 116-117, 166 |
| Lisa Carlton | A-E | 6-7, 23-24, 81, 84, 88, 99-102, 107, 116-117, 183-184 |

(the above defendants knew that FNAI had evaluated their land as having the lowest possible conservation value, but caused the state ARC and SWFWMD and County to give it the highest conservation purchase priority, an extreme falsification of the conservation value to the state)

| | | |
| --- | --- | --- |
| Defendant Group B | | |
| Berryman Longino Jr | A-E | 65, 68, 75, 79-81, 93, 107-108, 114, 154-160, 171-2, 183-4 |

(the above defendant knew that FNAI had evaluated his land as having the lowest possible conservation value, but pressured SWFWMD and the County to purchase the lands for conservation purposes)

| | | |
| --- | --- | --- |
| Defendant Group D | | |
| Eric Sutton | A,D | 8-11, 31, 35, 102, 140-141 |
| Amy Meese | A | 103, 125-134, 141 |

(every statement of the conservation value of the subject lands by Sutton and Meese was false)

| | | |
| --- | --- | --- |
| Defendant Group E | | |
| Paul Mercier | A | 143, 157, 163-164 |
| Nora Patterson | A,B,E | 99, 120, 137, 143, 154, 163-4 |
| Jon Thaxton | A,B,C,E | 70, 99, 105, 137-138, 143, 155-156 |

(these commissioners voted to purchase the subject lands knowing that the conservation and appraised values were false or unsubstantiated, falsely representing these values to the public)

1                                    **COUNT 5**

2          The defendants have offered or received payments, promotions, and honors for false
3   statements or acts in conspiracy, to defraud the state of Florida, Sarasota county, and the United
4   States, and to cause misappropriation of substantial public funds restricted to conservation
5   purposes, for land and easements having no conservation value while the land remains deforested
6   or in use as cattle ranches, for payments of many times the total fair market value of the land. The
7   section *Common Elements Incorporated Into All Claims* of this Statement of Claims is
8   incorporated hereunder.

9

10  Violations of Federal Law:
11          18 USC §§ 1952–1968 Racketeer Influenced Corrupt Organizations Act (RICO)
12                  These claims are brought under 18 USC §§ 1962 (c) and (d)
13          18 USC § 1341 Fraud and Violation of Honest Services
14          18 USC § 371 Fraud and Conspiracy Against the United States (see Mem. Of Law 3)
15          18 USC § 981 Forfeiture of property and proceeds of crime
16  Violations of State Law:
17          F.S. 817         Fraud
18          F.S. 837         Perjury in Official or Other Proceedings
19          F.S. 838.15-16 Bribery of Agents, Employees, Advisors, Appraisers
20          F.S. 838.016, .021      Unlawful Reward or Harm to Influence Official Action
21          F.S. 895         State Racketeering Offenses
22          F.S. Ch. 112    State Code of Ethics (No Criminal Penalties)

23

| 24 | **Defendant** | **Appendices** | **Complaint paragraphs** |
|---|---|---|---|
| 25 | Defendant Group A | | |
| 26 | Kimberly (Carlton) Bonner | A,B,F | 108-111, 143, 168-170, 189, 202-207 |
| 27 | Bonner was promoted from County Court to Superior Court. | | |
| 28 | Lisa Carlton | A-E | 69, 99-100, 105, 137, 150, 163-165 |
| 29 | Carlton was made trustee of the Nature Conservancy and GCCF. | | |
| 30 | Defendant Group D | | |
| 31 | Eric Sutton | A,D | 8-11, 31, 35, 102, 140-141 |
| 32 | Sutton was promoted to director of the FWC. | | |
| 33 | Amy Meese | A | 125-134, 141 |
| 34 | Meese gained job security and elaborated the conservation lies for years. | | |
| 35 | Defendant Group E | | |
| 36 | Eric Robinson | A,C | 91, 147-155, 158-162 |
| 37 | Robinson was appointed to public offices for party payments from proceeds of crime. | | |
| 38 | Carlos Beruff | B | 91, 123, 147, 150-153, 160-161 |
| 39 | Beruff was appointed to public offices for party payments from proceeds of crime. | | |
| 40 | Karen Rushing | A | 88, 111, 143, 163-164, 170, 205 |
| 41 | Rushing gained at least long term job security with the County. | | |
| 42 | Nora Patterson | A,B,E | 99, 120, 137, 143, 154, 163-4 |
| 43 | Patterson was made a board member of GCCF. | | |
| 44 | Jon Thaxton | A,B,C,E | 70, 99, 105, 137-138, 143, 155-156 |
| 45 | Thaxton was hired as VP of GCCF. | | |

**COUNT 6**

The defendants have conspired to defraud the United States by means of false claims, to cause misappropriation of federal funds restricted to conservation purposes, commingled with state and county funds, for land and easements having no conservation value, for payments of many times the total fair market value of the land. The section *Common Elements Incorporated Into All Claims* of this Statement of Claims is incorporated hereunder.

Violations of Federal Law:

        18 USC §§ 1952–1968 Racketeer Influenced Corrupt Organizations Act (RICO)

                These claims are brought under 18 USC §§ 1962 (c) and (d)

        31 USC § 3729  False Claims Act (FCA)

        18 USC § 1341 Fraud and Violation of Honest Services

        18 USC § 371 Fraud and Conspiracy Against the United States (see Mem. Of Law 3)

        18 USC § 981 Forfeiture of property and proceeds of crime

| **Defendant** | **Appendices** | **Complaint paragraphs** |
| --- | --- | --- |
| Defendant Group A | | |
| Barbara Carlton | A-E | 7, 116-117, 166 |
| Lisa Carlton | A-E | 6-7, 23-24, 81, 84, 88, 99-102, 107, 116-117, 183-184 |

(the Carltons knew that FNAI had evaluated their land as having the lowest possible conservation value, but caused the state ARC and SWFWMD and County to give it the highest conservation purchase priority, an extreme falsification of the conservation value to the state)

| | | |
| --- | --- | --- |
| Defendant Group B | | |
| Berryman Longino Jr | A-E | 65, 68, 75, 79-81, 93, 107-108, 114, 154-160, 171-2, 183-4 |

(Longino knew that FNAI had evaluated his land as having the lowest possible conservation value, but pressured SWFWMD and the County to purchase the lands for conservation purposes)

| | | |
| --- | --- | --- |
| Defendant Group D | | |
| Eric Sutton | A,D | 8-11, 31, 35, 102, 140-141 |

      Most statements by Sutton of the conservation value of the subject lands were false.

| | | |
| --- | --- | --- |
| Amy Meese | A | 103, 125-134, 141 |

      Every statement by Meese of the conservation value of the subject lands was false.

| | | |
| --- | --- | --- |
| Defendant Group E | | |
| Paul Mercier | A | 143, 157, 163-164 |
| Nora Patterson | A,B,E | 99, 120, 137, 143, 154, 163-4 |
| Jon Thaxton | A,B,C,E | 70, 99, 105, 137-138, 143, 155-156 |

(Mercier, Patterson, & Thaxton voted to purchase the subject land knowing that the conservation and appraised values were falsified, and thereby falsely represented these values to the public)

# COUNT 7

The defendants have received, paid, and/or concealed the sources of unlawful political contributions and quid pro quo bribes, in conspiracy to defraud the state of Florida, Sarasota county, and the United States, and to cause misappropriation of public funds of those entities, restricted to conservation purposes, for land and easements thereon having no conservation value, and to obtain public offices abused by them for personal gain. The section *Common Elements Incorporated Into All Claims* of this Statement of Claims is incorporated hereunder.

<u>Violations of Federal Law:</u>
    18 USC §§ 1952–1968 Racketeer Influenced Corrupt Organizations Act (RICO)
        These claims are brought under 18 USC §§ 1962 (c) and (d)
    18 USC § 1341 Fraud and Violation of Honest Services
    18 USC § 371 Fraud and Conspiracy Against the United States (see Mem. Of Law 3)
    18 USC § 981 Forfeiture of property and proceeds of crime

<u>Violations of State Law:</u>
    F.S. 106.08    Political Contribution Limits
    F.S. 817    Fraud
    F.S. 837    Perjury in Official or Other Proceedings
    F.S. 838.15-16 Bribery of Agents, Employees, Advisors, Appraisers
    F.S. 838.016  Unlawful Reward to Influence Official Action
    F.S. 838.022  Tampering Public Records
    F.S. 895    State Racketeering Offenses

| **Defendant** | **Appendices** | **Complaint paragraphs** |
| --- | --- | --- |
| Eric Robinson | A,C | 91, 147-155, 158-162 |
| Carlos Beruff | B | 91, 123, 147, 150-153, 160-161 |

**COUNT 8**

The defendants have conspired to deny, refused to prevent denial, and ratified denial of constitutional rights of the Plaintiff, in violation of 42 USC §§ 1982-1985 and 18 USC § 242, and in conspiracy to cause misappropriation of substantial public funds, and to retain public offices and licenses abused by them for personal gain. The paragraphs of *Common Elements Incorporated Into All Claims* of this Statement of Claims are incorporated hereunder.

Violations of Federal Law:
      42 USC §§ 1982-1985 Civil Rights Act
      18 USC §§ 1952–1968 Racketeer Influenced Corrupt Organizations Act (RICO)
            These claims are brought under 18 USC §§ 1962 (c) and (d)
      18 USC § 1341 Fraud and Violation of Honest Services
      18 USC § 371 Fraud and Conspiracy Against the United States (see Mem. Of Law 3)
      18 USC § 242 Denial of Constitutional Rights under color of law
      18 USC § 981 Forfeiture of property and proceeds of crime
Violations of State Law:
      F.S. 60.05    Injunctions, Nuisance
      F.S. 777.04(2) Attempts, solicitation, and conspiracy
      F.S. 817      Fraud
      F.S. 823.01   Nuisances
      F.S. 837      Perjury in Official or Other Proceedings
      F.S. 838.016  Unlawful Reward to Influence Official Action
      F.S. 838.021  Unlawful Harm to Influence Official Action
      F.S. 838.022  Tampering Public Records
      F.S. 838.022  Official misconduct
      F.S. 839.13   Falsifying records
      F.S. 839.24   Failure to perform official duty
      F.S. 877.03   Breach of the peace
      F.S. 895      State Racketeering Offenses
Violations of Sarasota County Ordinances
      Chapter 14 §§ 1 to 40, esp. 39 (Public Nuisance Animals)
      Chapter 54 §§ 151 to 159 (Nuisance Noise)

| **Defendant** | **Appendices** | **Complaint paragraphs** |
|---|---|---|
| Defendant Group A | | |
| Kimberly (Carlton) Bonner | A,B,F | 108-111, 143, 168-170, 189, 198-207 |
| Defendant Group E | | |
| Karen Rushing | A | 88, 111, 143, 163-164, 170, 205 |
| Rochelle Curley | F | 110, 169, 204 |
| Scott Ortner | F | 206 |
| Other Defendants To Be Named | | |
| (Robert Lincoln, Starlet McNeely, Chantel Saunders, Herbert Buck) | | |
| | F | 160, 199-200 |

**COUNT 9**

The named agencies of the defendant government of the United States, by and through employees and factions thereof, have abused public office to defraud and deny honest services to the people of Florida and the United States, by refusal to investigate and obstruction of Plaintiff FOIA investigation of the subject racketeering, in collusion with the other defendants to conceal sources of unlawful political contributions and quid pro quo bribes, and cause misappropriation of public funds. The United States is liable to the Plaintiff for any and all injuries caused by this racketeering collusion of agency factions, and the resulting denial of evidence to ensure proper and complete charging of other defendants. The paragraphs of *Common Elements Incorporated Into All Claims* of this Statement of Claims are incorporated hereunder.

Violations of Federal Law:
     5   USC § 552   Freedom of Information Act (FOIA)
     18 USC § 242   Denial of Constitutional Rights under color of law
     18 USC § 371   Fraud and Conspiracy Against the United States (see Mem. Of Law 3)
     18 USC § 981   Forfeiture of property and proceeds of crime
     18 USC § 1341  Fraud and Violation of Honest Services
     18 USC §§ 1952–1968 Racketeer Influenced Corrupt Organizations Act (RICO)
          These claims are brought under 18 USC §§ 1962 (c) and (d)
     18 USC § 2383 Rebellion against the United States or the laws thereof
     31 USC § 3729  False Claims Act (FCA)
     42 USC §§ 1982-1985 Civil Rights Act

**Defendant**          **Appendices**   **Complaint paragraphs**
United States (including Department of Justice, Federal Bureau of Investigation, and Department of Homeland Security Investigations)
               G          197-207

see **Fact Appendix G: Misconduct Of Factions Within Federal Agencies (with Exhibits)**

**COMMON ELEMENTS INCORPORATED INTO ALL CLAIMS**

The defendants have thereby defrauded and denied honest services to the people, have abused public office for private gain, and have stolen public funds. These acts of the defendants are in violation of the state and federal laws listed below, each violation an independent claim, and constitute racketeering activity in violation of 18 USC §§ 1952–1968 (RICO), subject to compensatory and punitive damages, forfeiture, and criminal penalties.

At the times material to this action, each of the defendants was the agent, servant, employee, partner, alter ego, subsidiary, or joint venturer of other defendants, and the acts of each such defendant were in the scope of such relationship, and in acting and failing to act as alleged in this Complaint, each such defendant acted with the knowledge, permission, and consent of the other such defendants, and each such defendant aided and abetted the other such defendants in the acts and omissions alleged in this Complaint, in participation in the racketeering enterprise.

The said violations were done with full *knowledge* of the injury done, *without the informed consent* of the people including the Plaintiff, with *intent to deprive* them of the said funds and conservation benefits, and have *caused injury* to them in the loss thereof, and further loss to the Plaintiff of income from employment and costs of prosecution, for which Plaintiff demands full compensation. Plaintiff further demands forfeiture and reforestation of the lands under easement, forfeiture of the balance of defendants' assets in compensation of public losses, punitive damages, and such criminal penalties as this court may deem sufficient to deter future related racketeering.

The facts, exhibits, and argument whereof are listed hereunder:

Fact Appendices:
 Fact Appendix A: Corruption of the Carlton Defendants
 Fact Appendix B: Corruption of the Longino Defendants
 Fact Appendix C: Corruption of the Walton Defendants
 Fact Appendix D: Conservation Facts and Argument
 Fact Appendix E: Methods and Criminal Acts of Defendants
 Fact Appendix F: Violations by Bonner and State Officials
 Fact Appendix G: Misconduct Of Factions Within Federal Agencies
Memoranda of Law:
 Memorandum of Law 1: Racketeering Law
 Memorandum of Law 2: Conservation Law
 Memorandum of Law 3: Fraud and Misappropriation
 Memorandum of Law 4: Related Wrongs by County Officials and Others
 Memorandum of Law 5: Florida Civil Rights Law
 Memorandum of Law 6: Federal Civil Rights Law
 Memorandum of Law 7: Forfeiture and Compensation

**PATTERN OF RACKETEERING CRIME AND STATUTES OF LIMITATIONS**

Racketeering is defined by 18 USC §§ 1952–1968 (RICO) as a "pattern of racketeering activity" including at least two acts of defined state and federal crimes, related in method, participants, or victims, "one of which occurred after the effective date [1970] and the last … within ten years … after the commission of a prior act" as shown in the timeline below.

**Timeline of Racketeering Crimes**

| | |
|---|---|
| 12/31/1998 | OR 1998175092 [601], MCRI to SWFWMD, Easement, $2,299,774 |
| | (Fair market value 1998: $(pending); paid $2,299,774 for easement alone) |
| 07/26/2002 | OR 2002122011 [610], LRI to SWFWMD, County, Easement $2,139,000 |
| | (Fair market value: $3,384,000 paid $2,139,000 for easement alone) |
| 11/07/2004 | OR 2004219065 [611], LRI to SWFWMD, Mitig. Easement $238,327.24 |
| | (for the right to spend state money to correct pollution LRI caused there.) |
| 12/20/2007 | OR 2007188019 [603], MCRI etc to SWFWMD and County, Deed |
| | (Fair market value: $9,396,791 paid $11,997,900) |
| 12/20/2007 | OR 2007188021 [604], MCRI et al to SWFWMD, Easement |
| | (Fair market value: $12,187,384 paid $39,200,379 for easement) |
| 08/23/2010 | OR 2010102429 [611], LRI to SWFWMD, County, Easement |
| | (Fair market value: $4,051,771 paid $14,499,000 for easement) |
| 07/16/2010 | OR 2010086705 [620], Waltons to Sarasota County, Deed |
| | (Fair market value: $4,434,376 paid $22,559,100) |
| 12/31/2012 | OR 2013007020 [605], MCRI to SWFWMD and County, Easement |
| 2002-present | Annual damages to taxpayers by taxation to pay bond interest |
| 2011-present | Annual damages to Plaintiff by taxation to pay bond interest |
| 2015-present | Injuries to Plaintiff by denial of due process to suppress this investigation |
| 03/26/2019 | OR 2019041195 [617], LRI to FFWCC, Easement addition |
| 2019 | County blocks public access to assessor records prior to 2010 |

**Statutes of Limitations: When the Plaintiff Should Have Known of Racketeering**

Federal case law tolls the four to five year period for filing the Complaint so as to begin when the injured party "knew or should have known" of related injuries. In this case, no other taxpayer burdened by bond interest to pay for these misappropriations discovered the racketeering before the Plaintiff, who could not have confirmed the problem prior to his research in 2017-18, and therefore could not reasonably have discovered sufficient fact before early 2018, when he reported the crimes to the FBI and DOJ.

| | |
|---|---|
| 4/29/13 | Plaintiff notes possible theft of public funds in other state and federal case 9/11/15 filings [90-98], but had insufficient evidence or knowledge of related law. |
| 2015-16 | Plaintiff suspected that the appropriation to the Carltons involved abuse of public office by Lisa Carlton, but had little information on related laws, |

| | | |
|---|---|---|
| 1 | | funding processes, information sources, persons, events, or injuries. |
| 2 | 2017-18 | Plaintiff investigated the events, funding processes, persons involved, |
| 3 | | records, and state and federal law of conservation, abuse of public office, |
| 4 | | and racketeering law, and assembled evidence. Plaintiff concluded that this |
| 5 | | constituted racketeering crime, and that he was a victim as a taxpayer. |
| 6 | early 2018 | Plaintiff knew of the racketeering crimes, and his standing to prosecute. |
| 7 | 2/7/18 | Online report to FBI. Reply about 10/18 suggests cannot investigate. |
| 8 | 2/8/18 | Online report to DOJ.  Reply 11/28/2018 form letter only. |
| 9 | 2/16/18 | Letter to DOJ Florida office. No reply. |
| 10 | 2018-20 | Plaintiff assembled the Complaint, Appendices, and Memoranda of Law. |
| 11 | 1/27/19 | Letter to IRS Criminal Investigations, offering substantial evidence. |
| 12 | 12/8/2019 | Online letters to FBI and DOJ Public Integrity Section Chief. |
| 13 | 12/27/19 | Original complaint filed under seal in Florida Middle District court. |
| 14 | 1/2020 | Telephone inquiries and online reports to FBI requesting investigation. |
| 15 | 2020-2025 | Further notifications of federal agencies, prosecution in district courts falsely |
| 16 | | denying jurisdiction, prosecution of agencies in this district, anf FOIA prosecution of agencies. |

1  **FACTS**

2      This complaint presents the facts of a racketeering enterprise including ranch owners in

3  one county of Florida, with extensive economic and political connections, who manipulated state

4  and county agencies to pay themselves about $100 million in conservation funds without public

5  benefit. Similar groups are known to operate elsewhere in Florida. The facts concern fraudulent

6  distortion of funding rationales and procedures to divert funds to defendants. These crimes form

7  a pattern of racketeering activity involving state and county government.

8      The complaint also presents facts of efforts by factions within the defendant agencies to

9  obstruct prosecution of political racketeering, by (1) refusal to investigate the racketeering

10  enterprise despite the Complaint, six Appendices of Fact and seven Memoranda of Law being

11  sent repeatedly over three years to the local, principal, and OIG office of each agency under the

12  administration of both major political parties, and despite their securing about 70 convictions

13  annually of public officials in Florida alone, of less than one percent the size of this case. These

14  factions also (2) compiled a false criminal dossier to obstruct prosecution by the plaintiff, who

15  has never committed a crime. The complaint does not apply to the entirety of these agencies.

16      The social groups of wealthy people are influential in Florida, using career or business

17  bribes to build followings of social and economic opportunists. When such groups find common

18  opportunity and resolve to fleece government, they become powerful racketeering operations.

19  When such groups of opportunists become prominent in government, they severely damage the

20  foundations of democracy, and form a new foundation of kleptocracy and oligarchy.

21      The facts presented in the Complaint are summaries supplemented by Fact Appendices.

22  Facts in a complaint are required to be sufficient only to raise the claims above the level of

23  allegation, and are supplemented by evidence obtained during the discovery phase. Appendices

24  A, B, and C present the facts about the groups of defendants designated A, B, and C, and are

25  referenced herein. Appendix D presents the conservation issues; Appendices E and F present

26  details of State and local corruption. Memoranda of Law 1 through 7 present the legal arguments

27  of Racketeering, Conservation Law, Fraud, Obstruction of Process, state and federal Civil Rights

28  Law regarding the Plaintiff, Forfeiture, and Compensation.

1 **Facts of False Land Appraisals for Defendant Groups A, B, and C (App. D, E)**

2    (see Fact Appendix D and E for further detail)

3 **General Facts of Land Appraisal**

4 1.   The value of real property is determined as Fair Market Value (FMV), the price that a well

5 informed buyer and seller would agree, where neither is subject to any constraint to buy or sell.

6 2.   Businesses such as ranches have a definite mortgage-paying ability which depends on their

7 Net Operating Income (NOI), which therefore determines the value of property used in the

8 business. Business property is therefore valued according to the mortgage-paying ability

9 ("capitalized NOI") of the most profitable business that could use the property ("highest and best

10 use"). The method of valuing business property is called the "capitalized NOI of the highest and

11 best use." It is commonly distorted by falsifying income and expenses, and thereby the net

12 operating income.

13 3.   Because small residential properties usually have no business income and include the value

14 of location and appearance, their value is instead a prediction of the market, usually determined

15 by comparison with recent sales prices of comparable properties in the immediate area, adjusted

16 for the size, condition, and other valued characteristics of the properties. This method of valuing

17 homes is called the "comparable sales" method. It is commonly distorted by falsifying the

18 compared properties, by comparing with properties in different locations, condition, etc.

19 4.   The use of the "comparable sales" method by private appraisers to value business properties

20 is a sign of likely falsification, because it permits false comparisons.

21 5.   The Sarasota County Property Appraiser has a specialist in the appraisal of agricultural

22 properties including farms and ranches. When contacted 12/23/2019 the specialist appraiser Ray

23 Grochowski outlined the methods used and potential variations of appraisals, as follows:

24 a. The county finds the taxable value of properties considered "classified" as agricultural, using

25 the method of capitalized NOI, but this is based upon available income and expense information

26 provided by the landowner, so it is likely to be an underestimate.

27 b. The county finds the Fair Market Value ("Just" value) of ranch property using Comparable

28 Sales as for residential property. There are many comparable sales in the county, but for large

29 parcels in the East County such as ranches, comparable sales in Desoto county may be used.

c. The county FMV accurately reflects the likely sales price, but it may be 7% below the actual

transaction cost, because the costs of marketing and transaction fees are added to the sales price.

The county FMV would never be more than 15% below the actual transaction cost.

d. If a private appraisal value was far more than the county Fair Market Value, it would have

been based upon sales of property that is not comparable, such as beach property or agricultural

property far away, or likely to be developed. Such an appraisal is clearly not valid.

**State and County Officials Should Have Known that Private Appraisals were Falsified**

6.   Lisa Carlton had admitted that the MCRI ranch was financially marginal, like most Florida

ranches, with a very low or negative average NOI, and was seeking "other income streams"

without much success. So everyone who needed to know, knew that the real land value was low.

7.   But Lisa Carlton was the Senate Budget Controller determining the SWFWMD budget and

appointees, attended the 2/21/2006 SWFWMD meeting [227] with Barbara Carlton concerning

their 2005-6 offer to sell land and easements to SWFWMD, and promised a budget increase to

$26 million in 2007 SWFWMD funding, of which the Carltons were given $20,135,000.

8.   The request of Eric Sutton of SWFWMD to its Governing Board 11/26/2007 [212B], for the

2007 purchases of Carlton land [602] and easement [604], shows clearly that they were well

aware that the property had far less value than the requested amount, because the private

appraisals were deliberately distorted, and far exceeded the County's own professional appraisal.

9.   The Sutton request demanded that "Closing must occur by December 31, 2007" showing that

Sutton and SWFWMD knew that the state officials would never approve such a transaction after

the end of the Lisa Carlton's term as Senate president and Budget Controller *on that date*.

10. The request admits that the highest and best use of the land was "low-intensity agriculture" so

the average NOI of the existing ranch would determine the land value very quickly. No ranch

buyer could pay more without going bankrupt, and if informed would not pay that much, because

they would make no profit, and would go bankrupt in any extended recession or weak market.

11. The request admits that the appraisers hired did not use the Capitalized NOI method (for

business property), but instead used the "Sales Comparison" method (for home prices), which

permitted them to generate any value desired by means of false comparisons.

12. Valuations based upon Comparable Sales use only very nearby properties due to large price

variations with location. Instead these appraisers based their comparison on properties primarily

in other counties, where differing land would have different values, likely much higher. So

1   clearly the private appraisers were instructed and motivated to generate a false high appraised

2   value.

3   13. The Sarasota County Property Appraiser (SCPA) generates the annual Fair Market Values

4   (the "Just" values) for all parcels (as well as the much lower assessed values for tax purposes),

5   and has a specialist in valuation of agricultural properties such as ranch land. The values for the

6   last ten years are available online at https://www.sc-pa.com/propertysearch, and the Sutton

7   request to SWFWMD actually lists the SCPA parcel numbers to look them up. So defendant

8   Sutton knew, and the SWFWMD board and County Commissioners should have known, that the

9   public had no need of new appraisals, and that the value of the land was far lower than the fake

10  private appraisals cited.

11  14. The current Fair Market Values staring at them on the SCPA screen totaled $9,396,791 for

12  the land purchase [602], but they agreed to pay $12,588,756. The total value *of the land* under the

13  easement purchase [604] was $12,187,384, but they agreed to pay $39,124,692 for the *easement*

14  *alone*, although they had paid only 24.5% of land value for the 1998 easement there. So Sutton

15  deviously advised SWFWMD and the County Commissioners that their Carlton masters be given

16  an extra $39,357,748 for nothing at all, and the SWFWMD governing board approved this at

17  their meeting the same day [214]. Sutton advised the same to the County Commissioners, who

18  rushed their approval the next day [212].

19  15. Had SWFWMD and the County cautiously purchased the land and easement during the next

20  recession (e.g. 2013 value) instead of during a land price boom, as any responsible public official

21  would do, they would have paid $11,140,338, but instead gave the Carltons $40,543,110 extra.

22  16. Neither SWFWMD nor the County Commissioners had any good reason to purchase

23  conservation land during a land price boom. Neither had any good reason not to wait for a

24  recession or bankruptcies of farms and ranches to make such purchases. All of them had easy

25  access to their own county Fair Market Value online, and their own county agricultural land

26  appraiser, who would have told them its real value. Instead they gave $40,543,110 to the Carltons

27  for nothing at all, for personal career preferments and gains from the Carltons, deliberately

28  stealing money, subverting the funding legislation, and preventing conservation.

29  17. The payments to the Longinos and Waltons were based upon similar claims of sudden vast

30  values of marginal ranch land, despite much lower Fair Market Values determined and sworn by

31  the County, and these values were also falsified. The Longinos were given at least $14,816,236

in excess of real values, and the Waltons were given $20,224,800 more than the real values. Even

if the easements had conservation value, these insiders were deliberately overpaid $75,584,146.

18. The value of an easement is the reduction in land value due to granting the easement, and was

also speculative and falsified. None of the easements had any effect upon the operations or

income of the ranches, and no land use of higher value could be expected in the foreseeable

future (see Appendix D section *False Claims of Imminent Urbanization of Remote Agricultural

Land*), so the true easement value was zero, and any conservation effect could have been

accomplished by regulation without effecting a taking of property value. This is because

regulations do not effect a taking of property under constitutional law unless they reduce the

"reasonable expectation of value" in the near future, so no payment at all is necessary.

19. The 1998 Carlton easement was nonetheless valued at 24.5% of the known Fair Market

Value of the land; the 2002 Longino easement was valued at 62.3% of the land FMV; the 2007

Carlton easement was arbitrarily valued at 321% of the known FMV of the land itself; and the

2010 Longino easement was valued at 358% of the known FMV. Not only was the 24.5% value a

giveaway to insiders, but when no public outcry was heard, the whole land easement business

quickly became outright theft of government funds by public officials, with minimal formalities.

20. See Appendix D section *Lack of Conservation Value of Ranch Land* and *These Species Do

Not Use Migration "Corridors"* concerning the intent of conservation funding for easements,

which was to provide strips of undeveloped land around habitat areas to isolate large predators

from residences, not to give tens of millions to ranchers far away from their forest habitat.

**Statewide Overpayments for "Conservation Land" Under Lisa Carlton**

21. The 2011 state Senate report on conservation land and easement purchases [202] shows

sudden increases in the amounts paid per acre beginning in 2006 and continuing though 2010,

even while Great Recession speculators were buying up foreclosed homes in Florida for pennies

on the dollar. The following costs per acre are derived from the report data.

| Fiscal Year | Full-title Purchases | | Easement Purchases | |
| --- | --- | --- | --- | --- |
| | Acres | Cost per acre | Acres | Cost per acre |
| 2001-2002 | 15,513 | $5,363 | N/A | N/A |
| 2002-2003 | 109,463 | $1,383 | 11,545 | $995 |
| 2003-2004 | 18,566 | $2,726 | 90 | $3,833* |
| 2004-2005 | 14,673 | $4,025 | 37,697 | $865 |
| 2005-2006 | 18,528 | $5,882 | 11,553 | $664 |
| 2006-2007 | 8,418 | $14,747 | 579 | $5,995 |

| | | | | |
|---|---|---|---|---|
| 2007-2008 | 16,093 | $7,432 | 1,430 | $5,096 |
| 2008-2009 | 2,215 | $15,836 | 1,489 | $4,701 |
| 2009-2010 | 77 | $162,622* | N/A | N/A |
| 2010-2011 | 41 | $13,880* | N/A | N/A |
| **Total** | **203,587** | **$3,660 avg.** | **64,383** | **$1,085 avg.** |

\* Not typical: small parcel(s) with high cost per acre.

22. In 2006-7, the amounts paid per acre for easements were about <u>seven times</u> the amounts paid in the prior two years, and for full title the amounts paid per acre were about <u>three times</u> the average amount paid in the prior two years. The amounts paid for worthless easements on ranches were over four times the amounts paid to purchase land outright five years earlier. Such prices for land located far from any foreseeable development, establish that the state officials willfully paid prices of many times the actual land value, for mere easements of little or no value to the state.

23. Even as the Great Recession deepened in 2008-10, the Florida real estate market crashed, construction projects were halted in the middle, tens of thousands of homes were foreclosed, and speculators were buying foreclosed homes for pennies on the dollar, the state continued to pay even higher prices for "conservation" land owned by insiders, culminating in a record $162,622 per acre for full title (<u>forty-four times</u> the average for the decade), and $4,701 per acre (over <u>four times</u> the average) for easements that in no way reduced the value of the land to the owners.

24. In 2010 with expiration of the original Florida Forever funding, and extension of the Great Recession, the state began to appropriate money annually, at far lower levels for several years. Even the kleptocrats saw at last that the great heist would have to be continued in better times. But there were no news stories on the thefts, and the few reporters who attempted this were fired.

25. Nonetheless, the Senate report claimed that conservation easements were a great bargain, because the average cost for the decade was much lower, and easements still cost less than land:

> The average cost per acre for the full fee acquisitions is approximately $3,650. The average cost per acre for the less-than-fee acquisitions is approximately $1,100. For example, according to DSL, a total of four conservation easements (CE) were acquired for fiscal years '07-'08, '08-'09 and '09-'10. The average amount paid for the CEs was 49% of the fee value, or 79% of the conservation easement value.

Of course the "conservation easement value" was a fiction created by corrupt appraisers, the easements had no effect upon foreseeable land use and therefore no effect upon value, the easements precluded habitat restoration and had no conservation value at any price, and any

1  longterm effect in reducing development could have been achieved by regulation at no cost at all.

2  This is because regulations do not effect a taking of property under constitutional law unless they

3  reduce the "reasonable expectation of value" in the near future, so no payment at all is necessary.

**Facts of Conservation Land Funding and Misappropriation in Florida (App. D, E)**

5      These essential matters are presented more fully in Appendices D, E, and summarized

6  only briefly here, due to the fact volume inherent in documenting racketeering by public officials.

**Common Methods of Fraud in Conservation Land Funding**

**Lack of Conservation Value of Ranch Land**

9  26. Ranching is the *primary cause of deforestation and species extinction*, due to clearing of

10  habitat and use of pesticides, herbicides and fertilizers in feed crop farming. The conversion of

11  Florida's forest habitat to ranches endangered such species as the Florida panther. Ranching is

12  the largest cause of animal cruelty, and a common source of health pandemics.

13  27. Purchasing "conservation easements" that allow ranching to continue without reforestation,

14  or purchasing cleared land without reforestation, has no conservation value. There is minor

15  conservation value in easements limiting development of narrow buffer strips around forest

16  habitats, but not in "preservation" of large ranches far away. Declining isolated ranches have

17  little land value, are unlikely to be developed, and do not lose wildlife without costly easements.

18  28. Insider officials map cleared and desolate ranches as green areas, and "greenwash" ranching

19  with "conservation talk" claiming that any land purchase is somehow conservation, simply

20  because rain falls there and some species can be found. But without reforestation such purchases

21  have no conservation effect, waste limited funds, and prevent high priority conservation activity.

22  29. The subject parcels [600-620] are adjacent ranches (exhibit 73). Those ranked in

23  conservation value by the state conservation advisory group FNAI were given the lowest possible

24  scores; the others were hidden from evaluation by discretionary county and water district

25  purchases. All were purchased anyway by corrupted procedures that stole funds and disrupted

26  conservation.

**False Claims of Conservation Value by Rancher Associations and Officials**

28  30. Associations of ranchers create fake terminology equating ranching with conservation, issue

29  "conservation awards" to benefactors, and infiltrate government agencies using equivocations as

1   excuses to give money to ranchers for nothing. The Carlton ranch was given an "environmental

2   stewardship" award for "proper irrigation amounts and times" allegedly "critical to the

3   ecosystem" which obviously did not need to have water moved around artificially.

4   31. Adopting this fake conservation terminology for career promotion, SWFWMD official Sutton

5   [503] praised the Carltons' "exemplary stewardship" in "permanently protecting the natural

6   resources of Florida" by their broad destruction of forest habitat and theft of conservation funds.

7   **False Claims of Migration Corridors for Non-Migratory Species**

8   32. As detailed in Appendix D, all claims by the defendants of land migration "corridors" for the

9   exclusively non-migratory endangered species involved are entirely false. There is no habitat

10  land on these ranches, nor on the thirty miles of cleared land and two major rivers separating

11  them from known habitat, which none of the endangered land species have crossed by

12  themselves.

13  **Falsification of Species Data by State and County Officials**

14  33.  Fact Appendix D details the complete absence of evidence of the endangered species alleged

15  to be protected by the subject conservation easements, from the defendant county and all adjacent

16  counties, in over 35 years of tracking, verified sightings, traces, and mortality.

17  34. County employees expecting benefits from the defendants made false claims in one 30-day

18  period after the plaintiff noted the absence of panther data to support easements, including one

19  widely-available panther footprint cast [402] and several fake "sightings" solely by defendant

20  county employees, forty miles from the closest verified sighting, with no intervening habitat. The

21  only alleged photo has no location data, and was obtained by a relative of the defendants who

22  admits extensive photographing of panthers in their real habitat to the south.

23  35. A panther injured in Polk county was released in 2016 in southeast Charlotte county [401],

24  where the Caloosahatchee river blocks access to habitats to the south. The FWS supervisor

25  involved, serving defendant insider Eric Sutton, used the occasion to promote the fraudulent

26  concept of "corridors" to ranch land across thirty miles of cleared land and rivers.

27  36. Unconfirmed "sightings" are invented: a child said in 2017 that she had seen "large cats" in

28  Manatee county (bobcats are common); her mother reported "panthers" to the news media.

**False Claims of Imminent Urbanization of Remote Ranch Land**

37. State demographic projections do not support propaganda that ranches in eastern Sarasota County might become residential developments. The Office of Economic and Demographic Research projects county population growth from 370,035 to 503,650 by 2045, mostly in urban apartments and townhouses, requiring less than 1.5 percent of the county land area, all near west coast beaches and amenities rather than the eastern county. The state had no grounds to "protect" ranches in the eastern county from development, and could expect no conservation benefit therefrom. Contrary assertions by public officials are plainly acts of fraud.

**Misappropriation of Florida State Conservation Funds**

38. Every good cause has broad support for its principles, but develops a business component that exploits the cause, creating social and financial dependents, and can thereby acquire false leaders who exploit the cause for private gain. The cause of conservation, whose language can make any outdoor activity sound like conservation, was espoused by those who destroyed natural habitat, to get public funds to keep ruined habitat in its ruined state, in exchange for bribes to politicians.

**State Process of Acquisition of Conservation Lands**

39. The state of Florida has programs to acquire land for conservation purposes; including Chapters 177, 253 (state lands), 258 (parks and preserves), 270 (public lands) and especially chapter 259 (land acquisition for conservation). The Florida Admin. Code prescribes land acquisition procedures in Rule 18-1 (State Land Acquisition Procedures) and Rule 18-24 ("Florida Forever" Land Acquisition).

40. The 2001 Florida Forever (FF) program provided funding of $3 billion ($300 million annually, re-authorized in 2008 for another ten years) by bond issues with debt service paid by taxes, so that all taxpayers are injured by waste of such funds. About one fourth of this annual amount was given to these defendants with no public benefit at all.

41. Florida Forever funding is distributed by the Florida Department of Environmental Protection (DEP). Due to fraudulent acquisitions, the Legislature made direct provisions for appropriation and distribution to agencies since 2010.

42. Lands proposed for acquisition are evaluated by the DEP advised by the scientific group FNAI (Florida Natural Areas Inventory). The governor-appointed ARC (Acquisition and

1    Restoration Council) then chooses projects for purchase, compiling a report for acceptance by the

2    governor-appointed  BOT (Board of Trustees of the IITF). Parcel owners are hidden by adjusting

3    project boundaries.

4    43. After evaluation by the FNAI, the acquisition of conservation land is controlled by appointees

5    of the same political party. Distortion of the acquisition process to benefit party donors or public

6    officials is willful misappropriation of state funds.

7    44. The state admits that much of the land purchased has no conservation value, by selling it off a

8    few years later as "no longer needed for conservation." [403]

9    **Facts of Broad Corruption of State Government in Florida**

10   45. Florida has the highest rate of federal conviction of public officials in the United States, an

11   average of 71 convictions annually shown by DOJ data [302]. Government corruption is a way of

12   life, with party factions elected, appointed, and supported by theft. These thefts require acts by

13   officials in state and local agencies, motivated by party loyalty, promises of promotions, and

14   contributions concealed by shell corporations and proxies.

15   46. Racketeering acts are encouraged in Florida politics as expected competencies and political

16   principles. Officials do the bidding of a party or are denied its rewards, campaign funding or

17   employment, and disappear. There is no decency, ethics, or alternate means to power.

18   47. In 2010 the state supreme court convened a grand jury [304] to "examine criminal activity of

19   public officials who have abused their powers" which concluded that public corruption is a

20   serious problem "in all aspects of government, politics, and business throughout the State." Their

21   report summarizes the history of the 1967 constitution amendment and ethics statute with

22   minimal penalties; the 1976 "Sunshine Amendment" requiring disclosures and a Commission on

23   Ethics; and the 2000 Public Corruption Study Commission recommendations. But the legislature

24   refused to enact felony penalties for major abuses of office, and refused to empower the Ethics

25   Commission to investigate, or the Statewide Prosecutor to prosecute such crimes, leaving

26   unpunishable their own crimes, and those of the executive and judicial branches.

27   48.  The grand jury noted [304] that federal law does proscribe fraud where "honest services" are

28   due, but that public officials are not punished under state law because:

29        1. The act is not criminalized;
30        2. The cases are too difficult to prove due to their definitions and extra elements of proof;
31        3. The punishments imposed [are] too lenient and do not fit the crime; or
32        4. The prosecutor decides to charge another crime or accept a plea ...

1

2  49. In 2011 a new governor (Scott) stated a "commitment to ethics and integrity in government"

3  and directed officials to "recommend a plan" to implement the grand jury recommendations.

4  50.  Nonetheless, in 2012 the nonprofit Integrity Florida issued a Corruption Risk Report Card

5  [302], noting failures in enforcement, and recommending executive and legislative action (see

6  Appendix D). But even these measures were weak, none of the stronger recommendations of the

7  grand jury were followed, and public efforts merely whitewashed the kleptocracy of Florida.

8  **State Definition of "Conservation Easements" Excludes the Subject Lands**

9  51.  The DEP white paper on conservation easements [203] defined their purpose and nature as

10  narrow buffer zones around protected habitat:

11  …because some wide-ranging species like the Florida Panther and the Florida Black Bear
12  use rural agricultural lands *in addition* to intact natural habitat, … these secondary habitat
13  areas could be protected by conservation easements that would allow landowners to
14  continue low-impact agricultural uses while… protecting habitat values for listed species
15  …. The state could concentrate its fee-simple acquisitions on primary high-quality
16  habitat.

17

18  52. These forest species use narrow zones of open land around forest habitat to hunt prey animals

19  that live in the same habitat, so the easements should be strips of open land around forest, a few

20  hundred or a thousand feet wide. The state has used highways as buffer zones.

21  53. The report states that "a conservation easement is… appropriate… if the property is

22  contiguous to an existing conservation land and can serve as a buffer." But the subject lands are

23  multiple square mile blocks of non-habitat land dozens of miles from forest habitat (exhibits 11,

24  14-15, 36-41, 73), where they cannot serve as buffer zones, so the conservation easements violate

25  the state standard.

26  54. State concern about sufficient funds to protect habitat shows intent not to expend funds to

27  limit development of buffer areas unlikely to be developed.

28  55. On isolated ranches with no foreseeable prospect of residential development, the easement

29  does not affect land value and is worth nothing. But the state often paid about the same amount

30  per acre for easements as for purchases, and the county has paid several times the full land value

31  sworn by its own assessor, for easements with no conservation or real estate value whatsoever.

**Misappropriation of State Water District Funds**

These facts are detailed in Appendix D section *Arguments of Conservation of Water*. Legal argument is in Memorandum of Law 3.

56. Sarasota county is in the Southwest Florida Water Management District SWFWMD ("swiftmud"). State water districts ensure the sufficiency and safety of water supplies, but when funds are wasted by corruption, mistakes must be corrected and corrupt officials removed.

57. Rainfall is plentiful, and water quality is controlled by land use regulations. County water consumption is about 18 million gallons per day (mgd), but water sources can supply nearly 30 mgd from the Peace river and Manatee river in other counties, with a small supply from wells.

58. SWFWMD has advanced no study projecting insufficient water sources. Ranches use about half of potential water supply, and would be the primary cause of any shortage. Population is projected to increase very slowly, and the generous water supply is sufficient and would increase as ranching declines. SWFWMD showed no need to conserve the public water supply or to build more wells, and allowed all easement land to remain as ranches using half of the available water supply. Therefore the easements were *not intended to conserve* the public water supply.

59. About half of the county wells are in heavily populated areas far North and West, so SWFWMD had no concern to prevent residential development near its few wells on the already-protected Carlton Reserve. The wells draw water from the Floridan aquifer (subsurface flow), unaffected by surface water which flows *from* the well areas anyway, to nearby creeks and rivers. So buying easements miles away to "prevent development" did not serve "protection of water" at any SWFWMD wells, nor its primary sources outside of the county.

60. The primary pollution problems in Southwest Florida are coliform bacteria in areas with septic systems and ranch sewage, and fertilizer runoff due to farming and ranching, causing substantial changes to wetlands. These problems are addressed with central sewage treatment, and reduction of ranching and inorganic fertilizer, none of which require easements. The subject land and easements *allowed* ranching and in no way protected the *quality* of the water supply. So SWFWMD had no intent to "protect water resources" by these payments as required by state law. The SWFWMD officials involved were insiders who defrauded the state and county to purchase easements that served no public purpose, and cost nothing to the beneficiaries.

**Delegated Declaration of Conservation Value of Land Purchases Invited Corruption**

61. The state water districts are funded to acquire land and easements under the Florida Forever legislation FS 259.105(3) *solely* for projects that serve the "conservation and protection of water resources" [FS 373.139(2)]. Evaluation of ecological value is unfortunately *discretionary*, inviting extensive corrupt influence by beneficiaries upon SWFWMD officials.

62. This process has been thoroughly corrupted by special interests that control district boards and the Florida legislature, as documented for south Florida by Farrago [301]:

> The south Florida WMD board is dominated by representatives of land speculators, Big Sugar, and the Growth Machine… The result has been… endless platitudes [during] rampant destruction of wetlands, aquifers, coral reefs, pristine bays…
> …special interests that control the Florida legislature… got what they wanted… and they got environmentalists to agree it was the best result possible.

63. The SWFWMD easement is described in the deed [603] as part of the "Myakkahatchee Creek project, referenced in the SWFWMD FF Work Plan" which it submitted to the State under FS 373.199, claiming falsely that their "Baseline Documentation" supports conservation value.

64. Most of the subject funds were paid by SWFWMD for "easements" over ranches that damage and consume water resources rather than conserve or protect them as required by law. The subject deeds allowed ranching to continue, even on land purchased outright.

65. As detailed below, massive payments were made to insider defendants Lisa and Barbara Carlton, and co-conspirator defendant Longino, who had "long term relationships" with SWFWMD officials. Longino was a member of the SWFWMD Manasota Basin Board, and Lisa Carlton arranged the Longino ranch purchase while president of the state Senate, and met with SWFWMD on appropriations supported by Longino, weeks before it gave most of its annual budget to her family, more than the land value, for a worthless easement that cost them nothing.

**Misappropriation of County Conservation Funds**

**County Process of Acquisition of Conservation Lands**

66. Sarasota county created in 1999 [200] the ESLPP Environmentally Sensitive Lands Protection Program to acquire land for conservation purposes, using bonds up to $250 million, with interest and management costs paid by real estate tax. The purchase process is shown in exhibits 81-83.

67. The county Commission set up the ESL Oversight Committee (ESLOC) to recommend property to purchase, often coordinated with the state SWFWMD. The ESLOC, county Commission, and SWFWMD have been influenced, and the subject decisions controlled by insider beneficiaries, by campaign contributions, acts by dependent politicians, and promises of rewards.

68. Members of the ESLOC include Carlton friends B.T. Buster Longino, Robt. Anderson, and Albert Joerger.

**Influence Upon County Process by Beneficiaries of Land Purchases**

69.  The County admits [204] "partnering" with the Nature Conservancy (<u>Lisa Carlton, trustee</u>) and Conservation Foundation of the Gulf Coast GCCF (founded by Carlton friend Joerger) to "assist" ESLPP land acquisitions. These "partners" were controlled by land purchase insiders.

70. Jon Thaxton, then chair of the county commission 2004-2012 is a lifelong activist for the Florida Scrub Jay, which requires low scrub vegetation. The subject land needs reforestation for its original species, but could be used by Scrub Jays if ranchers were allowed to burn off high vegetation as Thaxton allowed them to do. Choosing a species and spending public funds to assist it while depriving native species of habitat, is not preservation, and violates the county ordinance.

**Misappropriation of Federal Funds**

71. Federal appropriations are a major source of grant funds to state agencies for wildlife management and endangered species protection. These funds are blended with state funds, providing about 22 percent of Florida FWC funding in 2007-8 (see Memorandum of Law G).

72. The federal Farm Bill provides hundreds of millions of dollars to protect wildlife habitat, via the Conservation Reserve Program, Wetlands Reserve Program, and Wildlife Habitat Incentive Program. These funds appear to go directly to landowners.

73.  The federal Land and Water Conservation Fund (LWCF) provides matching funds from offshore oil and gas leases for state and local government conservation land and easement purchases.

74. Therefore the Florida state and Sarasota county funds available for conservation land easements and purchases are not distinguished but blended with federal funds, and both include

1  and depend upon federal funding, so that the subject payments for land easements and purchases

2  necessarily include federal funding.

3  **Facts of Fraudulent Misappropriation of Funds to Defendant Groups A, B, C (App. A - F)**

4      (see Fact Appendices A, B, C, D, E, and F for details)

5  **Summary of Facts of Defendant Racketeering**

6  75.  The Carlton, Longino, and Walton defendants (groups A, B, and C) are directly related, as

7  neighboring wealthy families specialized in ranching and politics. They have sustained mutual

8  friendships and cooperation over generations, and as detailed below have together developed the

9  means of political control to convert their declining ranches into excuses to steal state and local

10  conservation funds. They have entered politics as officials and advisory board members, making

11  public officials and their political parties dependent upon the contributions and mutual favors of

12  the wealthy ranchers. The Carltons (group A) arranged misappropriation of state funds to the

13  Longinos (group B) and Waltons (group C), as well as misappropriation of County and Water

14  district funds to themselves, while the Longinos arranged misappropriation of County and Water

15  district funds to the Carltons (exhibits 81 – 83).

16  76.  The defendants have operated a racketeering enterprise in directing the purchase of lands and

17  land easements by the state of Florida and county of Sarasota, so as to benefit persons who

18  participate in the selection process for such lands, either directly as owners of the land, or as

19  beneficiaries of political factions to which the landowners make contributions before or after the

20  land purchases, which determine their promotions and campaign funding. The criminal activities

21  include the selection of conservation lands with little or no conservation value, and the deliberate

22  over-valuing of such lands by appraisers linked to the landowners and officials. These acts are

23  thefts of public funds, and have caused the state to incur debt service on bonds issued to finance

24  such purchases, which is paid through real estate fees and taxes including those of nonresidents

25  like the Plaintiff, thereby interfering with interstate commerce, as well as constitutional rights.

26  77. The defendants have attacked those who investigate or expose their racketeering enterprise,

27  by extensive abuse of public office by landowner beneficiaries and their associates, including

28  sheriff employees and judges both state and federal, and through agents of theft, vandalism,

29  slander, and other injuries, causing direct injuries to citizens including nonresidents like the

30  Plaintiff, and thereby interfering with interstate commerce, as well as constitutional rights.

15

78.  Every educated adult in Florida knows that no one rises far in business or politics here without being an adherent of a dominant political party. That influence is twice as strong in government office, a spoils system in Florida. No one can expect to be elected, hired, or promoted in government office unless they follow the orders of their party. Therefore political officials of the state and county are frequently operatives of their party, using government office to direct public funds to themselves, their party, and its members, a criminal enterprise.

**Fraudulent Misappropriation of Funds to Carlton Group A 1998-2008 (Fact Appendix A)**

These facts are presented in detail in Fact Appendix A.

***The Low Conservation Value of the Subject Lands***

79. The entire eastern part of Sarasota county, where all subject land is located, was evaluated by the FNAI in 2000 [Exhibits 10 - 15] as having "little or no" conservation value to the state. The similar Walton and Longino ranches adjacent to the Carlton ranch were part of the "Myakka Ranchlands" project evaluated by the state FNAI scientific advisory body [207] in 2007 as having the lowest possible conservation value, both in value to statewide goals, and value relative to other available projects. As applicants for funding, defendants of Group A are presumptively aware of these studies showing the complete lack of conservation value of their proposed lands.

80. The ranch projects proposed by defendants for acquisition by the state and county were of no conservation value in use as ranches, the only plan proposed to the state and county, because such use involves no change in habitat or wildlife, and no development is likely on remote ranch land. This issue is presented in detail in Appendix D and Memorandum of Law 3.

81. Nonetheless, in the last month of Lisa Carlton's term as Senate President and Budget Overseer, the Carlton land and easement [602, 604] were pushed through the state water district and county funding processes controlled by the defendants (exhibit 82), with demands [220, "The closing is scheduled to occur no later than Dec. 31, 2007"] to complete this before her term expired on 12/31/07, and the Walton and Longino ranches, with the lowest possible conservation value, were proposed and approved by the state ARC under Carlton's control, displacing several projects of the highest conservation value.

*The Land Areas and Payments (Appendix A)*

82. In 1982 the wealthy county Commissioner T. Mabry Carlton, Jr. was "instrumental" in a referendum passing Ord. No. 82-94 to pay himself $30 million for the "Carlton Reserve" [600]. This began a series of payments ([600-604], App. B) from 1982-2007 totaling about $84 million.

83. The "Carlton Reserve" [600] land has minimal conservation or recreational value, with a small wooded area only at the entrance, and the 1998 "easement" on adjacent cleared land protected no species, denied public access, and allowed ranching to continue there, serving no public purpose.

84. The largest payments to the Carltons [603, 604] were on 12/20/2007 in the last few days of Lisa Carlton's term as Senate President and Budget Overseer, following the rush of her appointees, promisees, and supporters in the state ARC, SWFWMD, and county committees to approve $89 million of payments for ranch land and easements of the insider defendants, including about $52 million to the Carltons themselves, serving no public purpose whatsoever.

*Corrupt Relationships of Carlton Group A (Appendix A, D, E, and F)*

85. Due to the volume of fact inherent in racketeering cases, this essential section of fact is presented in Fact Appendices A, D, E, and F. The summary below is a brief overview.

86. T. Mabry Carlton, Jr. was in 1980 the Chairman of the County Commission, in which capacity he bought his own surplus Carlton Reserve land for about $30 million. His adjacent ranch continued in operation.

87. Barbara Carlton (now MCRI ranch president) has "longstanding relationships" with environmental groups that gave her the first county "conservation easement" with no effect upon ranching or conservation, brokered by the Nature Conservancy (its trustee Lisa Carlton is her daughter). She donated $25,000 to install the Agriculture commissioner Adam Putnam who named her "Woman of the Year" for having "battled excessive governmental regulations" of his own Agriculture department.[510]

88. Defendant Lisa Carlton admitted that marginal ranching posed "economic challenges" requiring new "income streams" and worked to elect defendant Rushing ("I love her") as county Clerk of Court and Comptroller, who pressed the county to purchase worthless easements from Carlton's MCRI, and criminally tampered court records to obstruct this investigation.

89. Defendant Carlton was an aide 1992-3 to state senator McKay, elected to the state House in 1994, and Senate for 10 years ending December 2007, when the subject payments were made.

90. In 2001 Senate president McKay selected Carlton to chair the Senate Appropriations Committee overseeing state budgets through 2007 when her MCRI ranch was given vast sums for nothing. McKay contacted the plaintiff in 2018 to falsely claim innocence of Carlton, having been told of Plaintiff investigations.

91. The wealthy Carlton made her party dependent upon her. Reports of her "contributions" were deleted. In return for her "generosity" she was named 2006 "Statesman of the Year" by the county Republican party [502], run by political fixer defendants Robinson and Beruff, and likely purchased influence disguised by their shell corporations.

92. In 2006 Carlton was named Senate President by McKay, which allowed her to appoint *all committees and their chairpersons*, route all bills, control all state funding, and force the Senate to do as she pleased. By 2007 she had made herself a member of the Legislative Budget, Finance and Tax, and Fiscal Policy Committees, and chairman of the Senate Appropriations Committee, controlling the entire state budget, the projects of every politician, and the subject land payments. Her family business then applied to receive $52 million in state and county funding, and $37 million for her friends (groups B and C), with no public benefit, and no cost to themselves.

93. As head of the Senate Appropriations Committee, Carlton oversaw the Florida Forever funds of SWFWMD, and assured them of $26 million in state "conservation" funding, of which they paid over $20 million to the Carltons themselves (exhibit 82). The ARC listened closely to Carlton's dependents in approving her Walton and Longino friends' project, despite it having the lowest possible conservation value, displacing projects of the highest conservation value.

94. Lisa Carlton had a public duty to disclose conflict of interest in the purchase process and did not do so. Despite being head of the Senate Fiscal Policy Committee, she gave her family and friends over $89 million, of which she herself received over $12 million.

95. Lisa Carlton said "I'm in my comfort zone behind the scenes" and politicians spoke of her "preference to work behind the scenes." The next senate president Pruitt stated that she was "at the forefront of every major issue."  But in 2007 Carlton claimed that despite specifically meeting with SWFWMD on a $26 million annual land purchase budget, that she "wasn't aware" that this included the $20 million payment for which her family had just applied from the Florida

1   Forever program, or of approval of future payment to her Walton and Longino friends, approved

2   at the very end of her term in special meetings over the holiday season.

3   96. The corrupt purchase caused an outcry among politicians and conservationists. Democratic

4   Party spokesman Jotkoff noted that "we trusted Sen. Carlton" but "she turned around to write

5   herself a check for millions of dollars." Lisa Carlton indeed caused the checks to be written, by

6   acts of fraud, conspiracy, bribery, influence of public officials, and denial of honest services.

7   97. Carlton was trustee of the Nature Conservancy of Florida [502], the county *broker* in the

8   subject land deals, and noted that "we got four appraisals" to inflate the already-known value.

9   98. The Carltons, Longinos and friends were directly involved in the SWFWMD decision, as "an

10  extension of a decade long relationship." Barbara had "started negotiations" with SWFWMD and

11  Lisa "became involved" as president of the Florida Senate in charge of the SWFWMD budget.

12  Both Carltons appeared at the SWFWMD meeting before the purchase to offer it $26 million in

13  state funds, of which $20,135,000 went directly to the Carltons.

14  99. Lisa Carlton is associated with Albert Joerger, county ESLPP acquisition agent 2007-2017,

15  SWFWMD board member 2008-2013, member of the state 2006 "Environmental Transition

16  Team" and founder of Gulf Coast Conservation Foundation GCCF. Carlton and Joerger's wife

17  are board members of GCCF [502], friends of county commission chair Thaxton who approved

18  these deeds and was then hired as VP of GCCF, and both are listed as GCCF "donors" of over

19  $10,000. Commissioner Patterson also voted for and signed the subject county deeds, and was

20  then made a trustee of GCCF.

21  100.    Lisa Carlton also controlled public information about conservation in the county, as the

22  PBS station WEDU board member for conservation publicity [502], and of the Sarasota County

23  Education Foundation [502]. Hence no one could publicly criticize the corrupt purchases.

24  101.    Carlton also influenced "conservation" decisions through many opportunist "family

25  friends" including Peace River Basin Board member Ken Harrison, a Carlton mortgagee.

26  102.    SWFWMD land purchase official Eric Sutton showed his Carlton dependency in praising

27  their "exemplary stewardship" in "permanently protecting the natural resources of Florida" by

28  their complete destruction of natural habitat by ranch clearing and burnoffs, and their extensive

29  theft of conservation funds that would otherwise have been used for habitat preservation.

103.    County conservation official (DNR) Amy Meese, present at the county Commission meeting that approved the Carlton payments, noted (Exhibit 100) the accelerated county approval of the Carlton lands for purchase, in about two months from December 2005 to February 2006.

104.    The subject payments increased Lisa Carlton's net worth from $2.4 to $14.8 million.

105.    In 2009 the Carlton friend, donor, and county Commission chair Thaxton (later hired as VP by her GCCF) appointed her to head a Budget Oversight Committee, to oversee (or rather overlook) the county kleptocracy, admitting that "we get criticism that we're wasteful."

106.    Barbara Carlton made extensive political contributions to public officials involved in the state and county decisions, both directly and via rancher associations of which she was a trustee.

107.    The Carltons' friend, ranch neighbor and beneficiary defendant Longino, used his influence with SWFWMD and the county commissioners to ensure payments to the Carltons from SWFWMD and county funds, while Lisa Carlton forced ARC approval of payments to Longino and her Walton neighbors from state funds (Exhibits 81-83) for land of zero conservation value..

**Carltons And Their Dependents Interfered With This Racketeering Investigation**

108.    With strong party backing, Carlton sister Kimberly (Carlton) Bonner was given a state judgeship and uncontested promotions without qualifications. Money is the determining factor in state judicial elections. In Florida most judge elections are uncontested, ballots show no candidate, and selection is by political party. The manifestly corrupt defendant (Carlton) Bonner never appeared on a ballot, and offered the *quid pro quo* recommendation of her wealthy rancher friend defendant Longino, who certainly knew her qualifications for racketeering.

109.    Florida judge Padovano noted that among Florida judges "everyone has an agenda." Extensive investigation of Sarasota County criminal judges has found that the political party, race, and sex of judges substantially determined their "sentencing patterns."

110.    Kimberly (Carlton) Bonner engaged in three years of corrupt schemes to deny due process and equal protection to the plaintiff in related action [90-95], to suppress this racketeering investigation, including denial of all plaintiff motions, demanding the deletion of the essential fact and argument, failing to find any defect but one long paragraph, despite having accepted as an Answer thereto a single 3x5 piece of torn-off notebook paper meeting *none* of the Rules, and never signed, sworn, or served. The grotesque (Carlton) Bonner misconduct at last caused her removal by the chief judge, who replaced her with defendent Curley to continue the attack.

111.    In 2015 [93] Carlton dependent ["I love her"] Karen Rushing, county Clerk of Court *and* Comptroller, who had pushed the county payments to the Carltons [exhibit 101], criminally deleted the Complaint of the plaintiff from the Record on Appeal from the (Carlton) Bonner's groundless dismissal, to conceal its lack of any defect, the *sole issue* on appeal. Carlton, Bonner, and Rushing knew that there was no defect in the Complaint, and acted in criminal collusion to deny due process, alter public records, and obstruct prosecution of their own racketeering crime.

### *Influence of the Defendants Upon the State BOT Purchase Process (Appendix A, D, E)*

See Appendix A, D and E for detailed references and links.

### *Influence of the Defendants Upon the State SWFWMD Purchase Process (Appendix E)*

112.    Nearly all of the "volunteers" appointed to run SWFWMD and the multi-county water "basin boards" of county commissioners, represent business interests directly affected by their decisions, not the public interest, and therefore exert undue influence (see App. E for details).

113.    Carlton family friend [226] and contributor [Fact App. A] Ken Harrison was a board member of the Peace River Basin Board of the Southwest Florida Water Management District 1999–2010, purchased a large land tract from them in 2002 [602], and is likely a Carlton mortgagee, exerting influence upon SWFWMD for Carlton advantages.

114.    Old Carlton family friend and neighbor, rancher defendant B.T. Longino was extensively and directly involved in SWFWMD affairs, serving as a member of its Manasota Basin Board (1999 - 2002). For his influence at SWFWMD to approve $21.7 million of the Carlton payments, Longino was repaid by the concurrent 2007 ARC approval of the 2010 payments of $14,499,000 to the Longinos, controlled by Lisa Carlton as President of the Senate and state Budget Overseer.

115.    SWFWMD purchased full title to 4,800 acres of Mabry Carlton Ranch in 1994 for $500 per acre. In 1998 it purchased a mere easement on the adjacent land [101] for a higher price ($523 per acre), a giveaway of state funds to the Carltons.

116.    Lisa Carlton admitted to reporters that the 2007 SWFWMD payment was "an extension of a decade long relationship her family's company has had with the district" [306] and that she "became involved" after her mother Barbara "started negotiations" with SWFWMD in 2005, despite being President and Budget Overseer of the state Senate that allocated these funds. She was also a trustee of the Nature Conservancy of Florida, the county *acquisition agent* in conservation land purchases, and a board member for conservation publicity by the WEDU PBS station which promoted its "conservation value." Carlton's mother Barbara also held office in

several environmental groups active in "advising" or serving as the county acquisition agent. The Carltons never reported these extreme conflicts of interest as required by state law.

117.    The minutes of the SWFWMD meeting 2/21/2006 [227] note that

> [SWFWMD] CLA staff… met with… Senator Lisa Carlton, Chair of the Senate Appropriations Committee… Highlights of the budget include… funding the Florida Forever program… $300 million… would include $26 million for the District. …the District received many compliments from Ms. Barbara Carlton.

SWFWMD looked solely to Lisa Carlton for its FF funding, gave 83% of it to the Carltons, and advocated with the county commissioners to pay the Carltons even more for worthless easements.

118.    By 2007, SWFWMD had "negotiated" (via the Nature Conservancy, Lisa Carlton, trustee) prices for the Carlton land and easement [602, 604] *twice* the price paid for *full title* to adjacent land on the same day, *ten times* the prices it had paid for adjacent land ten years earlier, and *over three times* the market values for *full title* assessed and *sworn by the County*, which would pay most of the joint purchase cost.

| | **Full Title** (4,746 acres) | "Negotiated" Amount | Appraised Value Jones | Appraised Value Marr | **County Appraised Value** |
|---|---|---|---|---|---|
| 603. | Total Value | **$11,997,888** | $11,900,000 | $12,320,000 | **$9,396,791** |
| | Per Acre | $2,528 | $2,507 | $2,596 | |
| | **Easement Only** (7,630 acres) | "Negotiated" Amount | Appraised Value Jones | Appraised Value Marr | **County Appraised Value** |
| 604. | Total Land Value | $ | $ | $ | **$12,187,384** |
| | Easement Only | **$39,065,600** | $48,832,000 | $51,128,630 | |
| | Per Acre | $5,120 | $6,400 | $6,701 | |

119.    Note that the "negotiated" price per acre of the easement alone (paid by SWFWMD without any state oversight but Lisa Carlton herself) was over twice the price of the *full land title* for the adjacent parcel [602] (paid by the county). Note that the price of the useless 2007 easement alone ($5120 per acre) is ten times the *full title* price of the adjacent 2002 purchase [602] ($532 per acre), ten times the price of the 1998 easement on the adjacent parcel ($523 per acre), and almost twice the price of land *plus* easement of the adjacent 2007 parcel ($3051 per acre). Clearly the appraisers, their "reviewer" and SWFWMD were seeking the highest price possible for insiders, not negotiating the lowest price for the taxpayers. The SWFWMD report

1    [213] actually lists the Sarasota County Property Appraiser's land parcel numbers and references

2    the website, but hides the appraised values shown by that professional ranch property appraiser.

3    120.    The SWFWMD report actually demands [220] that "the purchase must be approved by

4    the Sarasota County Commission. Closing is scheduled to occur no later than Dec. 31, 2007" the

5    last day of Lisa Carlton's term as president of the Florida Senate and Budget Overseer, and the

6    deeds are dated December 20, 2007, signed by Carlton dependent Nora Patterson.

7    121.    By the county sworn appraisal of Fair Market Value on the public record, the state and

8    county *gave away* $41,627,381 to the Carlton insiders in 2007, with no conservation effect. Had

9    they waited normally for the next recession instead of buying in a land boom, they would have

10    paid far less, so **the state and county *gave away* $48,616,643 to the Carlton insiders in 2007.**

11    The state and county allowed the ranch to continue business as usual, preventing reforestation

12    and using up half of the rainfall there, ensuring that there would be no conservation effect

13    whatsoever.

14    122.    The state even agreed to allow the ranch to continue business as usual on the land that the

15    state had just *purchased in full*, without even paying rent, guaranteeing that all of this land would

16    never be restored to its natural state, and would forever be of no conservation value whatsoever.

17    123.    In 2008, Carlton family friend Albert Joerger and Bryan Beswick, co-director with

18    Barbara Carlton of Peace River Valley Citrus Growers Association, became directors of

19    SWFWMD, and political fixer Carlos Beruff bought appointment as its chairman (see App. E).

20    ***Influence of the Defendants Upon the County Purchase Process***

21    124.    The Carlton Ranch conservation easement was jointly acquired by SWFWMD

22    ($20,135,000 of state FF funds) and the county ($31,678,488 of ESLPP funds) [exhibit 82].

23    125.    County Director of Natural Resources DNR Amy Meese was a principal in the deception

24    of the county. When asked by the plaintiff in 2013 to "critically evaluate" the Carlton Ranch

25    purchase decision "in the light of real preservation goals," DNR Meese made a sales pitch similar

26    to her statements to the county commission and the news media, to sell the purchase to the public

27    [exhibit 100], with a rationale consisting of lies, carefully developed and well-used, but obvious:

28    This [land] provides the large scale habitat connections crucial to the needs of the Florida panther and
29    Florida black bear. The survival of these two listed species depends on a system of
30    wildlife corridors linking wilderness islands throughout the state.

31

1  Every one of these statements was known by the county DNR to be false, revealing her role in

2  the subject fraud. Meese made these perjuries to the county commission when it made the

3  purchases.

4  126.    In fact the Florida black bear is not endangered; there is even a hunting season allowing

5  killing of the bears. This statement is known by the county DNR to be false.

6  127.    There is no habitat of Florida Panthers anywhere in Sarasota county, and they have never

7  been found or tracked there in the 35 years of tracking and observation, nor to any adjacent

8  county (except two rare cases in the far SE corner of Charlotte county). This is a false statement

9  by the county DNR and known by her to be completely false.

10  128.    There is no known instance of panthers living outside forest, or travelling upon ranch

11  lands except for brief incursions in pursuit of prey. The subject land is not panther habitat. This

12  statement is known by the county DNR to be completely false.

13  129.    Panthers do not migrate seasonally, and there is no known instance of panthers following

14  "corridors" of any kind. There is no linear movement shown in the 35 years of panther tracking

15  and observation data, which instead shows that they wander around in their forest habitat. This

16  statement is known by the county DNR to be completely false.

17  130.    Meese failed to explain how an easement that protects ranching that destroyed their forest

18  habitat would somehow be "crucial" to the panther and black bear which have never been

19  observed within 30 miles of this site in 35 years of observations, and cannot live on ranches.

20  Both species range through forest far to the south, not bare ranch land, and neither uses

21  "corridors" between habitat islands. See Appendix D for details.

22  131.    Meese falsely stated that the mere purchase of land or easements without any action to

23  improve habitat, pollution, or water supply somehow achieves a public purpose:

24          The purchase of the CE also protects the watershed and reduces risk of flood impacts &
25          damage which aligns with ESLPP 'Water' criterion.
26
27  But Meese knew that no land or easement purchase could have any effect upon flooding without

28  a large flood control plan, that the county had no flood control improvement plan related to the

29  subject lands, that none of the county drinking water comes from rainfall within the county, and

30  that ranching wastes about half of the surface water available. These statements were known by

31  the county DNR to be completely false.

32  132.    The county DNR deliberately lied about the conservation value of ranch easements:

Finally, there are specific terms in the CE contract that define & restrict future development or land uses that are not environmentally compatible.

But in fact there are no easement terms nor any plan to make the ranch land "environmentally compatible" with panther habitat; it is uninhabitable to panthers, and the allowance of continued ranching ensured that former habitat would never be restored. No development was foreseeable. These statements were known by the county DNR to be completely false.

133.    Further, even the Carlton land area that was purchased (not easements), was permitted to be indefinitely used by the seller as ranch land, without even leasing it, making it permanently useless to panthers. This statement is known by the county DNR to be completely false.

134.    The county DNR Amy Meese stated [Exhibit 100] that the approval process consisted of a committee vote of interested parties (ESLOC) during a holiday, and a letter to the commissioners:

> January 5, 2006 meeting of ESL "Oversight Committee" reviewed parcel and voted 6:2 to add the entire parcel to the Ranch Reserve site.
> February 2006 ESLOC memo to Board of County Commissioners amended the site boundary of Ranch Reserve to include the entire parcel.

The entire county process consisted of an "advisory" committee vote and a memo over a 30-day period, concealed from the public by simply amending a site boundary. A gift of $51.8 million to political insiders who controlled the public officials, done while others were on vacation.

135.    The County website admits [204] "partnering" with the Nature Conservancy and Conservation Foundation of the Gulf Coast GCCF to "assist" land acquisitions under ESLPP.

> Sarasota County has partnered in the past with non-profit land protection organizations like the Nature Conservancy, the Conservation Foundation of the Gulf Coast and NorthStar to assist with environmental land acquisitions under the county's Environmentally Sensitive Lands Protection Program…

136.    Defendant Lisa Carlton is a trustee of the Nature Conservancy.

137.    Carlton friend Albert Joerger (R) founded Gulf Coast Community Foundation, is the buyer's agent for the county ESLPP, and a SWFWMD board member 2008 – 2013. His wife Pauline (Palmer, a family that once owned a third of the county), defendant Lisa Carlton (R), and defendant commissioner Nora Patterson (R) are all board members of GCCF, and are all close associates of nearly all of the county commissioners (all R) who approved the Carlton payments, most of whom donated to Carlton's election campaigns. Then-chair of the county commission

1   Thaxton is their employee as VP of GCCF. In fact these "partners" are controlled by the

2   beneficiaries.

3   138.    Jon Thaxton (R), chair of the county commission 2005-2012 is an activist for the Florida

4   Scrub Jay, a bird that requires low scrub vegetation as in its primary habitat in Scherer park in the

5   southwest county, which became a state park by Thaxton family efforts. The subject ranches in

6   the east county are unsuitable for the Scrub Jay unless ranchers are allowed to burn off the high

7   vegetation, preventing its reforestation as natural habitat for its original species. Thaxton was

8   involved in passing the ESLPP program, and chaired the meeting that approved the subject land

9   and easement purchases. But choosing a favorite species and spending county funds to burn off

10  forest for its use, depriving native species of their forest habitat, is not "preserving" habitat.

11  139.    SWFWMD stated [206] that it planned to pay $20,135,000 from the Florida Forever

12  Trust Fund, and the County would pay $31,678,488 through its ESLPP, upon approval by the

13  county Commission "no later than Dec. 31, 2007" the last day of Lisa Carlton's term as president

14  of the Florida Senate and overseer of the budget from which the SWFWMD funds were taken.

15  140.    SWFWMD director Eric Sutton (R) made the sales pitch to the county commission at

16  their meeting when they approved the purchase, a conscious propaganda effort to equate the

17  ranchers' destruction of habitat with rancher-award-speak like "exemplary stewardship," and

18  called the failure to accomplish any conservation effects at all "achieving the vision" instead of

19  the reality of conservation. For his lucrative "visions," Sutton was made Director of the state

20  FWC, and proceeded to make further "conservation" deals by FWC with the same insiders.

21  141.    The subject Carlton land purchase and easement were decided at the Commissioners

22  meeting 11/27/2007 [212] in the last month of the term of Lisa Carlton (R). Both county DNR

23  Amy Meese (R) and Eric Sutton (R) of SWFWMD were present to deceive the public (exhibit

24  101) that the joint SWFWMD-County purchase would somehow preserve "ecological value"

25  despite their plan to continue ranching there, causing pollution, wastage of county water supply,

26  and burn-offs instead of reforestation to restore native habitat. Sutton and Meese abused public

27  office as agents of the Carltons to cause payments known by them to be without public benefit.

28  142.    Also present were county conservation employees George MacFarlane, Brooke Elias, and

29  John Herrli who all knew that continued ranching would have no conservation effect whatsoever,

30  and did not even propose a plan for conservation activity, but they advised the commissioners

31  that the judgment of experts approved the purchases. Two of the five commissioners objected

1  that the conservation value was unclear, and received only conservation happy-talk with no

2  argument. The advisers were all insiders connected to the landowners, who had political control

3  of their careers.

4  143.    Also present was old Carlton (R) friend ("I love her") defendant Rushing (R), county

5  comptroller *and* clerk of the circuit court, who later criminally tampered the record on appeal of

6  related plaintiff action [93] obstructed by Carlton's sister judge Bonner (R), to retaliate for this

7  investigation. The five commissioners present included Thaxton (R), Mercier (R), Staub (R), and

8  chairperson Patterson (R) (who signed the deeds), all of whom had made cash "contributions" to

9  Lisa Carlton to receive party election funds (Appendix A section *Political Contributions To and*

10  *From the Carltons*), and Miller. The motion to accept the Carlton-influenced ESLOC deal with

11  the Carlton-influenced SWFWMD, brokered by the Nature Conservancy (Lisa Carlton, trustee),

12  was made by Carlton family friend commissioner Thaxton (employee of GCCF, Lisa Carlton

13  trustee), and passed by the Carlton-dependent commissioners:

14      12:04 p.m. Board Action: Approved Contract No. 2008-048, a Purchase/Sale Agreement,
15      with the County and SWFWMD as Buyers, and Mabry Carlton Ranch, Inc., a Florida
16      Corporation, as Seller, for the purchase of a perpetual conservation easement over 7,630
17      acres of land and the fee simple interest in an additional 4,746 acres of land, both located
18      south of State Road 72 and east of Myakka River State Park, in the amount of
19      $51,063,488.00. Moved by Thaxton, seconded by Mercier, carried by a 4-1 vote;

21  144.    In the Carlton purchase, the county spent $31.7-million from its ESLPP land program

22  (and SWFWMD spent $21.1 million of state FF funds) to purchase land and easements that serve

23  no conservation purpose whatsoever, in violation of county ordinances and state law, for many

24  times the fair market value sworn by the county itself, without even receiving title to the land.

25  ***Unlawful Influence Upon the Subject Decisions by Election Funding Sources***

26  145.    All county commissioner campaign costs during the subject period could be paid with one

27  percent of the value of the subject county purchases, requiring them to make only one quick little

28  decision every few years, as advised by the campaign financiers or "fixers" in the same meetings.

29  146.    Donation limits make the *lawful* donations of interested parties and associates significant

30  primarily as indications of *intent* to influence the public official and the *likelihood* of greater

31  concealed influence, reflecting the value of the business involved. Nearly all commissioners

32  accepted such limited "donations" from interested parties and their relatives and associates, but

33  they also accepted *additional* donations from the same sources exceeding the maximum, and

1  accepted additional donations from *concealed* sources. It is reasonable to presume, until

2  discovery is completed, that the concealed funding sources include the defendants and their

3  associates who made limited direct donations, such as the Carltons, Longinos, and others.

4  147.    Most county commissioners, and state officials who appoint SWFWMD officials, relied

5  upon concealed sources for 30 - 50 percent of their campaign funds, accepting blocks of

6  payments from about 80 shell corporations run by political "fixers" Eric Robinson and Carlos

7  Beruff, often sharing the same few mailing addresses with individuals, who were often paid

8  agents [App. E].

9  148.    Eric Robinson is a highly organized "dark money" operative or "fixer" whose business is

10  to disguise the source of political "donations" using over 60 shell corporations. He ran for School

11  Board for 2016 and filed those reports. Most of these are clearly from himself or disguised

12  donors via his shell corporations like "Robbies LLC" and his accounting company. Large

13  contributions are from relatives, likely paid to do so. Many more are from his real estate "ranch"

14  LLCs. Five are from county officials, including Sheriff Knight, with whom he was later found to

15  be plotting to force the School Board to pay for security services, causing the resignation of

16  Robinson. The relationship of Lisa Carlton's husband Robert Robinson to fixer Eric Robinson is

17  unknown.

18  149.    Robinson was chairman of the county Republican party "deeply enmeshed" in state and

19  local party funding [311, 313], one of three primary "fixers" for public office seekers in the state

20  [314], who "did the vetting" of local candidates for governor appointments [314], saw that his

21  wife Christine Robinson was appointed county commissioner by the governor in 2010, and

22  provided concealed funding through his 64 fake corporations for her subsequent campaign.

23  150.    Carlos Beruff operates with Robinson and Joe Gruters (also chairman of the county

24  Republican party) and Robert Wyatt (its party treasurer), all "donors" to most of the county

25  commissioners, and conceals funding sources by operating more than 50 fake corporations.

26  Reported to be "openly racist" and nicknamed "Bully," he was appointed chairman of

27  SWFWMD 2009-2015 surrounded by appointees desperate to please him, and to the state's

28  highly politicized "Constitutional Revision Commission" along with defendant Lisa Carlton. His

29  wife Janelle runs GCCF along with the Joergers, serving as *county acquisition agent* for the

30  subject properties. Beruff has no qualifications for any of his state appointments, which resulted

31  from his payments of at least $36,000 to Gov. Crist in 2008 and over $100,000 to Gov. Scott in

1  2012, through his fake companies. The price was about $2,000 for a board membership and

2  $32,000 for a chairmanship.

3  151.    Therefore the concealed funding sources probably use the Republican party accounts and

4  shell entities as additional means to conceal interested party sources, while using Robinson and

5  Beruff to convey their demands to the public officials he controls. Their accounting reports

6  certainly cannot be trusted; the realities may be far worse.

7  152.    Fixer Beruff's appointment as SWFWMD chairman, and fixer Robinson's wife's

8  appointment as county commissioner, establish that they were themselves interested parties and

9  represented interested parties, directly controlling the careers and decisions of nearly all

10  SWFWMD and county officials, by supplying their campaign funds, or the campaign funds of

11  those who would reappoint them. Nearly all commissioners and SWFWMD officials knew that

12  the decisions of Robinson and Beruff determined their own SWFWMD appointments or

13  commissioner campaign funding.

14  153.    Such influence necessarily caused decisions of benefit to the interested parties whose

15  identity they concealed, in violation of F.S. 817, 837, 838.016, 838.15-16, and 895. Such

16  influence also denied to the public the honest services of public officials in violation of 18 USC §

17  1341, and constitutes Racketeering under 18 USC §§ 1952–1968 (RICO). Nearly all SWFWMD

18  directors and county commissioners including the Robinsons and Beruff knowingly violated

19  these laws, as did the directly interested defendants.

20  ***County Officials and Their Campaign Donors***

21  154.    Commissioner Nora Patterson filed only the 2010 report during this period. She admitted

22  about $3000 in donations from the Carltons and Lisa Carlton's sponsor John McKay, the

23  Longino business associate Mr. Ross and associates [225], party bagman Robinson and his shell

24  corporations and wife who runs CFGC, the Joergers of CFGC, and about $1000 from other

25  commissioners, and $1000 from developers with projects before the commission.

26  155.    Commissioner John Thaxton filed reports for the 2008 and 2012 elections. In 2007 he

27  admitted receiving donations from other commissioners, and spent $71,353 more than he

28  admitted receiving, suggesting that he had many unreported sources or promises of quid pro quo

29  payment by other means. In 2011 he admitted $1000 of donations from the Longinos, the Carlton

1   ranch MCRI and Lisa Carlton's sponsor John MacKay, and the party bagman's wife Christine

2   Robinson, as well as some payments from other commissioners.

3   156.     At the expiration of his term limit in 2010, having made motion and voted for the Carlton

4   payments, county commission chairman Jon Thaxton was hired by the GCCF (Lisa Carlton,

5   trustee) and later promoted to its VP.

6         When term limits forced him out, he was snapped up by the <u>Gulf Coast Community</u>
7         <u>Foundation</u>… as head of community investment…[541]

9   157.     County commissioner Paul Mercier filed only the reports for 2008. Nearly half of the

10   donor names were omitted, many from identical addresses, and a later report shows that $3000

11   from two addresses were from shell corporations, and at least $2000 was from developers with

12   projects before the commission, including Lisa Carlton's husband Robert Robinson.

13   158.     County commissioner Shannon Staub filed only the reports for 2008. The contributions

14   are mostly less than the maximum allowed, and few were from recognized builders or other

15   commissioners. Staub appeared to be legitimately funded. She was the only commissioner to vote

16   against the subject purchases, and was replaced in 2010 by fixer Robinson's wife Christine.

17   159.     County commissioner Jono Miller filed only the 2008 reports. Donations from the

18   Longino-Walton beneficiaries and the husband of Lisa Carlton were less than the maximum, but

19   may indicate concealed funding. Many no-name donors are listed at the same few addresses.

20   Miller has claimed against the evidence that ranching has no adverse environmental impact.

21   160.     County commissioner Christine Robinson (2010-) filed reports for 2012 only. She took

22   "donations" from the Carlton ranch and Lisa Carlton's sponsor MacKay, Longino's associate

23   Ross, all county commissioners, the crooked Argus Foundation based at the address of three

24   crooked lawyers including defendant Lincoln, both Joergers of SWFWMD and CFGC, 80 fake

25   corporations at only 7 mailing addresses run by her husband, fixer Eric Robinson, and one group

26   apparently run by fellow fixer and chair of SWFWMD Carlos Beruff, who also "donated."

27   161.     County commissioner Joe Barbetta filed reports for 2010 only. He took donations from

28   the Carltons, the Joergers of SWFWMD and CFGC, Beruff the fixer and SWFWMD chair,

29   commissioners Staub, Maio, and Robinson, and her husband Eric Robinson the fixer, 58 of

30   Robinson and Beruff's fake corporations with only 6 mailing addresses, the crooked lawyers

31   Icard and Merrill of Argus, and ten of the Bendersons having business pending before the

32   commission, with many unlawful double-maximum contributions.

162.    County commissioner Mason filed reports for 2008 and 2012. In 2008 she received donations directly from Lisa Carlton, several persons who made unlawful multiple donations from the same address, including one group of nine fake companies having the same address. By 2012 she received donations from two commissioners, Joerger of SWFWMD and CFGC, Christine Robinson of SWFWMD (whose husband Eric Robinson runs over 60 fake companies to conceal the sources of funds) and 36 fake companies having only 5 mailing addresses, several persons who made unlawful multiple donations from the same address, the crooked lawyers of Icard, Merrill and Argus, and four of the Bendersons having business before the commission.

### Destruction of State Records of Payments From Group A to Public Officials

163.    The Florida Department of State maintains a Campaign Finance Database that shows donors to Lisa Carlton's election campaigns for 1998, 2000, 2002, and 2004. Significant funders include most County commissioners (Thayer, Mercier, Patterson, Staub), the County Comptroller (Rushing), County Clerk of Court (Rushing), political parties (Republican), and rancher groups. See App. A for details. County commissioners who gave funds to Carltons presumptively sought *quid pro quo* party funding and favors, and voted the County payments to them for that purpose.

164.    All of the required reports of political contributions to Lisa Carlton were deleted for the years 1996, 2000, and for 2006 and 2008, erasing the relationship of donors to conservation payments just before and after the critical period. These reports are presumptively incriminating. Significant known funders [App. A] include most County commissioners who also approved land payments to the Carltons (Thayer, Mercier, Patterson, Staub), the County Comptroller (Rushing), County Clerk of Court (Rushing), a political party, and rancher groups (Florida Cattlemen's Assoc, Florida Farm Bureau, Peace River Valley Citrus Growers). County commissioners who funded the Carltons likely sought party funding for their election campaigns, and other favors.

165.    All political contributions *from* Lisa Carlton prior to 2017 were deleted from the state database by the Carlton political dependents, and are presumptively incriminating.

166.    All political contributions from Barbara Carlton from 2001 to 2016 were deleted from the state database by the Carlton dependents, and are presumptively incriminating. Barbara Carlton directed the Peace River Valley Citrus Growers which donated to Lisa Carlton campaigns. Money was given directly to county *Election Commissioner* Detert, and rancher groups (Florida Grown). County records show her $10,000 check to the county Republican party in 2010.

1  167.    Public records of campaign donations make this the least likely path of bribery of officials

2  to misappropriate funds for land grants. However, political funds in Florida are systematically

3  laundered by allowing hundreds of shell corporations run by political fixers [App. E], false

4  reporting with zero enforcement, and tampering or deleting state reports. Deleted state reports of

5  political contributions are presumptively incriminating and deleted by political operatives.

6  ***Group A Benefits Distributed to Persons Obstructing Investigation***

7  168.    When the plaintiff removed his related case from the county court of the plainly corrupt

8  state judge (Carlton) Bonner, to Circuit Court, noting that he was investigating Bonner for

9  racketeering, the political donations and favors of the Carltons allowed her to be immediately

10  promoted to state Circuit court and to assign herself the same case *there*, where she continued the

11  most extreme abuses of public office to retaliate for this investigation.

12  169.    After three years of abuses of office, consisting of demands to delete most essential fact

13  and argument from the Complaint, the chief judge of the Circuit court disqualified defendant

14  Bonner for financial relationships to the case, but a family court judge Curley was assigned the

15  case, who continued the same abuses, dismissed the case, and was promoted to Circuit court.

16  170.    When the plaintiff appealed that case, defendant Rushing, a Carlton dependent who was

17  both the county comptroller issuing payments to the Carltons, and clerk of the Circuit Court,

18  deliberately falsified the record on appeal, deleting the Complaint, the sole issue on appeal.

19  Rushing was not disciplined or dismissed for this plainly criminal act of tampering state records.

20  **Fraudulent Misappropriation of Funds to Longino Group B 2002-2011 (Fact Appendix B)**

21      These facts are presented in detail in Fact Appendix B.

22  171.    The Longino ranch consists of about 12 square miles of open ranch and wetland patches

23  at the NE corner of Sarasota county (exhibit 73), purchased as forested land during the

24  Depression to produce turpentine. When substitutes ended that industry about 1950, far from

25  being a "steward" of habitat, Longino cleared all but the wetland for ranching, destroying its

26  habitat value. When ranching declined, far from seeking to restore habitat, he sought to steal

27  conservation funds by fooling the public that *continued* ranching with vegetation burn-offs would

28  somehow "protect" the forest habitat that he had destroyed. But land cleared for ranching, like

29  parking lots, is not native habitat: the Longino ranch remains a disaster area for native species.

172.    Berryman "Buster" Longino is an influential politician and former chair of the Sarasota County Commissioners controlling all matters affecting his ranch and those of the Carltons and Waltons, including the selection of "conservation" purchases without public benefit [230].

173.    The wealthy Longino family are long-time friends of their ranch neighbors the wealthy Carltons, whose daughter Lisa was an influential state Senator when the subject purchases began, and President of the Senate and Budget Overseer 2006-2007, controlling the state budget and all Senate committees which made the decisions on these purchases at that time. [App. A]

174.    The 2000 report of the state's environmental science advisory group, the Florida Natural Areas Inventory (FNAI) [exhibit 223] on conservation land shows eastern Sarasota county, where the subject ranches are located, as having little or no conservation value to the state.

175.    The Longino ranch, like the other subject ranches, in no way improves the quality or quantity of local water supplies, as required for conservation purchases by state water districts, and in fact ranches are the principal polluters of surface water due to cattle sewage and agrochemicals, and use about half of the surface water supply for irrigation. [App. F] Yet the SWFWMD and county "conservation easements" actually allowed ranching to continue there, and even paid them to continue vegetation burnoffs.

176.    Already a wealthy rancher, defendant B.T. "Buster" Longino was extensively and directly involved in SWFWMD affairs as a member of its Governing Board and its Manasota Basin Board [522, exhibit 228], and was also a Sarasota County Commissioner voting on easement purchases.

177.    The first Longino easement was purchased by SWFWMD and the county in 2002 [610], soon after Lisa Carlton became Senate Appropriations Chair, for $2,139,000. A smaller easement there in 2004 granted salable "mitigation credits" so that the state paid to mitigate the ranch pollution. The easements had no effect on the ranch and were pure income.

178.    SWFWMD and County paid $2,139,000 or $625 per acre for the 2002 easement on land whose total value (sworn by the county itself) was $3,384,000, or 62.3% of its total value.

179.    The $625 per acre paid in 2002 exceeds the $532 per acre paid that same year for the Harrison purchase [602] of about a square mile of adjacent Carlton ranch land. So SWFWMD and County deliberately paid more for the easement than the known market of the land itself.

180.    If they had paid the same fraction of land value they had paid in 1998 for the Carlton easement (24.5%) they would have paid $829,080, and instead paid over twice that amount, and deliberately overpaid $1,309,920, knowing that they could buy the land outright for less.

181.    Even these valuations assume that the land and easement had conservation value, which they did not. See Appendix D and E proving the absence of conservation value, and the extensive political corruption that led to these payments, and payments to the Carlton and Walton groups.

182.    The third Longino parcel [611] was introduced at the last moment in the 2007 FNAI Evaluation [207] as part of the "Myakka Ranchlands" project, with two FNAI scores. Both values, relative to statewide conservation needs, and relative to other projects available, were the lowest possible scores [207] as in the 2000 FNAI report [223].

183.    Nonetheless, ARC approval of payments to the Longinos, controlled by Lisa Carlton's appointees, was rushed through in the last days of Lisa Carlton's term as Senate President. With two other projects of the *lowest* possible conservation value, the project was introduced at the last moment and ranked at the *highest* purchase priority ("A list"), displacing three projects of the *highest* conservation value.

184.    With Carlton no longer its President, the state Senate issued a warning report on "Land Acquisition in Florida" ([216] January 2008) severely criticizing the acquisition of conservation lands, for ignoring conservation values, questionable ranking of projects for acquisition, and dubious appraisals, especially for ("less-than-fee") easements. The Senate report also strongly criticized the conservation land appraisal process, and questioned the conservation value of ("less-than-fee") easements. See Appendix A for details.

185.    The state Board of Trustees of the IITF (BOT) not only ignored the Senate warning, but hastily met [210] to approve the new Priority List [209] for *later* purchase, including the projects of party donors, known to have zero conservation value and to have been appraised by insiders, including the subject "conservation easements." See Appendix B for details.

186.    The third Longino ranch easement was purchased by SWFWMD and the county in 2010 [613], for $14,499,000 on land for which the County had sworn a total land value of $4,051,771 that year, over three times its total value. This was $3,642 per acre, almost *six times* the cost per acre in 2002 despite being a similar area of the same ranch, *purchased at the bottom of the Great Recession*, with the lowest land prices in decades. This easement cost per acre far *exceeded* the

1  amount paid for the adjacent Walton ranch a month later for *full title* to the land [620], and was

2  *seven times* the price paid per acre for *full title* to the adjacent Carlton land [602] in 2002.

3  187.    If they had paid the same fraction of land value they had paid in 1998 for the Carlton

4  easement (24.5%) they would have paid $992,684, and instead paid *fifteen times* that amount.

5  SWFWMD and County deliberately overpaid $13,506,316 to the Longino insiders.

6  188.    Even these valuations assume that the land and easement had conservation value, which

7  they did not. The easement had no effect at all on the Longino ranch business, and was pure

8  income. The purchases did not effect any conservation or water quality goal, and served no

9  public purpose whatsoever. See Appendix D and E establishing absence of conservation value,

10  and the political corruption that led to these payments, and payments to the Carlton and Walton

11  groups.

12  189.    Not surprisingly, defendant Longino himself recommended defendant Lisa Carlton's

13  sister defendant Kimberly Bonner to an uncontested politically-determined position as Sarasota

14  judge, where she obstructed the Plaintiff's related case for three years to retaliate for this

15  investigation.

16  **Fraudulent Misappropriation of Funds to Walton Group C 2007-2010 (Fact Appendix C)**

17        These facts are presented in detail in Fact Appendix C.

18  190.    The Walton ranch land crucial to fictitious ranch-panthers was purchased by SWFWMD

19  in 2010 [620] along with the second Longino ranch easement. SWFWMD notes [214] that it:

20        approved the acquisition of conservation easements on the Walton and Longino ranches
21        in Sarasota County [between] conservation areas… from Sarasota to DeSoto County ... a
22        critical link between the two areas... The District and Sarasota County are acquiring
23        conservation easements and some fee title over the ranches… a total of 7,698 acres ….
24

25  191.    The Walton ranch was evaluated in the FNAI Evaluation Report of 11/2007 [207] in the

26  "Myakka Ranchlands" project, with the Longino ranch, with the lowest possible FNAI scores

27  both in value to statewide conservation goals, and value relative to other available projects.

28  192.    The ARC approval of these payments to the Waltons and Longinos, long-time ranch

29  neighbors of the Carltons, was made in less than a month (11/20/2007 to 12/14/2007), the last

30  days of Lisa Carlton's term as Senate President.

31  193.    The Walton and Longino ranches were purchased in 2010 [208]:

32        On 7/15/2010 Sarasota County purchased fee simple approximately 3,760 acres known as
33        Walton Ranch and sold to the SWFWMD conservation easement rights.

On 8/19/2010 SWFWMD and Sarasota County acquired Longino Ranch Conservation Easement (3,981 acres).

The state thereby purchased the Walton Ranch, despite it having the lowest possible conservation value statewide and among projects available that year, using $22,559,100 of state Florida Forever funds, over $6,000 per acre.

### The Walton Land Was Purchased for Five Times the Known Land Value

194.    The total 2010 Fair Market Value of the Walton ranch land as appraised and sworn by the County itself was $4,236,476 (exhibit 104), but it paid $22,559,100 on 7/15/2010, well over <u>five times the market value of the land</u>. For an area of [about 3500] acres, this was [$6445] per acre in the darkest period of the great recession, <u>six times</u> the average for the decade, and a higher price than the state paid even at the peak of the real estate boom back in 2006-7. By its own sworn appraisal of Fair Market Value on the public record, the state and county admitted giving away $18,322,624 to insiders, with no conservation value whatsoever.

195.    If the County had waited for the inevitable recession and paid the 2012-14 market value, it would have paid $2,334,300, so the County <u>deliberately overpaid as much as $20,224,800</u>.

196.    Even these valuations assume that the land had conservation value as required for the funds used, which it did not.

### Facts of Federal Agency Obstruction of Investigation 2018-2021 (App. G)

These facts are presented in detail in Fact Appendix G.

197.    This case will be strengthened by further evidence of financial *quid pro quo* to the public officials, whereupon the major buyers of influence and channels of corrupt influence upon the politicians and decision makers involved can be joined as defendants. However, the defendant federal agencies refused over seven years to investigate, and sought to obstruct prosecution.

198.    During the period 2018-2021, the DOJ (DC and Tampa Fl), FBI (DC, Jacksonville, and Tampa Fl), HSI (Arlington VA and Tampa), and IRS Investigations (Fresno CA) were each notified of this major racketeering case, by several emails and reports on their websites (Fact Appendix G, Exhibits A-1 to H-1). No reply of any kind was received to about 30 inquiries.

199.    In August 2020 each agency office was again sent such a letter by certified mail (Appendix G, Exhibits E-1 to E-4), with copies of the Complaint and a CD with six Appendices

1   of Fact, seven Memoranda of Law, and all evidence. The letter stated that a failure to respond

2   would be a violation of the mandated duty of each agency. None of the agencies even replied.

3   200.    A call was placed to the Inspector General (OIG) of the DOJ and FBI, asking whether the

4   failure to respond might be due to fear of career damage by political appointees, and how much

5   time should be allowed after the inauguration 1/20/2021, before sending the letters. The FBI OIG

6   denied that any political bias was possible despite political appointees, but suggested sending

7   another packet to their office in DC (in the same building as DOJ).

8   201.    Clearly persons then in control of each of these agencies were abusing office to protect

9   racketeering to steal state and federal funds for the Republican party. The question remained

10  whether that corruption is limited to the appointees of the political party of the racketeers.

11  202.    On 2/9/2021 after the inauguration of an opposing party administration, a second round of

12  certified envelopes with documents and CDs were sent to all of these offices (Appendix G,

13  Exhibits G-1 to G-6). After six months, none of the agencies had replied. The same political

14  factions were clearly obstructing prosecution, of one or perhaps both major political parties.

15  203.    The defendant investigative agencies clearly had substantial communications that

16  coordinated their refusal to investigate or even reply to over thirty Plaintiff reports over four

17  years, made to the local, state, headquarters, and OIG office of each of these agencies. There

18  would be no excuse to conceal that information from an FOIA inquiry.

19  204.    The possibility remained that these agencies were acting upon false information about the

20  Plaintiff, but this would have to be extreme to prevent action by any office of any such agency. A

21  recent FBI report [900] notes that citizens may now be classified as a domestic terrorism threat

22  for espousing a "conspiracy theory" if they "attempt to explain events or circumstances as the

23  result of a group of actors working in secret to benefit themselves at the expense of others." So

24  anyone aware of systemic dishonesty in the DOJ, FBI, HSI, or any political party may be

25  vengefully "classified" as a threat of "terrorism" to prevent cooperation and obstruct prosecution.

26  205.    To determine the nature of agency communications to prevent any response to the thirty

27  Plaintiff inquiries, and whether that misconduct involved false information about the Plaintiff,

28  FOIA requests were made 2/25/2021, for all information held about the Plaintiff. The DOJ

29  admitted on 3/1/2021 that it had twenty-six pages of criminal information on the Plaintiff,

30  although he has never committed a crime, referred to its criminal section CRM for redaction.

206.    When no information was received after three months, the Plaintiff filed an appeal for expedited determination, which was denied without stating when information would be sent.

207.    After five months, the Plaintiff notified DOJ that further delay would be interpreted as obstruction of prosecution, in violation of the mandate of these agencies. No reply was received, except a letter from the DOJ OIG claiming that no misconduct had been alleged. The DOJ OIG was advised to investigate immediately, or prosecution would commence (Exhibits H-1 to H-3).

208.    After six months, no FOIA response on the 26-page "criminal" dossier had been received. It appears that political factions or cabals within these agencies colluded to obstruct prosecution of racketeering crime by one or perhaps both major parties, by means of abuse of office, and willfully subverted the Constitution and laws of the United States, acts tantamount to treason.

Timeline of FOIA Requests to Federal Agencies

| | |
|---|---|
| 2/25/21 | Filed FOIA request 197391 via DOJ website with request form and summary. |
| 3/1/21 | DOJ letter: "twenty-six pages were located... this material originated with … the Criminal Division (CRM), we have referred that … to CRM for processing ... |
| 5/20/21 | Filed appeal A-2021-01803 for "expedited determination" |
| 5/25/21 | Expedited Determination denied for "insufficient cause" |
| 6/18/21 | Expiration of 3.5 months typical delay to final determination in FOIA cases |
| 8/24/21 | Expiration of 6 months extreme delay to final determination in FOIA cases |

**Facts of The Plaintiff and His Damages 2011-2025**

These facts are presented in detail in Fact Appendix F.

209.    The Plaintiff John S. Barth, jr. is a retired software engineer for complex control systems, long involved in major charitable activities. He has gained legal knowledge in charity work, and was forced to investigate corruption of Florida public officials in seeking relief from a severe nuisance there, which precluded engineering employment. These circumstances make this case an opportunity for this Court to set a precedent in the area of racketeering by public officials.

210.    The Plaintiff was caused years of unemployment, suffering, and litigation of related action [90- 95], by denial of state process resulting from statements that he was investigating the theft of $51 million in state funds by the family of corrupt state judge (Carlton) Bonner.

211.    The related case defendants McNeely and Hollman sought to force the Plaintiff from his adjacent home as a result of their estate dispute with the prior owner, having been evicted therefrom by probate court [27]. Upon Plaintiff purchase of the home, they enclosed part of his land for over one year, forcing civil action to eject them once more [2], and sought for over four

1    more years to force the Plaintiff from his home by extreme nuisance, keeping large dogs outside

2    to bark through the night, and by vandalism and assault, severely injuring the Plaintiff in quality

3    of life, liberty and property, ability to perform engineering work, and years of litigation. There

4    are six sheriff reports [Exhibits X1-X6] proving violation of four laws and ordinances, and two

5    sworn defendant admissions [Exhibits Y1-Y2] sufficient for summary judgment at any time.

6    212.    The defendants with their corrupt lawyer defendant Lincoln refused to Answer the

7    complaint, filing demands for deletion of fact without basis in the rules, based solely on false

8    statements, immaterial citations, and non sequitur argument.

9    213.    A local court judge, defendant (Carlton) Bonner evinced unmistakable corruption by

10   accepting a torn-off 3x5 notebook sheet from the defendants as an Answer to the Complaint,

11   unsigned, unserved, and meeting none of the Rules, while making endless demands for deletion

12   of essential fact from the properly-structured Complaint, without basis in the rules, based solely

13   on false statements, immaterial citations, and non sequitur argument. The Plaintiff investigated

14   Bonner, discovered the racketeering enterprise, and changed venue to the Circuit court, stating

15   that he was investigating the theft of $51 million in state funds by the family of the corrupt state

16   judge. The defendants denied, conspired to deny, and failed to prevent denial to the Plaintiff of

17   constitutional rights, in violation of 42 USC §§ 1983, 1985, and 1986.

18   214.    The Circuit judge was sympathetic, but his political party promptly forced his retirement,

19   promoted the corrupt Bonner to Circuit court, assigned her to the case, and for three years she

20   refused to require the defendants to Answer [90- 95], demanded deletion of the facts, denied due

21   process and equal protection, and refused to recuse, until disqualified by the chief judge.

22   215.    Efforts to enforce constitutional rights in federal court met false statements of law

23   without cognizable argument, as that immunity exists where it does not, and that unequal

24   protection can never be proven, despite good evidence and prior judgments by the same courts.

25   216.    Upon disqualification of Bonner the political party of the Carltons assigned another of its

26   career dependents, defendant Curley, for whose identical abuses of office they promoted to be a

27   principal judge of the circuit court, a position shared with defendant (Carlton) Bonner.

28   217.    Upon appeal, the circuit court clerk Karen Rushing, an old ally and mentor of Bonner's

29   sister defendant Carlton ("I love her"[501]), knowing that no court of review could find fault in

30   the Complaint, deleted it from the Record on appeal, despite billing the Plaintiff and including all

31   other items, a criminal act of tampering public records to fool a court of review that it might have

1    faults falsely claimed by Bonner. No relief could be found in the state or federal courts, despite

2    the sheriff reports, admissions of the defendants, and long history of nuisance law enforcement.

3    **State and County Are Liable For Damages To The Plaintiff**

4    218.    The state of Florida and Sarasota County, acting through the sheriff department and its

5    "Animal Services" director defendant Ortner, denied the Plaintiff liberty and property, due

6    process, and equal protection of law, by selective enforcement, reckless disregard, mistraining,

7    delegation to a final policymaker, concealment of records, and judicial ratification of tort.

8    219.    The state of Florida, acting through its officials including defendant Bonner, failed to

9    enforce any state law or ordinance, despite Sheriff reports and sworn admissions, and denied due

10    process and equal protection in violation of the Civil Rights Act.

11    220.    The exhaustion of sleeplessness caused by these defendants forced the Plaintiff to sleep

12    during the day in the years of prosecution and investigation, prevented engineering employment,

13    and impeded prosecution. Exhaustion severely affected his health, social situation, and income.

14    221.    The defendants are liable for the extensive direct and consequent damages caused to the

15    Plaintiff by their denial, conspiracy to deny, and refusal to prevent denial of liberty, property, due

16    process, and equal protection of the Plaintiff, to obstruct his investigation of these fraudulent

17    purchases of land and easements from the defendants. The state of Florida and Sarasota County

18    are liable for these damages as the immediate cause, despite their exploitation by the racketeering

19    enterprise of the defendants, and the Court should compensate the Plaintiff from the proceeds, in

20    recognition of his extensive work to remunerate them for theft of public funds by the defendants.

21    **SUMMARY OF FACT**

22    222.    These facts establish a racketeering pattern of abuse and corruption of public office by the

23    defendant agencies in collusion with groups A, B, C, D, and E, for the purpose of theft and

24    misappropriation of public funds, securing other benefits from public officials, and retaliation for

25    investigation thereof. The defendants have made extensive false representations of the market

26    value and conservation value of ranch land owned by themselves or other defendants, have

27    distorted non-profit entities, and have abused public office to select and purchase ranch land and

28    easements thereon, for many times the fair market value thereof, with little or no conservation

29    value or effect, deliberately violating the laws and ordinances restricting the use of the funds

30    expended, denying honest services to the people, and charging the costs thereof to the people.

1  223.    The acts of the defendants were made with *knowledge* and *intent* to violate these laws and

2  ordinances for personal gain, to abuse public office, and to deny honest services to the public.

3  224.    The defendants have persisted in these unlawful acts over many years with full

4  knowledge of the rights violated and the injuries done.

5  225.    Every such act of the defendants has been without the consent, against the will, and in

6  violation of rights of the plaintiff, as well as those of the people of Florida and other states, and

7  has injured the plaintiff by injuring his health, reducing his income, increasing his expense, and

8  forcing him to investigate and litigate this corruption for many years.

1 **PETITION FOR RELIEF**

2      See Memorandum of Law 7 for argument of compensation of Plaintiff, State and County.

3 **Just Compensation**

4 226.   Plaintiff demands from the defendants compensation for four years of suffering and lost

5 income [90-98], for three years of investigation, and for an estimated eight years of prosecution

6 (fifteen years total) at his engineering rate of $140,000 annually, with three times these total

7 damages as provided by 18 USC §§ 1952–1968 for racketeering damages, a total of $6,300,000.

8 227.   The Plaintiff further demands from the defendants, for public interest and public

9 charitable projects of his choice, ten percent of the amounts recovered for excess payments or

10 land value by the State of Florida, Sarasota County, and the United States, to be held in an

11 account for these purposes.

12 **Compensation of State and County for Fraud**

13 228.   The Plaintiff proposes the following compensation to the State and County.

14 229.   Full title to all subject lands, for which payments were made by the State or County to the

15 defendants for conservation easements, where title was not subsequently purchased, shall be

16 seized by the State or County owning the easement, and held for use as wildlife habitat or

17 recreational areas excluding private motor vehicles, subject to legislation of alternate land uses.

18 230.   All amounts in excess of the County appraisal at time of purchase of the subject lands and

19 easements, shall be seized from, and forfeited by each defendant who received such funds, each

20 amount adjusted for inflation to the date of seizure, and placed in a compensation fund.

21 231.   Amounts due to the Plaintiff for compensation shall first be paid. Ten percent of all funds

22 recovered shall be placed in a separate account for public charitable projects of the Plaintiff.

23 232.   The balance of the compensation fund shall be returned to the State and County

24 conservation funds from which they were drawn, or their successor funds.

25 233.   The land seized should be combined with contiguous state and county lands including the

26 "Carlton Reserve" tract, reforested if so desired by the people of the County, and renamed for the

27 Judge rather than the defendants, or renamed Sherwood Forest in memory of Robin Hood.

28 234.   The defendants shall pay such punitive damages as this Court may deem fair and

29 appropriate, and/or such criminal penalties as this court may deem sufficient to discourage abuse

30 of public office in state and local government.

**OATH**

    I, the undersigned Plaintiff John S. Barth do hereby certify under penalty of perjury that the foregoing is true and correct.

Executed on (date): ___3/3/2025___

                                  John S. Barth, Plaintiff, pro se

                 P.O. Box 88, Springvale, ME 04083 Jbarth@gwi.net  207-608-1741

United States, Dept of Justice, 950 Pennsylvania Ave, Washington, DC 20530-0001
Federal Bureau of Investigation, 935 Pennsylvania Ave NW, Wash., DC 20535-0001
Homeland Security Investigations, 1901 S. Bell St., Suite 900, Arlington, VA 22202
Mabry Carlton Ranch Inc., agent Barbara B. Carlton, 9430 Sidell Rd., Sidell, FL 34266
Barbara B. Carlton, 9430 Sidell Rd., Sidell, FL 34266
Lisa Carlton, 9420 Sidell Rd., Sidell, FL 34266
Kimberly Carlton Bonner, 9450 Sidell Rd., Sidell, FL 34266
Longino Ranch, Inc., agent John Minton Jr, 26111 Turpentine Still Rd, Sidell, FL 34266
Berryman T. Longino jr, 25501 Tampensi Trail, Sidell, FL 34266
John Longino, 757 17th St, Fort Lauderdale FL
John L. Minton Sr, 2513 S Indian River Dr, Fort Pierce, FL 34950
John L. Minton Jr, 2619 Park Place Dr, Winter Park, Fl 32789
Thomas L Curry, 2805 Oakland Park Blvd, Fort Lauderdale FL
MJW Ranch LLC, James J Walton Trust, Wyona June Walton Trust,
    Manager and Trustee Michael Allen Walton, 27790 Hickory Blvd, Bonita Springs FL
Michael Allen Walton, Julie M Walton, 27790 Hickory Blvd, Bonita Springs FL
Eric Sutton, Florida FWCC, 620 S. Meridian St, Tallahassee, FL 32399
Amy Meese, 6369 Mighty Eagle Way, Sarasota, Fl 34241
Jon Thaxton, 2046 Cordes St, Osprey FL 34229
Paul Mercier, 2124 Cork Oak St E, Sarasota, Fl 34232
Nora Patterson, 707 Freeling Dr, Sarasota, FL 34242
Eric Robinson, 133 Harbor Dr South, Venice, FL 34285
Carlos Beruff, 632 Regatta Way, Bradenton, Fl 34208
Karen Rushing, 7372 Mara Vista Dr, Sarasota, FL 34238
Scott Ortner, 11473 Tinder Ct, Venice FL 34292
Robert Lincoln, 1928 Rolling Green Cir, Sarasota, Fl 34240
Rochelle Curley, 2405 Moccasin Hollow Rd # R, Sarasota, FL 34240

**Certificate**

    The notary certificate as required by the State of Florida follows:

43

**Document Name:** District Court of the United States District of Columbia ( John S. Barth, v. Mabry Carlton Ranch Inc.: etc.

### State of Florida Jurat Notary Certificate

**STATE OF FLORIDA**
**COUNTY OF Manatee**
Sworn to (or affirmed) and subscribed by personally appearing before me by physical presence this 31st day of March, 2025, by,      John S. Barth              .



LOUIS G.C. VETTRAINO
Notary Public, State of Florida
Commission# HH 401569
My comm. expires May 22, 2027

_____
*(Signature of notary public)*

Lou's G. C. Vettraino
_____
*(Name of notary public)*

**My commission expires:** <u>05/22/2027</u>

Official Seal

Personally known          OR
Produced identification  X  Type of identification produced:  Maine Drivers License

1

44