<table>
<tr><td></td><td></td></tr>
</table>

**District Court of the United States**
**District of Columbia**

--------------------------------------------

|                                         | Case No. 1:25-cv-01136-DLF
John S. Barth,                            |
       Plaintiff               |
v.                                        |
Mabry Carlton Ranch, Inc., et al.         |     **Fact Appendix F**
                                          |
    Defendants              | Acts Of Crime Constituting Racketeering
_____|           By State, County, And Private Defendants
                                            (Extreme Nuisance And Fraud To Obstruct Prosecution)

# Contents

Facts of Defendants 2012-17: Obstruction of Investigation and Denial of Constitutional Rights . 2

   The Plaintiff and the Damages ................................................................................. 2

   Original Cause of Action........................................................................................... 2

   Acts of Defendant State and County in Failure to Enforce, and Ratification of Tort ................ 3

   Denial of Constitutional Rights by Defendants State of Florida, Sarasota County, & Bonner... 4

   Denial of Constitutional Rights by Defendant Kovachevich and 11th Circuit ............................ 7

   State Court Actions Following Improper Acts Of Federal Court............................................. 10

   Denial of Constitutional Rights by the United States................................................................. 11

   Facts Of Racketeering By State Judge Bonner And Others ..................................................... 13

Facts of Florida State Defendants 2020-22: Fraud, Perjury, And Abuse Of Office .................... 13

   Defendants In This Claim............................................................................................................. 14

   Brief Statement of Claim.............................................................................................................. 14

   Facts Of Fraudulent Sale Of Vehicle.......................................................................................... 15

   Acts of Defendant State in Ratification of Tort and Denial of Constitutional Rights.............. 18

**Facts of Defendants 2012-17: Obstruction of Investigation and Denial of Constitutional Rights**

***The Plaintiff and the Damages***

1.   The Plaintiff John S. Barth, jr. is ordinarily employed as a software engineer involved with complex control systems, when not involved in charitable activity or novel writing. The Plaintiff has gained considerable legal knowledge in the context of his charity work, and was forced to deal with and investigate the corruption of Florida public officials in seeking relief from a severe nuisance in his residential neighborhood there, which prevented his further engineering employment. This combination of circumstances makes the present lawsuit an unusual opportunity for this Court to set an important precedent in the area of racketeering by public officials.

2.   In the present case, the Plaintiff was caused years of unemployment and suffering and litigation by state process that repeatedly dismissed complaints of extreme noise nuisance with nothing but non-specific whining about documents, found no specific problem in his final complaint, at no time evaluated evidence or argument, ignored all facts, laws, and precedents, and refused throughout three years even to require the defendants to make the required answer to the complaint [90, 91, 92, 93, 94, 95]. That situation resulted from the Plaintiff's statements that he was investigating the theft of $51 million in state funds by the family of the corrupt state judge who took over the case and refused to recuse, who willfully and extremely misapplied state rules with intent to deny process to the plaintiff and obstruct his investigation.

***Original Cause of Action***

1.   Details of the original defendant offenses prior to and during state civil action are stated in the Complaint section *The Plaintiff and His Damages 2011-2021*. The original defendants McNeely and Hollman sought for five years to force the Plaintiff from his adjacent home as a result of an estate dispute with the prior owner, having been evicted therefrom by probate court [27]. Upon Plaintiff purchase of the home, they enclosed part of his land for over one year, forcing civil action to eject them once more [2], and have sought for over four more years to force the Plaintiff from his home by extreme nuisance, keeping large dogs outside to bark through the night, and other crimes including vandalism and assault, with the intent and effect of severe injury to the Plaintiff in his quality of life, liberty and property, and years of intensive

litigation [3,4,5,6]. There are six sheriff reports [Exhibits X1-X6] in evidence of violation of four state laws and county ordinances, and two sworn defendant interrogatory admissions [Exhibits Y1-Y2] of these facts, sufficient for summary judgment.

2.    Throughout these civil actions, these defendants continued these torts, and with their corrupt attorney defendant Lincoln filed sham pleadings in lieu of Answer, consisting of demands for deletion of facts and argument without basis in the rules of civil procedure, based solely upon false statements of fact, immaterial citations, and non sequitur argument. These defendants have clearly and willfully denied, conspired to deny, and failed to prevent denial to the Plaintiff of constitutional rights, in deliberate violation of 42 USC §§ 1983, 1985, and 1986.

### *Acts of Defendant State and County in Failure to Enforce, and Ratification of Tort*

3.    Defendants state of Florida and Sarasota County, acting through their sheriff department for said county, including its "Animal Services" director defendant Scott Ortner, have denied the Plaintiff liberty and property, due process, and equal protection of law, by selective enforcement, reckless disregard of injury, mistraining of employees, delegation of policy making to a final policymaker, concealment of records, and judicial ratification of tort.

4.    The defendant state of Florida, acting through its judicial officials, has refused in this matter to enforce any state laws or county ordinances prohibiting nuisance, despite evidence of its own Sheriff reports (Exh X1-X6) and sworn defendant interrogatory admissions (Exh Y1-Y2), and has denied due process and equal protection in violation of the Civil Rights Act.

3.    Defendants McNeely and Saunders/Hollman are employees of the defendant county, with many relatives in its Sheriff department. Defendant County, acting through its Sheriff department, denied the Plaintiff equal protection of law by selective enforcement of four nuisance statutes and ordinances, denied the Plaintiff liberty and property without due process of law by reckless disregard of need and mistraining, and by falsification and concealment of records of disparate enforcement, and has acted in collusion with these defendants in violation of 42 USC §§ 1983-6.

4.    During state and federal action, these defendants continued these torts, and conspired to deny the Plaintiff due process and equal protection by filing spurious motions in lieu of Answer. A state judge defendant Bonner under investigation by Plaintiff, in the corrupt state grant of $51 million to her family ranch without public benefit, obstructed state action by extreme abuse of

rules to deny due process. When the Plaintiff changed venue and found a sympathetic judge, his political party forced his retirement, promoted the corrupt Bonner to assign her the case, and she continued to deny due process, and refused to recuse, bringing the matter to federal court.

### *Denial of Constitutional Rights by Defendants State of Florida, Sarasota County, & Bonner*

5.   The acts of state courts are here considered only as <u>facts</u>. For detailed consideration of the false statements and arguments that resulted in these violations, see Memorandum of Law 5.

6.   In the first state action in county court [90], Bonner manifested profound corruption by making it clear in court that belligerent southern women with guard dogs, like herself and the original defendants, would prevail over single northern men regardless of the law and the facts of the case. Bonner also stated that lies by lawyers in court were not perjuries.

7.   Bonner accepted in [91] a scrawled 3x5 torn-off notebook page from defendants (Exhibit Y), never signed or served upon Plaintiff and meeting *none* of the Florida Rules of Civil Procedure (FlaRCivP), as an "Answer to the Complaint" but ordered the Plaintiff to delete facts and argument from his exemplary Complaint, which already met *all* of the Rules. The defendants continued their unlawful harassment of the Plaintiff on a daily basis throughout these actions, including leaving their dogs outside at night to bark intermittently at every passing car, wildlife, and faraway dog, blasting their horns whenever passing the home of the Plaintiff, and throwing lawn debris and trash over the fence between the properties. The dog barking incidents occured three to six times every night, preventing more than four hours of sleep nearly every night.

8.   The Sheriff deputies who responded to complaints generally reported staying five to ten minutes, whereas the barking occurred every one or two hours, so that Sheriff observations of barking occur only for roughly one in twenty reports. About one fifth of the incidents of nuisance barking were initially reported to the Sheriff. Consequently no more than one percent of the initial barking disturbances have been <u>observed</u> by the Sheriff.

9.   Most Sheriff deputy <u>observations</u> of barking did not result in a report, due to deputy misunderstanding of the facts (the false idea that deputy presence is the sole cause of barking), distortions of the law (the false idea that the barking must be continuous, see Memorandum of Law 5), or bias (the idea that they must protect a female defendant or fellow dog owner having relatives in the Sheriff department). However seven deputies reported six incidents of barking,

1    indicating over five hundred incidents of barking sufficient to awaken a neighbor. The usual

2    three to five barking incidents per night indicates 1100 to 1800 offenses per year since

3    9/21/2012. Each offense after a first warning carries a sentence of 30 days in prison under state

4    law. Hence a finding of prior warning permits prison sentencing consistent with state law,

5    without any limitation of term.

6    10. As a result of this manifest corruption of Bonner, and the escalation of damages beyond the

7    damages limit in county court, civil action [92] (2013 CA 001257 NC, later 2013 CA 003585

8    NC) was filed to the Florida 12th Circuit Court, again requiring months of the professional time

9    of the Plaintiff for research, preparation of documents, and prosecution of the action. As before,

10   the Complaint was clearly stated and in exemplary form, with proper formatting and citations,

11   and every paragraph of fact, relief demand, Memorandum of Law section, and exhibit, indexed

12   for each claim on a single page.

13   11. The state Circuit Court case was assigned to elected judge Rick De Furia who was

14   sympathetic with the nuisance action, and who was immediately and involuntarily retired upon

15   demand of the Carltons' political party faction, which promoted defendant Carlton/Bonner

16   herself to the Circuit Court and assigned her to obstruct the case and investigation by the

17   Plaintiff, a delay of nine months since filing of the first complaint in which Bonner had denied

18   due process.

19   12. Again Bonner denied all twenty-nine plaintiff motions for relief, and all motions to recuse

20   (examples AppV1 p.12, 18; AppV2 p.35, 37, 102), and granted all dilatory motions of

21   defendants (AppV1 p.22, AppV2 p.59, 76, 114, 137) to completely obstruct process.

22   13. Although defendant Lincoln, now representing the original defendants, had no difficulty

23   reading the Complaint, and made no request nor motion for clarification as required by the

24   FlaRCivP, he made no filings other than frivolous objections to Complaint format, and

25   groundless demands for the deletion of facts. Lincoln disgraced his name for four years.

26   14. Despite having sufficient evidence for summary judgment for the Plaintiff (Exhibits X1-X6

27   and Y1-Y2), and despite having accepted a torn-off 3x5 notebook page, unsigned and never

28   served, as a defendant "Answer" to the County court complaint [91], defendant Bonner granted

29   [92] these dilatory motions of the defendants, and merely copied into her decisions the bogus

30   rationales from defendants, which consisted of lies as to the facts, rules, and case law.

15.  Plaintiff was forced to investigate this obvious state judicial corruption, and discovered a large racketeering enterprise involving defendants Bonner, Carlton, their family ranch, their political party faction, Sarasota county, and state of Florida. This was prosecuted separately in a court of original jurisdiction. Defendant Carlton/Bonner with her sister Lisa Carlton (former president of the Florida senate) are principal benefactors and beneficiaries of the same political faction, whose state and county officials had given Carlton, Carlton/Bonner, and their family-owned Mabry Carlton Ranch Inc a 2007 end-of-term-limit "farewell gift" of $51 million in state conservation funds with no public benefit (and further millions to their rancher neighbors involved in the racketeering crimes). This racketeering, and its use to obtain political campaign funds from the state budget, is detailed in Facts of Racketeering below. Extensive proof of this fraud is available. The political faction later named Bonner's sister Lisa Carlton "Statesperson of the Year" for her *quid pro quo* family "donations" to itself.

16. Plaintiff notified local newspaper reporters and officials of the fraud, which indirectly notified Bonner of his investigation. Bonner refused to recuse herself from the case.

17. At hearing 8/22/2013 defendant judge Bonner refused to consider any of the dozens of enumerated perjuries of public record by defendant lawyer Lincoln, and claimed that there was no legal definition of perjury. Bonner denied without legal basis the very reasonable and well documented motions to censure and to disbar defendant Lincoln for perjury and abuse of process, "because we're both lawyers." Defendant Bonner refused to consider as improper pleadings any of the 100 pages of entirely false, perjured, immaterial, and dilatory pleadings of defendants, or to strike those dilatory pleadings, or to order the defendants to Answer the Complaint as required by the FlaRCivP, or to grant temporary injunction.

18. Defendant Bonner pretended to be unable to understand the exemplary statement of claims (several counts combined into count 8 of this action), which could not be in more comprehensible form. Bonner was unable to find a single point in which that Complaint did not conform to the rules of pleading, nor any rule wherein the Complaint's one-page Statement Of Claims is other than exemplary, as each of the claims meets the requirements of a civil claim in stating the acts of defendants, the injury to plaintiff, and the lack of permission thereof. Unlike most complaints, each claim carefully tabulated the related paragraphs of Fact, Demand for Relief, and Memorandum of Law, and the Exhibits. Bonner had in case [91] accepted from defendant McNeely as an "Answer" a single torn-off sheet of note paper with an immaterial

1    handwritten sentence, bearing no oath, signature, or notarization, in no way answering any claim,

2    and never served upon Plaintiff (Exh Y), proving beyond reasonable doubt, upon evidence of

3    record, her intent to deny the Plaintiff equal protection and due process of law guaranteed by the

4    U.S. Constitution. Bonner forfeited immunity by these manifest abuses of office.

5    19. Bonner denied all motions for Injunction and motions to Order Defendants to Answer the

6    Complaint, and for three years granted endless spurious defendant motions for deletion of facts

7    and argument from Plaintiff documents, and refused to recuse herself, while these injuries

8    continued, taking advantage of state law immunizing state actors.

9    20. When a single court shows two tracks of response to the same type of claim – one set of

10    cases scrupulous and observant of law and precedent, the other track completely ignoring law

11    and fact – we know that unlawful influences were decisive, whether patronage, contributions, or

12    favors, and that the unfavored parties were more honest. We need not trace cash flows, favors,

13    and promotions. If principles are not always involved, no principles are involved.

14    21. Defendant Bonner has knowingly, willfully, and repeatedly over a period of four years

15    denied, conspired to deny, and refused to prevent denial of the constitutional rights of the

16    Plaintiff to due process and equal protection of law, and in taking of his liberty and property

17    without due process, by these endless vague demands for restatements, and judicial perjuries as

18    to vague defects of exemplary Plaintiff pleadings, claims which conflict grotesquely with the

19    acceptance of defendant pleadings meeting none of the rules of pleading whatsoever.

20    22. As the state action was clearly controlled entirely by corruption, the Plaintiff filed concurrent

21    civil rights action in federal court, detailed below as Summary of Errors of Federal Courts.

22    ***Denial of Constitutional Rights by Defendant Kovachevich and 11th Circuit***

23    23. Upon proof of corrupt obstruction of state action based upon racketeering, this matter was

24    filed in US District Court, Florida middle division at Tampa [96], where it soon met willful and

25    knowing abuse of office by defendant judge Kovachevich, including ignoring of the Sheriff

26    reports and the sworn admissions by the original defendants, perjury as to the facts and the law,

27    and denial to the Plaintiff of compulsory discovery of public enforcement records, so as to

28    conceal her own denial of equal protection and that of defendant Sarasota County. Again

29    personal and political prejudice completely controlled the proceedings, requiring investigation of

30    Kovachevich.

24. Kovachevich had herself required the federal government to spend thirty million dollars to eliminate similar animal noise nuisances at the same Tampa federal courthouse where she denied those rights to the Plaintiff (Exhibits W-2, W-3), had herself affirmed enforcement of the same state laws by the same county sheriff sergeant, had herself ruled that county and state can be responsible for allowing private tort against other persons (all cases where the victim was herself or another woman) and so knew with certainty that these long-standing state laws and ordinances had indeed been enforced previously, and had before her the sworn interrogatory admissions of the original defendants (also both women, interestingly), but claimed falsely that unequal protection could not possibly be proven in this case, and denied discovery to conceal the abundant evidence thereof.

25. Defendant Kovachevich without cognizable argument denied all Plaintiff motions to Order Answer, to Strike Sham Pleadings of defendants, to Join Robert Lincoln as a Defendant, and for Summary Judgment, inventing pretexts to deny constitutional rights to all at her discretion, and failing to respond to superior and standard arguments. The district court showed gross prejudice, maneuvering to block discovery and to immunize defendant county and the private defendants for admitted deliberate violations of civil rights, by dismissing without any cognizable argument, all civil rights and statutory claims, despite full interrogatory admissions by the defendants and Kovachevich' personal knowledge of her own disparate acts and judgments.

26. Defendant Kovachevich willfully committed perjury and abuse of office, as well as denial, conspiracy to deny, and refusal to prevent denial to the Plaintiff of liberty and property, and of due process and equal protection of law, rights guaranteed by the United States Constitution.

27. When a single court shows two tracks of response to the same type of claim – one set of cases scrupulous and observant of law and precedent, the other track ignoring fact and law – we know that unlawful influences were decisive, whether patronage, campaign contributions, or favors. We need not even trace the cash flows, favors, and promotions. If principles are not always involved, no principles are involved. Clearly Kovachevich is an operative of, was influenced by, and was protecting, the same political racketeering enterprise that Bonner sought to protect.

28. During federal action [96], the original defendants continued their injuries, slanders, and solicitation of harassment and vandalism. Plaintiff's car was damaged on both sides by a larger

vehicle, the car lights and tires were vandalized several times, and his boat was twice heavily vandalized, while he was known to be away from home. No such crimes had occurred before.

29. The exhaustion of sleeplessness caused by these defendants forced the Plaintiff to sleep at intervals during the day in the years of prosecution, prevented employment in his usual engineering activity, and substantially impeded prosecution of both state and federal actions. The misery of exhaustion severely affected his health, social environment, and income.

30. Appeal of these obvious abuses to the 11th Circuit [97], the notorious citadel of deep south anti-civil-rights law, met further abuse of office, in a cut-and-paste affirmation which failed to make any cognizable argument whatsoever (App 1, MOL 1), willfully burying constitutional rights for all but themselves and their political affiliates. Any excuse pleased the 11th Circuit.

31. The Supreme Court denied certiorari [98] by actions of defendant junior court employee Travers and his supervisor Atkins, who repeatedly lied that documents were not in the required type size (and did so in other cases, and continue to do so), despite proof of font type and size, and the obvious dimensions thereof and clear written explanations of type dimensions sent to both Travers and Atkins. The bound documents were repeatedly sent back damaged for reprinting with great effort and cost. When all Supreme Court justices were sent samples of the actual document to verify the type size, and defendant Travers was at last forced to file the case, he deprecated the legal basis of the petitions to prevent consideration, a procedure regrettably allowed by that court, which allows politically biased junior clerks to decide about 99 percent of the most serious cases in the United States, on petition to that court.

32. Defendants Kovachevich and Travers, having denied, conspired to deny, and refused to prevent denial to the Plaintiff of liberty and property, and of due process and equal protection of law, rights guaranteed by the United States Constitution, and having upon public record knowingly and explicitly protracted, facilitated, and ratified the injuries of the Plaintiff by defendants Florida, Sarasota County, and other defendants, are thereby implicated as full principals in those torts, in betrayal of the people of the United States.

33. Thus did abuse of office by four Jim Crow judges and a junior clerk, inventing pretexts to subvert the Supreme Law of the land at their discretion, willfully deny, conspire to deny, and fail to prevent denial to the Plaintiff of the same constitutional rights that they defended vigorously for themselves and those they prefer, and so did they willfully and explicitly subvert the Constitution and laws of the United States.

***State Court Actions Following Improper Acts Of Federal Court***

34. When state court action resumed, the corrupt judge Bonner continued to obstruct process by demanding deletion of facts and argument from the Complaint, and refused to recuse. The Plaintiff moved the facts of closely-related prior offenses to an appendix, and Bonner ordered that to be removed, so Plaintiff added the claims of those offenses to the Complaint proper and restored the facts as immediately material to the claims. Bonner still ordered the removal of these essential facts, seeking to conceal the motives and activities of the defendants.

35. Upon disqualification of Bonner after three years (state App. V1 p.11) of complaints, her political party assigned judge Curley, who had won elected judgeship only because unopposed, and knew that she would lose if opposed by Bonner's party. Curley owed favors to the law firm Icard, Merrill (of defendant Lincoln) having appointed them to supply guardians Ad Litem for her family court, had political dependency for employment upon defendant Republican party and its local Chief Judge, and had attended events with her friend and colleague Bonner. Note that these "elected" judges never appear on any ballot or receive any votes unless opposed, which is prevented by negotiation among political partisans, who thereby control their employment.[**]

36. Promptly after identical abuses of office by Curley to protect Bonner's party (state App. V1 p.19-21), Curley was promoted by them to be a principal judge of the twelfth circuit court, and later shared that position only with Bonner.

37. Curley continued denial of due process to gain re-election, and then made a dismissal order on false pretenses of noncompliance, unable to find even one further objection to the Complaint. The matter was promptly appealed to the state Second district court of appeals.

38. Upon appeal, the circuit court clerk Karen Rushing, an old ally and mentor of Bonner's sister defendant Carlton ("I love her"[501]), knowing that no court of review could find fault in the Complaint, deleted it from the Record on appeal, despite billing the Plaintiff and including all other items, a criminal act of tampering public records to fool a court of review that it might have faults falsely claimed by Bonner.

39. The Florida second district court of appeals continued these political demands for meaningless and laborious reformatting of documents with no basis in the Rules of Appellate Procedure, and further knowingly and willfully denied, conspired to deny, and refused to prevent denial of due process and equal protection, and liberty and property of the Plaintiff, for more than an entire year of continuing injuries to the Plaintiff, without hearing the case. This corrupt

1  "court" then made a three-word "per curiam affirmation" of the corrupt lower court decision,

2  unable to support any statement of that decision with evidence or argument.

3  40. The Florida Supreme Court denied jurisdiction. On the eve thereof, two Sheriff cars arrived

4  at the home of defendant McNeely. On their departure, the nuisance dogs were let outside as

5  usual, and were not been restrained at any hour for several more years.

6  41. The unlawful and unconstitutional acts of the Florida court having been appealed to the state

7  court of last resort, appeal was taken to the US Supreme Court [4], which as always denied

8  certiorari to the state supreme court, as it does in about 99 percent of all cases.

9  42. Defendants Carlton, Bonner, Mabry Carlton Ranch Inc, state of Florida, Sarasota County and

10  original defendants, are responsible for denial, conspiracy to deny, and refusal to prevent denial,

11  of liberty and property, and due process and equal protection, of the Plaintiff, as well as for the

12  operation of a criminal racketeering enterprise, engaged in the large scale theft of funds and

13  subversion of the constitution and laws of Florida, and all defendants are engaged in the willful

14  and organized subversion of the Constitution and Laws of the United States.

15  ***Denial of Constitutional Rights by the United States***

16  43. *The duty of the federal judges was not to decide whether or not to enforce the rights of the*

17  *Plaintiff*, but to find the means to do so. Instead they bantered and palavered excuses to abuse

18  their office, to deliberately deny constitutional rights on the basis of prejudice, and contrived lies

19  to fool courts of review, that this was magically due to mistakes of the Plaintiff. The defendant

20  federal judge having deliberately and explicitly denied the constitutional rights of the Plaintiff,

21  and having affirmed the denial thereof by the other defendants, in violation of each and every

22  provision of the Civil Rights Act, the United States is liable for compensation as a matter of law.

23  44. The federal courts, and in particular defendants Kovachevich and Travers decided upon the

24  effect that they wanted, knew that the effect is prohibited by the Constitution, denied due process

25  and equal protection of law to reach that effect, and rationalized this by lying as to the facts,

26  course of proceedings, and case law. These defendants ignored the Constitution, and by

27  definition their acts were wrong, regardless of rationale. They intended to take liberty and private

28  property without due process or just compensation, to betray the people of the United States by

29  willful abuse of public office, and to deny the equal protection of law to the Plaintiff, and their

30  actions have had this effect, and have obligated the United States to ensure just compensation,

31  either by itself or by the other defendants.

45. The Plaintiff is not obliged to further prove that the US knowingly *failed to prevent* violation of constitutional rights, because US judicial process explicitly refused to enforce those rights, deliberately allowing constitutional rights to be violated, making the US responsible *a priori* for violation of 42 USC §1986 (failure to prevent denial of rights). The collusion of federal judges with the other defendants to deny civil rights, made the US responsible under 42 USC §1985 (conspiracy to deny rights). US judicial process explicitly affirmed the violation of civil rights, and was therefore by definition *not due process*, in violation of 42 USC §1983 (denial of rights without due process). Similarly, the cases cited show that *equal protection* was denied, regardless of process. However, the Plaintiff has nonetheless extensively refuted the fallacies and obfuscations of the defendant judge (see Memorandum of Law 1 and 3), simply to show that the Constitution and laws might have been enforced in the usual manner.

46. This case rests upon the effect of the federal decision, not upon argument against the decision. This Court has authority to compensate federal violations of constitutional rights, regardless of the branch of government involved. The federal decision having the effect of denial of constitutional rights obligates the United States to compensation, regardless of argument of those decisions in the lower courts.

47.  This is the fourth time in twenty years that the federal government has through judicial "errors" and misconduct destroyed the work, retirement investments, and ability of the Plaintiff to engage in professional work, by unlawfully allowing others to unlawfully take or destroy their value. That is not due to any fault of the Plaintiff, either in the original causes or in litigation, and it is not coincidence. Even if the pleadings had had faults, which they did not, it was the duty of the judicial branch to prevent violation of constitutional rights by operation of its procedures.

48. In none of these cases was any cognizable argument made for dismissal. In each case, a typical cause of dismissal was stated to fool the general public, with no argument or connection to the facts of the case. In each case the federal courts have ignored all statutes, case law, their own prior decisions, common law, evidence, and their own personal knowledge. In each case, the utter absence of cognizable argument was appealed, and no cognizable argument was made by the appeals court. In each case, the Supreme Court refused petitions for hearing.

49. These cases show clearly that the federal judiciary has failed to expel from certain venues a racketeering enterprise, operated to deny civil rights for the benefit of partisans. The factions, purposes, and beneficiaries of this enterprise are not material. These effects of these actions have

1    obligated the United States to ensure that treble compensation is made by the United States or the

2    other defendants.

3    ***Facts Of Racketeering By State Judge Bonner And Others***

4    50. The related actions detail the racketeering activities of defendant state judge Bonner and

5    others. These criminal activities were determinative in related Florida state action, and clearly

6    determined the outcome of the related federal action.

7    51.  The Florida case rose to appellate court due to the political agenda of elected lower court

8    judges Bonner and Curley. When corruption became apparent, the Plaintiff investigated Bonner.

9    With her sister, politician Lisa Carlton, Bonner was directly involved in the theft of $51 million

10   of state and federal funds. The theft was arranged by partisan officials as a no-strings grant to

11   their Carlton ranch with no public benefit whatsoever, falsely claimed to benefit two endangered

12   species never found in that county or any adjacent county, which require forest habitat and

13   cannot live on ranch land (abundant proof available from state agencies). Bonner used the funds

14   to gain an elected judgeship, knows that Plaintiff is investigating the theft, and attacked the

15   Plaintiff's case in County court [91]. When Plaintiff moved the case to Circuit court [92],

16   Bonner's political party forced the retirement of sympathetic judge DeFuria and promoted her to

17   Circuit Court, where she took this same case again, and again denied all plaintiff motions for

18   relief and motions to recuse (App B1 – B9), and granted all dilatory motions of defendants (App

19   B8a). Upon disqualification of Bonner after three years, her political party assigned judge

20   Curley, who had won elected judgeship only because she was unopposed, and knew that she

21   would lose if opposed by Bonner's party. Promptly after her identical abuses of public office to

22   protect Bonner's party (App B8b), Curley was promoted by them to be a principal judge of the

23   twelfth circuit court, and now shares that position only with Bonner (see 12th Circuit website).

24   **Facts of Florida State Defendants 2020-22: Fraud, Perjury, And Abuse Of Office**

26          The Defendants here named are not identified in the original Complaint because this

27   matter was pending in the Manatee County court of Florida at the time of filing thereof.

28   Defendant Bonner is the immediate superior of that judge, so that corrupt handling of that matter

29   had to be evidenced before inclusion in this case. That corruption is now established, and the

30   Complaint herein shall be amended to include this claim when the primary defendants are joined.

*Defendants In This Claim*

52. Defendant Mark Walzer is owner and registered agent of defendant Paradise Motors LLC.

53. Defendant Paradise Motors LLC is a Florida LLC, document L05000046647, FEI/EIN 13-4299152 engaged in the sale of used cars, dealer license 1012643-1, with a place of business at 3015 9th St W, Bradenton, Florida 34205. Dealer bond is CMS41001110, Hudson Insurance Group, 1064 Greenwood Blvd, Lake Mary, FL.

54. Defendant Bonner of Defendant Group A, a state judge engaged in organized crime.

55. Defendant Heather Doyle, a state judge of the Manatee County court, whose immediate superior is defendant Bonner of the Circuit Court in Sarasota County.

56. The state of Florida is liable for damages and may be named as a defendant as needed.

*Brief Statement of Claim*

57. On March 24, 2020, Plaintiff and Defendants entered into a contract (Exhibit B) for:

    A. Sale of an automobile under Florida law and regulation (see details below);

    B. Plaintiff paid defendant $6515.25 in cash including taxes and registration fees.

58. The Defendants failed for ten months to fulfill the terms of the contract:

    A. Failed to deliver the vehicle for three weeks, ignoring frequent requests;

    B. Delivered the vehicle without title and with over 200 more odometer miles;

    C. Refused for eight months to deliver title despite many certified requests;

    D. Refused to cooperate with the investigation by Florida DHSMV, which found defendants in violation of Fl. St. 319.23-6-A (failure to transfer title in 30 days).

    E. Forced the plaintiff to spend two full months trying to obtain title documents, proceeding with the Florida DHSMV investigation, and litigation preparation;

    E. Denied the plaintiff use of the vehicle, forcing him to use an older vehicle, causing loss of six months of labor searching for a home that he could not then purchase due to breakdown of the older vehicle; the home was sold to others.

59. The damages to the Plaintiff include (1) difference in purchase price, taxes, and fees to purchase another vehicle today; (2) two months of full time labor over a period of ten months to select and evaluate the vehicle, seek the vehicle and title, initiate and pursue DHSMV investigation, and prepare and pursue litigation; (3) six months of full time labor to select a home

1  needed by the Plaintiff, for which the purchase opportunity was lost due to breakdown of the

2  older vehicle to be replaced; and (4) and nine months of vehicle storage and interest;

3  ***Facts Of Fraudulent Sale Of Vehicle***

4  60.  The Plaintiff contacted defendant Paradise Motors to purchase a used car in mid-February

5  2020, a Toyota Camry 2008 VIN 4T1BE46K18U777636, and had the car inspected by a

6  mechanic on 2/24/2020 (Exhibit A).

7  61. The purchase was agreed between the plaintiff and Paradise Motors, and plaintiff paid

8  $6515.25 in cash on 3/4/2020 (Exhibit B). This amount included taxes and fees for registration in

9  Florida. The defendant's salesperson refused to give a receipt, and the Plaintiff was forced to

10  have defendant Mark Walzer sign with "Paid in Full" on the agreement.

11  62. Defendant Walzer requested a few days to replace a visor which the Plaintiff allowed. But

12  the car itself was not delivered as agreed. After several weeks in which plaintiff calls and

13  messages to defendant Paradise Motors were <u>never answered</u>, plaintiff reached Walzer himself

14  by telephone and requested delivery of the car with the visor not repaired.

15  63. About 3/20/2020 the car was delivered to the plaintiff residence <u>without the title documents</u>.

16  It had been driven over 200 miles since purchase. Plaintiff left several messages for the

17  defendants over several days, requesting the title documents, so that the car could be registered.

18  64. Defendants did not respond to any messages, so the plaintiff requested the title documents by

19  mail with proof of mailing 3/30/2020 (Exhibit C, D).

20  65. Defendants did not respond to this request, so the plaintiff requested the title documents by

21  certified mail 4/20/2020 and 4/24/2020 (Exhibits E-H). <u>Both requests included title transfer</u>

22  <u>documents already filled out, and stamped return envelopes</u>.

23  66. Defendant Walzer called the plaintiff about 5/1/2020 and promised take the title  documents

24  for the car to the Dept. of Motor Vehicles and tax collector the next day. But by 5/19/2020 the

25  title documents had not been delivered to DHSMV or tax collector, nor had the defendant

26  explained the further delay, now <u>eleven weeks since purchase</u>.

27  67. On 5/20/20 the plaintiff filed a complaint against the defendants with the Florida Department

28  of Highway Safety and Motor Vehicles (DHSMV) with the above facts and exhibits, asking

29  DHSMV to require Mr. Walzer to provide the title documents to the buyer immediately, or

30  refund the amount paid. Because the Plaintiff is a professional forced to make extensive efforts

to get the defendants to deliver the car and the title documents, the plaintiff requested that the defendants be required to pay an additional penalty to the plaintiff. The complaint suggested that the dealer license of defendant Paradise Motors should be revoked for dishonest practices.

68. 5/21/20 DHSMV began investigation, estimating completion within 60 days.

69. 6/16/20 DHSMV notified the plaintiff that investigation had to be reassigned to the Palmetto office (Steve Bundy) because defendant Walzer was non-responsive (Exhibit I).

70. 7/10/20 DHSMV Steve Bundy notified the plaintiff that the defendants never respond to his inquiries, and that he planned to go there to talk with them.

71. 7/20/20 was the last day of usual 60-day maximum for DHSMV to process a claim.

72. 7/30/20 DHSMV Steve Bundy notified the plaintiff that he had contacted defendant Walzer and that he expected to get the title transferred in the next few days.

73. 8/14/20 DHSMV Steve Bundy notified the plaintiff that he had gone to Paradise Motors and found it closed. Walzer had falsely claimed that an employee was sick. DHSMV Tallahassee HQ would require a substantial penalty from the defendant. DHSMV planned to seize Florida title to transfer to Maine, likely within 1-2 weeks. This process would not depend upon any response of the defendants.

74. 8/27/20 DHSMV Steve Bundy notified the plaintiff that he and the regional administrator expected to seize the title from the dealer before October.

75. 9/20-10/20/20 the plaintiff made calls to Steve Bundy, who now stated no expectation of progress until plaintiff return to Florida, that he did not think that FDHSMV would be able to get the title, and that he did not expect the dealer would get more than a minor fine. Clearly DHSMV had changed course and made a decision to minimize its response to the dealer fraud.

76. 11/25/20 plaintiff call to Steve Bundy, who stated that the FDHSMV investigation was completed, that the state attorney would decide penalties of the dealer, whose failure to transfer title within 30 days violated Fl. St. 319.23-6-A.

77. The plaintiff contacted Sandra Haynes of FDHSMV in Tallahassee and obtained the 11/30/20 determination letter (Exhibit J) (it does not state violations of law, and notes that resolution by DHSMV is "not authorized" as such matters are referred to the state attorney to penalize the dealer or suspend/revoke the license).

78. The plaintiff requested information from FDHSMV on (1) the dealer failure to deliver title, and persistent refusal to cooperate; (2) copy of communications with the state attorney

recommending process against the dealer; and (3) the conclusion on whether the dealer has the vehicle title. No response was received.

79. 12/3/20 Steve Bundy called to say that he would obtain the title documents and give those to the plaintiff upon return to Florida. The plaintiff went to the DHSMV Palmetto office on 12/8/20, which gave him the vehicle title. The forms had been signed by the defendant on demand of DHSMV, an admission that he could easily have done so at any prior time.

80. The defendants caused the plaintiff major efforts over eight months to obtain compliance with sales contract, regulations, and laws, forced him to bear the cost & risk of storage of an unusable car, over 6 mos depreciation, and the repair of any damage in storage. The defendants also retained copies of the car keys, so that the Plaintiff could not safely own or use the vehicle. Therefore the vehicle was sold at the original price, adding damages for the higher prices today.

81. The Plaintiff was seeking an alternate northern home to use when the school property at which he resides is sold, and about 10/4/2020 located a riverfront home on the Chenango River near Binghamton, NY, foreclosed and in need of renovations, which the seller agreed to sell for only $15,000 (see broker emails, Exhibit L). This was an older riverfront house which perfectly met the plaintiff needs and abilities as a northern home in retirement. The subject vehicle began failing at that time, and was diagnosed and repaired during the period 10/9/2020 to 10/20/20 (Exhibit K). During that period the Plaintiff attempted to delay the transaction, but could not inspect the home or sign a purchase contract until he had a working vehicle, and the home was sold before the car repair was completed.

82. The purpose of the car purchase was to retire the older car and use a newer car for travel North to Maine during the summer, when the Plaintiff had to inspect homes for purchase. Because the DMV had not completed its investigation, the Plaintiff could not determine when compliance might occur, and could not obtain a third vehicle within days. The deliberate refusal of the defendants to deliver title to the newer car, even under order of the DMV, forced the Plaintiff to use the old car (111,000 odometer miles) that summer, causing the loss of a year of searching. No similar opportunity has been found despite almost daily searches for homes at prices up to $100,000 for more than one year since that disaster, and home prices have nearly doubled since then. The only practical opportunity was lost due to the car repair, entirely due to the refusal of the defendant to deliver title to the newer car purchased seven months earlier. The estimated Consequent Damages exceed $100,000, and will exceed $200,000 if another such

home cannot be found for less than $215,000, which is very probable. In addition, the delays in home purchase have prolonged the home search by more than a year's effort, and have greatly complicated storage and temporary housing when moving.

### *Acts of Defendant State in Ratification of Tort and Denial of Constitutional Rights*

83. The Plaintiff filed action for fraud 12/10/2020 in the Manatee County Court as case no. 20CC6245. The assigned judge was defendant Doyle, whose immediate superior is defendant Bonner at the Circuit Court in Sarasota, engaged in the racketeering enterprise including other injuries to the Plaintiff by perjury and abuse of public office. The necessary venue in Manatee forced the experiment: whether defendant Doyle would act independently of the organized crime of her superior defendant Bonner, or would join Bonner in seeking to injure the Plaintiff to prevent or retaliate for his ongoing prosecution of the Carlton/Bonner racketeering crimes.

84. Despite four Plaintiff Motions for Summary Judgment and two Notices of Relocation to his residence out of state, Doyle took *no action at all for fifteen months*, when a brief hearing was held, and the trial needlessly moved past the departure date of the Plaintiff and held 5/10/2022.

85. In pretrial documents and at trial, defendant Walzer admitted the essential facts, that the contract stated that Florida title would be transferred, and that he made no effort to do so until ordered by the state DHSMV. Maine requires that vehicles have title in the state of purchase before title is transferred to Maine. Florida requires that buyers sign a title transfer form then sent by the dealer to the DHSMV. Although Walzer claimed to have sold two thousand cars before this one, he refused to answer questions as to why he did not in two years take five minutes to return the numerous inquiries of the Plaintiff, including three proven certified letters with all of the necessary forms and prepaid return envelope, or have any other communication with the Plaintiff. He relied upon the absurd lie that the Plaintiff kept "changing his mind" requesting title transfer directly to Maine, even though Maine does not permit that, and he had refused all communication with the Plaintiff, which would have clarified any issues immediately. He claimed that the Plaintiff could at any time gone to the always-closed (and now sold) "dealership" to transfer title. He lied outrageously that this refusal to take even five minutes during two years to clarify the title transfer constituted "working closely" with DHSMV.

86. The facts of record in the case show clearly that DHSMV investigation determined that defendant Walzer had known that Florida title was to be transferred, although DHSMV noted Walzer's claims that the Plaintiff "changed his mind" despite zero communication with Walzer.

The records clearly show the damage done by Walzer forcing the Plaintiff to leave for Maine with an old car, which caused the loss of a very important home purchase due to the resulting car repairs. There was no evidence at trial for the Walzer excuses for obstructing the title transfer.

87. During cross-examination of a witness recently appointed a manager of DHSMV, defendant Doyle demanded an end to questioning, and the Plaintiff explained that the manager's proven efforts to distort the evidence from the investigation, requests to employees to refuse further communication with the Plaintiff, and refusal to penalize the crooked used car dealer, showed collusion with the Plaintiff's ongoing racketeering prosecution of defendant groups A, B, and C. The judge defendant Doyle inquired and found that her superior Bonner is a defendant therein.

88. Despite the obvious fact that the evidence supported only the Plaintiff claims, the corrupt judge Doyle wrote a judgment in contradiction of all of the evidence, stating with telling inversion of roles that "The Defendant failed to prove the Complaint by a Preponderance of the Evidence." Indeed the *defendant* failed to *disprove* the Complaint, but the Plaintiff proved all claims thereof, for there was *no evidence whatsoever against the claims*. The crooked judge did not find a preponderance of evidence, but did as she was told by her boss, defendant Bonner.

1

**OATH**

     I, the undersigned Plaintiff John S. Barth do hereby certify under penalty of perjury that the foregoing is true and correct.

Executed on (date): ___3/3/2025___

John S. Barth, Plaintiff, pro se

P.O. Box 88, Springvale, ME 04083 Jbarth@gwi.net  207-608-1741

United States, Dept of Justice, 950 Pennsylvania Ave, Washington, DC 20530-0001
Federal Bureau of Investigation, 935 Pennsylvania Ave NW, Wash., DC 20535-0001
Homeland Security Investigations, 1901 S. Bell St., Suite 900, Arlington, VA 22202
Mabry Carlton Ranch Inc., agent Barbara B. Carlton, 9430 Sidell Rd., Sidell, FL 34266
Barbara B. Carlton, 9430 Sidell Rd., Sidell, FL 34266
Lisa Carlton, 9420 Sidell Rd., Sidell, FL 34266
Kimberly Carlton Bonner, 9450 Sidell Rd., Sidell, FL 34266
Longino Ranch, Inc., agent John Minton Jr, 26111 Turpentine Still Rd, Sidell, FL 34266
Berryman T. Longino jr, 25501 Tampensi Trail, Sidell, FL 34266
John Longino, 757 17th St, Fort Lauderdale FL
John L. Minton Sr, 2513 S Indian River Dr, Fort Pierce, FL 34950
John L. Minton Jr, 2619 Park Place Dr, Winter Park, Fl 32789
Thomas L Curry, 2805 Oakland Park Blvd, Fort Lauderdale FL
MJW Ranch LLC, James J Walton Trust, Wyona June Walton Trust,
     Manager and Trustee Michael Allen Walton, 27790 Hickory Blvd, Bonita Springs FL
Michael Allen Walton, Julie M Walton, 27790 Hickory Blvd, Bonita Springs FL
Eric Sutton, Florida FWCC, 620 S. Meridian St, Tallahassee, FL 32399
Amy Meese, 6369 Mighty Eagle Way, Sarasota, Fl 34241
Jon Thaxton, 2046 Cordes St, Osprey FL 34229
Paul Mercier, 2124 Cork Oak St E, Sarasota, Fl 34232
Nora Patterson, 707 Freeling Dr, Sarasota, FL 34242
Eric Robinson, 133 Harbor Dr South, Venice, FL 34285
Carlos Beruff, 632 Regatta Way, Bradenton, Fl 34208
Karen Rushing, 7372 Mara Vista Dr, Sarasota, FL 34238
Scott Ortner, 11473 Tinder Ct, Venice FL 34292
Robert Lincoln, 1928 Rolling Green Cir, Sarasota, Fl 34240
Rochelle Curley, 2405 Moccasin Hollow Rd # R, Sarasota, FL 34240

**Certificate**

     The notary certificate as required by the State of Florida follows:

43

**Document Name:** District Court of the United States District of Columbia ( John S. Barth, v. Mabry Carlton Ranch Inc.: etc.

## State of Florida Jurat Notary Certificate

**STATE OF FLORIDA**
**COUNTY OF Manatee**
Sworn to (or affirmed) and subscribed by personally appearing before me by physical presence this 31st day of March, 2025, by,      John S. Barth          .



LOUIS G.C. VETTRAINO
Notary Public, State of Florida
Commission# HH 401569
My comm. expires May 22, 2027

_____
*(Signature of notary public)*

Lou's G. C. Vettraino
_____
*(Name of notary public)*

**My commission expires:** 05/22/2027

**Official Seal**

Personally known          OR
Produced identification  X  Type of identification produced:  Maine Drivers License

1

22