**District Court of the United States**
**District of Columbia**

| John S. Barth,
|        Plaintiff
| v.
| Mabry Carlton Ranch, Inc., et al,
|        Defendants

Case No. 1:25-cv-01136-DLF

**Memorandum of Law 2**

**Lawful Means to Achieve Conservation Goals**
**by Land Use Regulation, and**
**Government Purchases of Land and Easements**

## Contents

AUTHORITIES ................................................................................................................ 2
ARGUMENT OF LAND USE REGULATION AND CONSERVATION PURCHASES .......... 4
    Observations On Florida Racketeering And Conservation ........................................ 4
    No Compensation Was Required to Limit Development of the Subject Lands ........................ 6
        County Does Not Compensate Most Landowners for Regulation of Future Uses ................ 7
        Population Studies Do Not Support Expectation of Urban Land Use of Subject Ranches ..... 7
        Owners of Subject Properties Admit and are Well Aware of Lack of Residential Value ....... 8
        Appraisals of the Highest Market Values of the Subject Properties Were Fictitious ............. 8
        State and County have Extensive Experience of Fraudulent Land Value Claims .................. 9
        No Compensation Was Required Under Federal Law ............................................................. 10
        No Compensation Was Required Under State Law ................................................................. 11
    Regulation was Sufficient for State and County Conservation Goals on the Subject Lands .... 12
        Federal Law Already Restricts Development of Habitat for Endangered Species ................ 12
        State Law Provides for Rural Development Consistent with Conservation Goals ................ 14
        County Protection of Environmental Land Prior to 1994 Did Not Fund Purchases ............. 14
        Easements Were Unnecessary Because Zoning Was Sufficient ........................................... 15
        Conclusion: No Compensation Was Required To Meet Conservation Goals ...................... 16
    Eminent Domain was Sufficient to Purchase Conservation Land Not Available For Sale ....... 16
        Customary Practice Included Eminent Domain Taking of Conservation Land .................... 17
    County Procedures for Conservation Purchases Invited Interested Parties to Interfere ........... 17
        Florida Law Requires a County Comprehensive Plan to Meet Environmental Goals .......... 17
        County Comprehensive Plan Requires Maintaining and Restoring Native Habitats ............ 17
        County "Environmentally Sensitive Land" Protection Program ESLPP ............................. 19
        ESL Oversight Committee ESLOC Invited Interested Parties to Advise ............................. 20
        County Knew That State ARC and BOT Would Not Approve The Subject Purchases ........ 21
    State Law for Purchase of Conservation Land Required Scientific Evaluation ....................... 21
        State and Local Designation of Conservation Lands: FS Chapter 380 ................................. 21
        State Acquisition of Conservation Lands: FS Chapter 259 .................................................... 22
        SWFWMD Manages Mitigation Credits Chargeable to FDOT ............................................. 24
        Purchases by Water Districts are Intended to Protect *Only* Water Resources ...................... 24
        Purchase Required Scientific Evaluation But Water District Circumvented This ................. 26
    Federal Funding of Conservation Purchases was Mixed with State Funding .......................... 29

**AUTHORITIES**

**Constructive Taking of Property**

31.  Palazzolo v. Rhode Island, 99-2047 (2001)
32.  Lucas v. South Carolina Coastal Council. 505 U.S. 1003
     (112 S.Ct. 2886, 120 L.Ed.2d 798) (1992)
33.  Nollan v. California Coastal Comm'n, 483 U. S. 825 (1987)
34.  Penn Central Transportation Co. v. New York City 438 U.S. 104 (1978)
35.  United States v. General Motors Corp. 323 U.S. 373, 378 (1945)
36.  Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922)
37.  Old Colony & Fall River R.R. v. County of Plymouth, 14 Gray 155, 161
38.  James G. Cayon vs. City of Chicopee & another, 360 Mass. 606, 609 (1971)
39.  Gomillion v. Lightfoot 364 U.S. 339 (1960)
40.  Mesag Aselbekian & others vs. Mass. Turnpike Auth. 341 Mass. 398 (1960)
41.  U.S. v. 564.54 Acres, 441 U.S. 506, 511 (1979)

**Statutes of the United States**

18 USC §§ 1951-1968 (Chapters 95, 96) Racketeering, including the Racketeering Influenced and Corrupt Organizations Act (RICO)

**Related Ordinances of Sarasota County**

Resolution 92-106: creates Environmentally Sensitive Lands Advisory Board (later ESLOC) to develop criteria to identify lands and methods for acquisition.
Resolution 92-272: establishes criteria to identify and rank environmental lands.
Ordinance 94-009: establishes policies for environmental lands not publicly owned. (Sarasota County Environmentally Significant Lands Protection Ordinance)
Resolution 94-236: establishes Myakka River Planning Advisory Board (now MRPAC).
Ordinance 98-025: provides management plan for a 220-foot protection zone as part of the Myakka River Protection Plan
Ordinance 98-096: increases ad valorem tax to .25 mils for 20 years and authorized bonds to $53,000,000, subject to referendum, to acquire and manage environmental lands.
Ordinance 99-004: sets up ESLPP and creates Environmentally Sensitive Lands Oversight Committee (ESLOC) to submit proposed land or easement purchases to the Board for approval.
Ordinance 2005-*** extends the ad valorem tax through 2019
Ordinance 2007-211 sec 1.3 extends the ESLOC and defines its authority to propose land purchases and uses, and requires that members comply with the state Code of Ethics.

**Statutes of Florida**

**Reference Works**

150. *Manual for Complex Litigation*, MCL 4th, Federal Judicial Center 2004

151. *Criminal RICO: 18 U.S.C. §§1961-1968, A Manual For Federal Prosecutors*, 2016, U.S. Department of Justice, Organized Crime and Gang Section

152. *A Study of Public Corruption in Florida and Recommended Solutions*, First Interim Report, Nineteenth Statewide Grand Jury, 2010

**Other References**

160. Teresa M. Becvar, *When Does Sleaze Become A Crime? Redefining Honest Services Fraud after Skilling v. United States*, 88 Chi.-Kent. L. Rev. 593 (2013). (available at: http://scholarship.kentlaw.iit.edu/cklawreview/vol88/iss2/16)

161. *Ecology and Economics of Florida's Ranches*, Univ. Fl. IFAS Extension, 2004

162. *Things to Know Before Buying a Ranch*, Winder, Schmedt, Noble Research Inst., 2000

163. *Trade-Offs Among Ecosystem Services and Disservices on a Florida Ranch*, Swain, Boughton, Bohlen, and Lollis, Society for Range Management, 2013

164. *Florida and Metro Forecast*, Inst. for Economic Competitiveness, Univ. of Florida, 2018

165. *Closing the Gaps in Florida's Wildlife Habitat Conservation System*, Fl FWC, 1994

166. *Conservation Easement Program,* Florida DEP, Div. of State Lands, 2012

167. *Coller FAIRR Protein Producer Index*, environmental assessment of ranches, www.fair.org

1
2    **ARGUMENT OF LAND USE REGULATION AND CONSERVATION PURCHASES**
3
4    Racketeering is prohibited by 18 USC §§ 1951–1968 (Ch. 95, 96) including the
5    Racketeering Influenced and Corrupt Organizations Act (RICO, §§ 1961–1968), where income
6    therefrom is derived from or used to control, or it is engaged in by persons associated with, an
7    enterprise engaged in or affecting Interstate Commerce. Violators are subject to compensatory
8    and treble punitive damages as well as criminal penalties.

9    **Observations On Florida Racketeering And Conservation**
10   Residents of Florida know that few people rise or succeed in business in here without
11   being a member of the predominating political party. Government office in Florida has long been
12   a spoils system, where party influence is irresistible, and this is broadly accepted. No one can
13   expect to be appointed, hired, or promoted in state or local office unless they join and follow the
14   requests of the predominant party. Therefore political officials of the defendant state and county
15   are necessarily operatives of the predominant political party, using government office to direct
16   public funds to party advantage, a process which can readily cross the line between political
17   scheming and criminal enterprise.
18   Rogue elements of any party or faction in government office can readily influence large
19   state grants to benefit the party, such as those of Florida's $400 million annual purchase of
20   conservation lands, for example by purchasing wasteland and "conservation easements" from
21   those likely to contribute some of the funds to the party. In this way public funds are diverted to
22   political campaigns to maintain predominance. Plausible rationales can be manufactured for
23   conservation projects, because even well-intended rationales are often hypothetical, strategies are
24   flexible, little evidence of need or effectiveness is expected, professional dissent can be silenced,
25   and the credentials of malleable professionals can be used to silence critics.
26   For example, the decline in numbers of the Florida Panther due to declining forested
27   habitat led to its classification as an endangered species. About one hundred panthers remain,
28   concentrated in the sparsely populated far southwestern counties. Efforts of the Florida Fish and
29   Wildlife Conservation Commission (FWC) from 1980 to the present to track panthers and
30   identify signs of their presence, such as roadkill, predation, scat, confirmed interactions, and

telemetry tracking, have allowed the state FWC to map their natural range.[1] There is no evidence whatsoever that panthers have lived in or even ventured to Sarasota county or any adjacent county, except for rare incursions into far southeast Charlotte county.[2] Therefore one would expect that projects purporting to protect their habitat would concentrate on areas within or near their known habitat,[3] not in Sarasota county.

But instead, priority zones for habitat protection were assigned within Sarasota county, about thirty miles from the nearest rare evidence of panthers, and over fifty miles from any areas of regular panther activity.[4] Almost all of the intervening land is open, non-forested land such as farms and ranches, not habitable by panthers, and any paths that might be created between Sarasota county and panther habitat are blocked by several rivers that panther are not known to have crossed.[5] There is no evidence that panthers cross large rivers between habitat areas. There is no evidence that panthers migrate along narrow corridors between habitats of sufficient size; indeed the only known corridor-like habitat is along a midstate valley that does not lead to a larger habitat and is not crossed by rivers, and that is little used. The state FWC has not even designated any of the intervening land as significant for habitat preservation,[6] nor have they proposed a panther migration corridor to Sarasota county. Yet the state FWC and county officials have consistently claimed that the land purchases in Sarasota county constitute a "migration corridor" connecting existing habitat far away with public land in Sarasota county.[7]

The grants made for purchases of land in Sarasota county, and for conservation easements, contain no provisions requiring the land to be reforested as needed for use by panthers, and in fact permit ranch activity to continue even on land purchased as panther habitat.[8] Therefore the grants and easements involve no cost to the rancher whatsoever, and no provide benefit to panthers whatsoever.

---

[1] see Exhibits Vol. 1
[2] Ibid
[3] Ibid
[4] Ibid
[5] Ibid
[6] Ibid
[7] Ibid
[8] Ibid

1    Furthermore, the entirety of public lands in Sarasota county, together with land
2  designated important for panther habitat, is barely enough for a few panthers,[9] even if it were
3  reforested. To create such a habitat, including even land of high value along Interstate 75
4  adjacent to rapidly expanding coastal towns and cities, would cost hundreds of millions of
5  dollars, for the prospect of merely enticing a few panthers there. Purchasing the intervening land
6  to connect to existing panther habitat, bridging the intervening rivers if possible, and reforesting
7  all of the land would cost billions of dollars, all for a few hypothetical panthers. Such purchases
8  would also introduce large carnivorous animals in proximity to high density residential areas.

9    It is unlikely that the people of Florida would approve such a project if they knew the
10  facts. With a strongly anti-environmental state government (the governor recently prohibited use
11  of the term "global warming" in official communications), it is unlikely that Florida would have
12  funded large environmental programs without some benefit to an unstated group of people in or
13  connected with the legislature. This "conservation" funding would not exist without the prospect
14  of political insiders and legislator election campaigns getting the funds.

15    In fact, these funds for land purchases and conservation easements have been paid
16  primarily to members of the predominant political party, by purchasing land of influential party
17  members, and a substantial part of these funds have been used for political purposes.

18    Yet conservation projects are popular with the electorate, who wish to believe that
19  expenditures to protect endangered species or habitats will be effective.

20

21  **No Compensation Was Required to Limit Development of the Subject Lands**

22    For conservation of habitat in remote farm and ranch areas, regulation restricting further
23  development is sufficient to protect against residential or commercial development in the distant
24  future, because this is not a reasonably foreseeable land use, and therefore owners do not have a
25  "reasonable expectation of value" in such unforeseeable uses, and therefore would have no claim
26  of property taking under state or federal law.

27    The subject land parcels are farms and ranches far from the coastal cities and amenities
28  that attract new residents, with no foreseeable residential value, and any appraisal claiming
29  otherwise would have been an obvious land sales fraud. Therefore the owners had no
30  "reasonable expectation" of land uses of greater value. Because the conservation easements did

---

[9] Ibid

1  not restrict existing land uses on the subject parcels, regulation having the same effect would not

2  have effected a taking of property, and so no easement or expenditure of funds was necessary.

3  **County Does Not Compensate Most Landowners for Regulation of Future Uses**

4  Sarasota County does not offer payments for new land use restrictions imposed by its

5  zoning and other land use ordinances, which apply to nearly all real property of residents in the

6  county. For example, the Plaintiff owned property within the county for which restrictions of

7  future uses were enacted by several zoning ordinances, but was never compensated for loss of

8  real market value in the prohibited future uses, yet was taxed to compensate the owners of the

9  subject properties for prohibition of uses of which they had no reasonable expectation. The

10 county therefore taxed landowners whose reasonably expected development rights it restricted,

11 to pay other landowners for rights of development that they had no ability to use anyway.

12 **Population Studies Do Not Support Expectation of Urban Land Use of Subject Ranches**

13 Studies of population growth and urbanization of southwest Florida over the past 50

14 years do not support expectation of growth of urban areas to such an extent as to permit

15 investment based upon residential use of remote ranches like the subject properties.

16 The population of Florida grew after 2000 due to retirement of the post-WWII "baby

17 boom" segment, slowed by the recession 2008-2014. Mortality among this large segment retirees

18 is likely to greatly reduce the population growth rate. Demand for residential land inland from

19 the popular coastal areas will not increase substantially.

20 Demand for housing and new construction is strongest near existing amenities and jobs in

21 cities like Sarasota and Fort Myers, and weakens with distance from the coast, as in areas east of

22 I-75. Demand in areas north and south toward the nearest cities is strong only near the coast.

23 Northport to the south of the subject land has almost no urban amenities, is an hour's commute to

24 the nearest cities, and would have to double its population to develop fully to the boundary of the

25 subject land. The northern areas of the city of 66,000 are sparsely populated (exhibit 103), and

26 while it has grown at about 2.2% during the recent housing boom, requiring 32 years to reach its

27 northern boundary, it is likely to cease development as the postwar "baby boom" demand

28 declines in 5 to 10 years, and will have to fill housing with migrants who need better access to

29 city employment. The supply of undeveloped land east of I-75 but north and south of Sarasota is

30 almost unlimited and residential demand is very weak at this distance from the nearest cities.

1    The only recent proposal for major residential development of ranch land in the region
2    would use part of the former Babcock ranch to the southeast. Because it is located between
3    nearby cities Ft. Myers and Punta Gorda, such development could succeed despite a lack of
4    amenities. In contrast, the subject ranches are no closer to Sarasota than Northport, are further
5    from other cities and I-75, and less likely to grow as baby boom retirement building ends.

6    The state purchase of parts of that former ranch as the Babcock Preserve was hoped to
7    extend panther habitat, although separated by forty miles from established panther habitat
8    approved by the FWS, and the Caloosahatchee River obstructs their movement from that
9    direction. Panthers have very rarely been found at the Babcock Preserve, possibly caught and
10   released there, and the nearest parts of Sarasota are another twenty miles NW with the much
11   larger Peace river obstructing migration.

**Owners of Subject Properties Admit and are Well Aware of Lack of Residential Value**

13   Owners of the subject ranches are acutely aware of this problem of extremely slow
14   urbanization, and low growth of employment. Defendant Bonner's husband is an attorney
15   employed by Northport and was engaged in the foreclosure of homes after the 2007 recession,
16   fully aware that the area is economically marginal and unable to support residential expansion,
17   let alone expansion to several times its present size, to permit residential development of the
18   lands closer to the Bonner/Carlton ranch. Therefore the owners of the subject property had no
19   "expectation of value" in any proposed residential use.

**Appraisals of the Highest Market Values of the Subject Properties Were Fictitious**

21   Florida has an industry of false real estate appraisal in support of its extensive land scam
22   industry. In addition to the large lot-sales scams of the 20th century, fraudulent appraisals were
23   widely used to inflate prices and mortgages during the great real estate bubble of 2002-2007, in
24   which properties were typically sold for more than twice their long-term value, leading to the
25   collapse of the real estate market and mortgage holders in the years 2007 to 2012. Because
26   residential property is appraised on the basis of comparable sales, while business property is
27   appraised on the basis of real net operating income, inflating the value of house lots is done by
28   merely comparing the property with already-inflated sales prices. Where the property has no
29   likelihood of residential use, the giddy speculations of marketers are simply substituted for

1  business judgment. Florida was one of states hardest hit by such fraudulent appraisals, but

2  appraisers suffered no consequences, and continue to serve its development industry.

3       The defendant officials had appraisals done by appraisers with likely connections to the

4  defendants, which do not establish any reasonable expectation of more valuable residential use.

5  These appraisals followed typical schemes of appraisal inflation, such as selecting "comparable"

6  properties in more valuble locations, and accepted mere zoning classifications in lieu of market

7  data. Appraisal inflation will be more accurately detailed after discovery.

8  **State and County have Extensive Experience of Fraudulent Land Value Claims**

9       The history of Florida development in the 20th century is substantially composed of large

10  real estate speculation schemes involving fraudulent sales claims made to faraway buyers, that

11  residential areas had been or would be built in what was in fact wasteland. There is no state more

12  acutely aware of, or more intimately involved in, real estate fraud of this kind. It is fair to say

13  that real estate fraud and government corruption are belief systems and principal skills of a

14  predatory native species of Florida that spans most professions and socioeconomic classes.

15       The inland area of Northport on the southern boundary of Sarasota county was partially

16  developed from woodland in the 1960s by unscrupulous developers such as GDC who built only

17  roads through native forest, along with similar fake cities in nearby Rotonda and elsewhere. Tens

18  of thousands of lots were sold as retirement investments via national marketing campaigns, but

19  the developers had not built electricity, water, or sewerage infrastructure, so that owners of most

20  lots could not afford to extend the infrastructure to their land, and had made worthless

21  investments. Most of the "city" remained forest, tens of thousands of lots were abandoned to the

22  county in lieu of taxes, and the developer was sued and went bankrupt. About fifty years passed

23  in gradual extension of power lines along major roads before most lots became buildable and

24  sufficient demand existed to construct modest homes there, far from the jobs in the nearest cities.

25  No county in the nation is more aware than the defendant county of the problem of fake

26  "expectations of value" of residential land use. The county's many years of auctions and sales of

27  these "house lots" for $500 to $1500 ($2000 to $6000 per acre with streets and residential

28  zoning) is an admission that the county had no expectation of residential use of isolated land.

**No Compensation Was Required Under Federal Law**

In <u>Palazzolo v. Rhode Island, 99-2047</u> (2001) [31] the Court well summarized its prior judgments on public taking of private property:

> The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, Chicago, B. & Q. R. Co. v. Chicago, 166 U. S. 226 (1897), prohibits the government from taking private property for public use without just compensation. The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use. Our cases establish that even a minimal "permanent physical occupation of real property" requires compensation under the Clause. Loretto v. Teleprompter Manhattan CATV Corp., 458 U. S. 419, 427 (1982). In Pennsylvania Coal Co. v. Mahon, 260 U. S. 393 (1922), the Court recognized that there will be instances when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs. In Justice Holmes' well-known, if less than self-defining, formulation, "while property may be regulated to a certain extent, if a regulation goes too far it will be recognized as a taking." Id., at 415.
>
> Since Mahon, we have given some, but not too specific, guidance to courts confronted with deciding whether a particular government action goes too far and effects a regulatory taking. First, we have observed, with certain qualifications, see infra at 19-21, that a regulation which "denies all economically beneficial or productive use of land" will require compensation under the Takings Clause. Lucas, 505 U. S., at 1015; see also id., at 1035 (Kennedy, J., concurring); Agins v. City of Tiburon, 447 U. S. 255, 261 (1980). Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action. Penn Central, supra, at 124. These inquiries are informed by the purpose of the Takings Clause, which is to prevent the government from "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U. S. 40, 49 (1960).

The prohibition of an *established* land use is clearly a taking of established value and is a taking of property, unless uses of equal or greater value remain. Regulation that does not restrict established land uses does not take established value, unless a *present fair market value* in a *proposed new land use* is affected. Recent cases establishing criteria of property taking therefore consider proposed *new uses* of land rather than established land uses.

**The Standard of Regulatory Taking of Proposed New Uses of Property is Not Met**

The standard of judgment for regulatory taking of property *balances* the standard of taking with the public interest in land use regulation. The defining cases balance takings criteria against the feasibility of public-benefit regulation of *future land uses*, which does not take away

the *existing* value of established uses. These cases adopt stricter standards for proposed new land uses, so that owners must demonstrate that the value taken was not merely *speculation* about the future, but a "reasonable investment-backed expectation" of value.

For example, in *Penn Central* [34] the owner of historical Grand Central Station proposed a high-rise structure above and dwarfing the station in violation of a NY historic preservation ordinance. In *Lucas* [32] the owner proposed to build a home on a previously vacant beach lot, in conflict with state conservation law. In both cases only the proposed *new* land use was in question, because it conflicted with a legitimate government purpose.

To determine whether there is a taking by application of law or regulation, three factors are applied as set forth by the Supreme Court in *Penn Central* [34]: (1) the character of the impairment of use of the property, (2) the economic impact of the government process as applied to the property, and (3) the property owner's distinct investment-backed expectations of value of the property.

In most cases where conservation law does not impair the established use, (1) there is no impairment of present use of the property, (2) the is no impairment of the value of the property in its established use, and (3) the property owner had no reasonable investment-backed expectation of higher value use of the property. Therefore none of the criteria of property taking by application of law or regulation are met.

Where land use regulation does not impair established land uses, nor impair a present fair market value in proposed land uses more valuable than the established use, it does not impair a "reasonable investment-backed expectation" of higher value, therefore no value is taken. A farm or ranch remote from the populous coast and its amenities that attract new residents, and unlikely to be developed for residential or commercial use in the foreseeable future, would not have a "reasonable, investment-backed expectation" of value beyond its present FMV as farm or ranch, and therefore the imposition of land use regulation prohibiting such higher uses would not create a basis of claim for compensation under federal law.

**No Compensation Was Required Under State Law**

Florida law incorporates the federal standards of property taking as state standards and explicitly requires compensation where taking of a reasonably expected value occurs. Fl. Chapter

11

70 (Private Property Rights Protection Act 1995) provides at 70.001(1) a statutory basis of claims for compensation by a landowner :

> When a specific action of a governmental entity has inordinately burdened an existing use of real property or a vested right to a specific use of real property, the property owner of that real property is entitled to relief, which may include compensation for the actual loss to the fair market value of the real property caused by the action of government

The statute explicitly requires that the claim be for impairment of an "existing use" or a "vested right to a specific use" which is limited by 70.001(3)(b)(2) to:

> *reasonably foreseeable, nonspeculative* land uses…which have created an *existing fair market value* in the property greater than the fair market value of the actual, present use or activity on the real property.
> [emphasis added]

The statute explicitly adopts the criteria of *Penn Central* [34] in defining "inordinate burden" at 70.001(3)(e)1 as a case where:

> the property owner is permanently unable to attain the reasonable, investment-backed expectation for the existing use of the real property or a vested right to a specific use of the real property

Therefore the owner of a Florida farm or ranch subject to a new regulatory prohibition of development beyond the present land use, such as a restriction for habitat preservation, could make a claim for compensation under FS Ch. 70, but would be required to show that such uses were "reasonably foreseeable, nonspeculative land uses" which had already created an "existing fair market value" greater than that of the farm or ranch use. A farm or ranch that is remote from the populous coast and its amenities that attract new residents, and therefore unlikely to be developed for residential or commercial use in the foreseeable future, would not have a "reasonable, investment-backed expectation" of value beyond the present FMV as a farm or ranch, and therefore would not have a claim for compensation under Ch. 70.

**Regulation was Sufficient for State and County Conservation Goals on the Subject Lands**

**Federal Law Already Restricts Development of Habitat for Endangered Species**

The Endangered Species Act (ESA) [5,6 below] provides that the U.S. Fish and Wildlife Service (FWS) maintain a list of endangered or threatened land species and designations of habitat based upon economic impact and scientific data. The ESA prohibits with penalties the

"taking" of a species or its habitat, defined as action to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" including action that disrupts "normal behavioral patterns." Taking is permitted to prevent bodily harm but not property damage, although regulations permit killing of wolves attacking livestock and crops.[3,4 below]

Private property use is restricted unless federal approval is obtained. Land modification such as filling or clearing requires application for an "incidental take" permit for listed species including a habitat conservation plan (HCP) detailing feasible protective actions, minimization of taking, and predicted effects.

The use of ESA restrictions to protect the Florida panther has been recommended by conservation groups:

> In 2009 five conservation groups including the Conservancy of Southwest Florida and the Sierra Club petitioned the U.S. Fish and Wildlife Service to designate critical habitat for the Florida panther. In 2010 the FWS denied the petitions and refused to designate critical habitat. The conservation groups filed civil action in Fort Myers against FWS for failure to protect the Florida panther, stating that FWS had approved every development proposal in panther habitat since 1993.[10]

The available restrictions are detailed in government sources.[11]

**Federal Agencies Do Not Consider the Land Species of Sarasota County Endangered**

The federal FWS lists many land animals and plants as endangered or threatened species in Florida, and maps critical habitat areas. Although the Myakka River is designated habitat, there is no land area in Sarasota County designated as critical habitat (see Exhibits Vol. 1).

The FWS enters agreements limiting future restrictions in exchange for conservation activity. Candidate Conservation Agreements with Assurances (CCAAs) protect owners engaged in conservation actions, against additional restrictions if a species becomes listed. Conservation banks (CB) are credits granted for permanently protecting and managing land, that landowners may sell to allow mitigation of adverse impacts elsewhere. Existing CB programs in Florida for

---

[10] *U.S. Fish and Wildlife Service Sued*, Biological Diversity, 2/10/2010
http://www.biologicaldiversity.org/news/press_releases/2010/Florida-panther-02-18-2010.html
[11] [3] US Congressional Research Service, "The Endangered Species Act (ESA) and Claims of Property Rights Takings"
[4] US FWS, "ESA Basics"
[5] US EPA, " Endangered Species Act (ESA) Requirements for Construction Activities"
[6] US NWS, "Endangered Species Act"

the Everglades and Keys habitats are shown on the ACE tracking system (RIBITS). No such conservation programs have been deemed necessary in Sarasota county or any adjacent county.

**State Law Provides for Rural Development Consistent with Conservation Goals**

In particular, F.S. 163.3248 (Rural land stewardship areas, 2011-12) provides a low-cost means to protect significant environmental qualities of rural land areas over 10,000 acres. This statute provides incentives as development credits transferable within a stewardship area.

(1) Rural land stewardship areas are … a long-term incentive-based strategy to … accommodate future land uses in a manner that protects the natural environment...
(3)    Rural land stewardship areas may… further …protection of ecosystems, habitats...
(5)    A rural land stewardship area… shall provide…
(a)    Criteria … to avoid conflict with …environmentally sensitive areas...
(9)    Owners … should be provided other incentives…to enter into … agreements…
(a)    Opportunity to accumulate… credits for use or sale.
(d)    Compensation for… environmental restoration… listed species protection…

Further, F.S. 163.3162 (Agricultural Lands and Practices) allows appropriate development:

(1)    …to protect reasonable agricultural activities …from duplicative regulation…
(3)    … (a) A governmental entity may not … limit … farm operation on land classified as agricultural land pursuant to s. 193.461, if such activity is regulated… by the [state DEP, DA] or a water management district …or … [USDA, US ACE, or USDEP]…
(4) The owner of a parcel of land defined as an agricultural enclave under s. 163.3164 may apply for an amendment to the local government comprehensive plan pursuant to s. 163.3184. Such amendment is presumed not to be urban sprawl as defined in s. 163.3164 if it includes land uses and intensities … consistent with … areas that surround the parcel.

**County Protection of Environmental Land Prior to 1994 Did Not Fund Purchases**

County protection of environmental lands prior to 1994 did not assume that land or rights therein would be purchased. Land use regulation under existing law was sufficient, and isolated habitat land was known to have no land uses of greater value within the present "reasonable investment-backed expectation of value" so compensation was not required. Habitat protection without restoration required only ordinary land use regulation.

County ordinance 94-009 (Environmentally Significant Lands Protection Ordinance) established policies for privately owned environmental lands, and ordinance 98-025 provided a management plan for a 220-foot protection zone as part of the Myakka River Protection Plan.

1 **Easements Were Unnecessary Because Zoning Was Sufficient**

2   The easement purchases ignore the fact that state and local governments have rarely

3 purchased easements to regulate land use: they simply declare limitations on future use via land

4 use ordinances such as zoning ordinances. The Supreme Court recognizes a "regulatory taking"

5 of property by government only where the landowner had a "investment-backed expectation" of

6 value in a future more valuable use. Mere assertions by ranchers that developers are about to

7 build skyscrapers all over the ranch, do not qualify as "investment-backed expectations."

8   A ranch owner who declares a preference that the land "will always be a ranch" has

9 publicly admitted renouncing any future more valuable use, and cannot claim having any

10 "investment-backed expectation" of greater future value in other uses, so no land taking would

11 occur if the more valuable use is simply prohibited. If this had been done by county regulation,

12 the ranch owner would have no legal claim of value taken. The same is true of tens of thousands

13 of landowners whenever zoning ordinances are passed.

14   Zoning ordinances have been widely and effectively used to accomplish conservation

15 purposes, and have been used specifically to protect large predator cats near agricultural areas.

16 Jaguars and pumas are protected in Colombia by zoning regulations and public education in

17 areas with coffee plantations,[12] with no purchases of property or easements. Where there are no

18 such predators anyway, as in Sarasota county, mere zoning regulation is sufficient.

19   State and county planners are fully aware of land use law and the legal basis of property

20 takings claims. They knew that there would be no legal basis for a claim against government if

21 they simply prohibited more intensive development of land needed for conservation. Therefore

22 the planners who decided to pay for easements rather than pass a zoning ordinance were

23 deliberately giving public funds to insiders with no public benefit. This establishes that they saw

24 value for themselves or their political party by paying enormous sums for something the state

25 and county normally obtain for nothing, and they knowingly gave public funds to insiders for

26 nothing of value to the public.

27

---

[12] In Colombia, a successful jaguar conservation program was based upon zoning regulation. See
https://southafricatoday.net/environment/in-colombia-a-successful-jaguar-conservation-program-has-a-whiff-of-coffee/ see also https://es.mongabay.com/2021/05/colombia-los-campesinos-de-norte-de-santander-ahora-son-amigos-de-los-felinos/

**Conclusion: No Compensation Was Required To Meet Conservation Goals**

The owners of the subject properties had no "reasonable expectation" of urban growth near the subject properties to support any "existing fair market value" in any "reasonably foreseeable, nonspeculative land use" exceeding the value in ranch use. Therefore regulation to achieve conservation goals without prohibiting the existing use would create no claim for compensation for property taking under FS Chapter 70 or under the federal or state constitutions.

Although there is no land area in Sarasota County designated as critical habitat for endangered species, if the county was concerned, it could have nominated habitat areas for protection under the Endangered Species Act which would restrict further development.

Therefore no purchase of the subject land or easements was necessary to achieve conservation goals short of restoration of forest habitat. The county made no attempt to preserve forest habitat on similar large land areas which it owned, allowing these to be cleared, and therefore had no conservation goals that required purchase of land or easements.

As noted in a 2015 article on Florida conservation theft schemes:[13]

> At the top of the environmentalists' list has always been: Buy Big Sugar Lands For Restoration Into Everglades Wetlands. …
>
> The issue is… that large property owners who control Florida elections have zero interest in setting their land prices so long as they perceive endlessly increasing values…
>
> Big Sugar wants … its proxies in the Legislature and the Ag Secretary … keep any mention of buying Big Sugar lands out of sight, and any mention of eminent domain ...
>
> …the Great Destroyers got Florida Wildlife Federation and Audubon of Florida to …pass Amendment 1, and now the black hats … are … hijacking the largest pot of money… in Florida – some $20 billion – to protect the environment…It's… the do-gooders opening the vault doors for the black hats … they'll hand out a few hundred thousand dollars to any of the groups who will put them on their board of directors...

**Eminent Domain was Sufficient to Purchase Conservation Land Not Available For Sale**

This section argues in general that the subject purchases of easements were unnecessary where motivated by an unwilling or opportunist seller, because existing law and customary practice were sufficient for taking by eminent domain of essential habitat lands.

---

[13] *Deleting History (and Land) in South Florida*, Alan Farago, 2015

1    **Customary Practice Included Eminent Domain Taking of Conservation Land**

2       Even within the Florida Forever program, the BOT has delegated authority to the DEP to

3    make eminent domain takings of lands essential to conservation projects. For example, at its

4    1/31/2006 meeting the BOT approved such a "delegation" for the Save Our Everglades project:

5       DSL-48 – Adds the delegation of authority to (1) acquire, by the power of eminent
6       domain pursuant to the provisions of Chapters 259.73 and 74, F.S., fee simple title to all
7       remaining land (thirteen parcels) within the portion of SOE Florida Forever project
8       (Phases VI and VII) lying south of I-75;…
9

10   Therefore the state was not constrained to purchase easements where an unwilling seller

11   preferred to continue ranching there.

12   **County Procedures for Conservation Purchases Invited Interested Parties to Interfere**

13   **Florida Law Requires a County Comprehensive Plan to Meet Environmental Goals**

14      The Florida Community Planning Act (FS 163.2164) requires counties to develop

15   comprehensive plans for development (163.3167), and adopt implementation programs based

16   upon "appropriate data" (163.3177(1)(f)) including "guidelines, and standards for conservation"

17   that "designates environmentally sensitive lands for protection" (163.3177(6)(d)2.h.). The statute

18   provides for judicial review of county acts under such comprehensive plans (163.3194(4)(a)):

19      A court, in reviewing local governmental action or development regulations under this
20      act, may consider, among other things, the reasonableness of the comprehensive plan…
21      in relation to the governmental action…
22

23   The statute requires counties to adopt and enforce land use regulations that "implement their

24   adopted comprehensive plan" (163.3202(2)) that "shall at a minimum"

25      (c)   Provide for protection of potable water wellfields.
26      (d)   Regulate areas subject to… flooding and provide for… stormwater management.
27      (e)   Ensure the protection of environmentally sensitive lands designated…
28

29   These county designations and criteria are independent of state standards or scientific evaluation,

30   inviting interested parties to make up definitions of conservation to be met by their own land.

31   **County Comprehensive Plan Requires Maintaining and Restoring Native Habitats**

32      Pursuant to FS § 163.3167(2) et seq Sarasota county prepared a comprehensive plan,

33   under its ordinances Article III Comprehensive Plan, providing:

Environmental Goal 1:

Protect, maintain, and… *restore the native habitats*… of Sarasota County...

1.1 Identify, manage, and protect ecological communities, and native habitats. Review all development proposals for consistency with the "Principles for Evaluating Development Proposals in Native Habitats."

1.2 Protect environmental resources during land use changes and establishment of urban services.

1.2.1 Land uses and land and water development shall be consistent with and governed by the Environmental Values and Functions of Sarasota County's native habitats in accordance with the Management Guidelines set forth in the "Principles for Evaluating Development Proposals in Native Habitats."

1.3 Habitat Connectivity…

Preserve… habitat connectivity… to support… all ecological communities…

1.3.10 Maintain … rural … practices such as prescribed burning including a requirement that all new development… shall… protect existing … practices…

1.3.11 Native habitats set aside in … conservation areas shall be managed … to ensure maintenance and… enhancement … of these native habitats …

For… privately-owned… conservation areas set aside prior to the county's … resource management plan the county shall … provide incentives for management…

1.3.14 Protect… natural communities in the public resource lands including Myakka River and Oscar Scherer State Parks, the Scherer-Thaxton Preserve and Myakka State Forest. …

1.5 Tree Canopy, Landscaping, and Vegetation Management

1.5.6 To the extent practical… invasive… vegetation shall be removed from… protected native habitats and… conservation areas on lands… a county… order…

1.5.9 Pursue an… interagency approach to… management plans… for County owned … Lands, and… within parks… to protect, maintain, and restore native habitats.

Environmental Goal 2:

Support native birds, fish, and wildlife through … stewardship of their habitats

2.1 Protect habitat for endangered and threatened bird and wildlife species identified in official federal, state, or international treaty lists.

2.1.1 The county shall coordinate with state and federal agencies and shall support implementation of protection guidelines relating to listed species…

2.1.3 Require development order applicants to use recognized sampling techniques to identify listed species… to consult with the appropriate wildlife agencies…

2.1.10 Special measures shall be taken to protect Florida Scrub-jays ...

Environmental Goal 6:

Create and maintain a comprehensive and connected system of parks, trails, greenspace, native habitats, and environmentally sensitive lands.

6.1 Manage lands for public access and environmental benefit.

6.1.1 County-owned or managed lands shall be managed in accordance with Sarasota County's Land Management Master Plan...

6.1.2 Acquire… a contiguous system or otherwise protect environmentally significant lands through a voluntary program (Environmentally Sensitive Lands Protection Program)…acquiring and…protecting properties…adjacent to…conservation areas…

6.1.4 …continue establishing incentive programs for landowners to protect …

1  beneficial features of the lands … having high ecological value pursuant to FLU
2  Policy 1.1.2, rather than… reliance upon regulatory … authority…
3  https://library.municode.com/FL/Sarasota_County/codes/code_of_ordinances?nodeId=COORSACOFL_CH94PL
4
5  The comprehensive plan is generally consistent with state environmental goals, except that

6  ranchers sneaked in section 1.3.10 to "maintain… rural… practices such as prescribed burning"

7  which in fact precludes habitat restoration on ranches, and should be avoided as contrary to the

8  primary goal of the comprehensive plan, to "protect, maintain, and… restore the native habitats."

9  **County "Environmentally Sensitive Land" Protection Program ESLPP**

10  In 1998 the county authorized (Res. 98-096) the issuance of up to $53 million in bonds

11  paid by an ad valorem property tax, "to acquire, protect and manage environmentally sensitive

12  lands" and in 1999 enacted by referendum (Res. 99-004) an Environmentally Sensitive Lands

13  Protection Program ESLPP (county code Chapter 54 Article IV) to establish a procedure for

14  protection of "Environmentally Sensitive Lands" and "*to limit Protection to those lands which*

15  *satisfy the ecological criteria* set forth in Resolution No. 92-272" administered by an Oversight

16  Committee the ESLOC.

17  Sec. 54-87(b) The County will restrict its Protection efforts to Environmentally Sensitive
18  Lands… evaluated utilizing the ecological criteria specified in Resolution No. 92-272
19  (Attachment A) and approved for the Protection Priority List… by the Oversight
20  Committee or the Board.
21
22  The referenced county Resolution 92-272 of 1992 (Criteria for Identifying and Ranking

23  Environmentally Sensitive Lands) ranks land on five criteria: Rarity, Connectedness, Quality,

24  Manageability, and Water resources, where the score of "1" is a high priority and any higher

25  score is quite ordinary or worse.

26  Sec. 54-88(a) provides that "County staff" are to apply the "ecological selection criteria"

27  to decide the eligibility of nominated sites, and the Oversight Committee is to review the

28  "eligibility pool" for approval. Those sites with willing owners comprise the Protection Priority

29  List PPL, which the Oversight Committee is to review for approval by the county Board.

30  The county hired the Nature Conservancy for contract negotiations.[14] By 2002 it had

31  acquired about 5,000 acres, and had plans to purchase about 40,000 acres. These include Curry

---

[14] *This Land Is Your Land*, Sarasota, 10/1/2002

Creek, Red Bug Slough, Rocky Ford and Manasota Scrub. Several were purchased jointly with SWFWMD and Florida Communities Trust.

A single local program manager of the Nature Conservancy served as the ESLPP acquisition agent for negotiations, appraisals, surveys and title work for selected sites. Note that Lisa Carlton is a Board member of the Nature Conservancy in Florida.

The county ordinance (Sec. 54-85) prohibits any person, entity, or relative with a financial interest from being involved:

> Sec. 54-94(c) No person or entity shall be authorized to negotiate on behalf of the County, or otherwise be directly involved in, the purchase, sale or exchange of real property, or real Property Interests, pursuant to the terms of this article, if that person, entity, or a Related Person has a financial interest in the transaction.

But in fact, the defendant landowners and their social, business, and political dependents held many positions on the ESLOC that selected properties for purchase, the SWFWMD that worked closely with the ESLOC, the Board of county commissioners that approved the purchases, and the Nature Conservancy that negotiated and appraised their own properties, which had already been evaluated by the state as having the *lowest possible value* as conservation lands.

**ESL Oversight Committee ESLOC Invited Interested Parties to Advise**

A county Board in 1992 created the ESLOC (resol. 1992-106 continued by 2007-211[15]), allowing unqualified persons and interested parties to propose and advise major land purchases:

> The purpose of the ESLOC is to provide… citizen input… and… advice to the Board on … issues within the Environmentally Sensitive Lands Protection Program (ESLPP)… ESLOC shall be comprised of… nine (9) members... staggered three-year terms…
> Three (3) members will have background… in business or development...
> Three (3) members will have background… in environmental areas...
> Three (3) members will be… at-large representatives… to ensure… diversity…

The resolution established ESLOC members' duty to:

> a. Submit all proposed protection priority sites to the Board for approval;
> b. Work with staff to develop a work plan for each site on the protection priority list;
> c. Approve the Work Plans prior to forwarding them to the Board;
> d. Verify that the property proposed for purchase under the ESLPP meets the criteria set forth in Resolution 92-272 prior to the Board's execution of any contract;
> e. Advise the Board on the management, restoration, and/or public use of each property;

Section 5.1 provides that

1       ESLOC shall comply with all applicable requirements of Florida's Sunshine Law, Public
2       Records Law, and the Code of Ethics for public representatives.
3
4  But in fact, interested parties and their friends, and social and financial dependents served on the
5  ESLOC as well as the Board of commissioners, and deliberately violated the code of ethics to
6  recommend the purchase of lands that they knew had zero conservation value, for personal gain.

7  **County Knew That State ARC and BOT Would Not Approve The Subject Purchases**

8       Under FS 380, each county having areas of "critical state concern" is to create a land
9  authority (ESLPP in this case) with powers to acquire land or interests to "protect the natural
10  environment" under its comprehensive plan, to issue bonds to fund this, and to recommend land
11  parcels for state acquisition to the state ARC under FS 259.035. Each land authority is to set up
12  an advisory committee (ESLOC in this case) to propose land acquisitions for ARC approval,
13  which must be in the priority order listed by the ARC (FS 380.0663 to FS 380.0667).

14       So at any time Sarasota county could have proposed conservation land purchases to the
15  state ARC at no cost to the county. But Sarasota County had no areas of "critical state concern,"
16  just some wetlands readily protected, and knew that it could not get a Florida Forever project
17  past the FNAI scientific evaluation to the ARC. When it tried that with the "Myakka
18  Ranchlands" project (Walton and Longino 2 parcels), FNAI gave the project the lowest possible
19  score, and only the intervention of Lisa Carlton for her friends and neighbors, as president of the
20  Senate, got the project accepted by ARC at the last moment, excluding projects with high scores.

21       So the Carlton parcels 2 and 3 were sold to the county for many times their real value, by
22  twisting the words of the county conservation standard 92-272, by simply purchasing the county
23  ESLOC, Nature Conservancy, and Board, just as they purchased SWFWMD.

24  **State Law for Purchase of Conservation Land Required Scientific Evaluation**

25  **State and Local Designation of Conservation Lands: FS Chapter 380**

26       Florida Statutes Chapter 380 includes Environmental Land and Water Management (FS
27  380.012-380.12, 1984-1995) and provides for an Administration Commission working with the
28  state land planning agency. Areas of "critical state concern" are to be designated and studied by a
29  committee to propose a "voluntary resource planning and management program" with state land

---

[15] Resolution No. 2007-211, https://www.scgov.net/home/showdocument?id=13104

planning agency recommendations for approval by the Commission which is to direct state or regional agencies to conduct specific programs consistent therewith. (FS 380.045)

Regional planning agencies are to designate their areas of critical state concern, and the (state land planning agency) is to approve or reject each local land regulation and comprehensive plan or amendment based upon the principles for development of the area per FS 163.3184 Comprehensive Plans (FS 380.050).

Each county having areas of "critical state concern" is to create a land authority under the county governing board with powers to acquire land or interests therein to "protect the natural environment [and] preserve wildlife habitat areas" and other uses under its comprehensive plan, to issue bonds to fund this, and to recommend land parcels for state acquisition to the advisory council under FS 259.035. Each land authority is to set up an advisory committee to propose land acquisitions for its approval, which must be in the priority order listed by the advisory committee. (FS 380.0663 to FS 380.0667)

State agencies are not authorized by this chapter to make regulations or orders that would constitute a taking of property without compensation, but no criteria of such taking are stated. An agency that decides to purchase land or interest therein is to certify to the state land planning agency and the Board of Trustees of the Internal Improvement Trust Fund that this best serves the public interest. The seller of lands proposed for purchase must file a statement of all financial transactions concerning the land and all parties having a financial interest therein, for the preceding 5 years. (FS 380.08, 1972-1995)

Therefore the purchase of conservation lands with state funds requires proof that a regulation having the same conservation effect would be a taking of property, and therefore requires compensation by such purchase of lands or easements.

**State Acquisition of Conservation Lands: FS Chapter 259**

Florida Statutes Chapter 259 (Land Acquisitions, 1972-2016) provides for acquiring lands or interests therein that "protect native species habitat or endangered… species" or advance "species or habitat recovery" plans and "cannot be adequately protected" by regulation alone.

259.032 Conservation and recreation lands.—
(1)   It is the policy of the state that the citizens of this state shall be assured public ownership of natural areas for purposes of maintaining this state's unique natural resources… that a high priority be given to acquiring lands or rights or interests in lands that advance …approved species or habitat recovery plans, or lands … of critical state

concern under s. 380.05 which… cannot be adequately protected by … regulations adopted pursuant to s. 380.05. … that lands acquired for conservation …be managed in such a way as to protect or restore their natural resource values…

The purpose clearly is to protect resources in cases where sufficient regulation of land uses would effect a taking of private property in violation of FS Ch. 380 and constitutional rights, requiring payment of just compensation. While the statute does permit purchase of easements on "agricultural lands under threat of conversion to development" this does *not* include cases where regulation would *not* impair the "reasonable expectation of value" in such a new land use. Therefore land or easement purchases under Florida Forever funding *cannot* lawfully be made where land use regulation would *not* impair the "reasonable expectation of value" of property.

The "Preservation 2000 Act" (FS 259.101) provided substantial funding to purchase and protect environmentally significant lands from imminent development. This was extended by the "Florida Forever Act" (FF, FS 259.105) funded by fees on real estate transactions, appropriated annually and distributed by the DEP to agencies to purchase public lands as parks, trails, forests, and wildlife management areas. Funding has varied with economic trends, with initial annual funding of $300 million, vetoed in 2012 after the subject misallocations, and $20 million in 2013 (plus $50 million from sale of "surplus" conservation land).

Lands are grouped into projects that are evaluated by the scientific advisory group Florida Natural Areas Inventory (FNAI) and selected for recommendation by the Acquisition and Restoration Council (ARC) to the Board of Trustees (BOT) of the Internal Improvement Trust Fund, designated to approve purchase of lands or interests therein with annual appropriations. The ARC and BOT consist of executive appointees with representatives from related executive agencies. Expenditures must protect unique lands having "native, relatively unaltered flora and fauna," natural resource areas of "critical state concern," "native species habitat or endangered or threatened species" designated by FNAI, as well as water resources, the Everglades, and easements on "agricultural lands under threat of conversion to development" wherever those purposes "*cannot otherwise be accomplished through local and state regulatory programs*" (259.032(2 to 6)).

The land selection procedure is stated in 259.035 (ARC) and acquisition process in 253.025. The Board is to select land for purchase from an annual list of projects and adopt a management plan for each project. All such lands are to be managed for the greatest "benefits to

the public and to the resources" (259.032(7)(a)). A designated managing agency must provide a project-specific management plan to "identify, locate, protect, and preserve, or otherwise use fragile, nonrenewable natural and cultural resources" devised by an advisory group with members from the managing agency and "comanaging entities, local private property owners, the appropriate soil and water conservation district, a local conservation organization, and a local elected official" failing which the possession is "subject to termination by the board."

The funding appropriated to the Florida Forever program is allocated 65% to the DEP for water districts (30%) and evaluated conservation projects (35%), but specific provisos replaced the fixed percentage distribution after FY 2010-11, suggesting concern with misappropriations. From 2001, the program funding averaged about $300 million annually in bonds, but was cut sharply during the recession, ignoring lands available by foreclosure and even large donations. A phosphate company tried to donate the 4,000-acre Peaceful Horse Ranch high on the FF priority list, along with $2 million for upkeep, which was declined by DEP as a state park. In 2015 a referendum allocated several times the peak FF funding, but FF still had only 5% of its original funding in 2016, due to funding diversion to water conservation and operating expenses.

**SWFWMD Manages Mitigation Credits Chargeable to FDOT**

The Florida Department of Transportation FDOT mitigates roadway effects upon wetland, originally on a project basis, superceded in 1996 by the FDOT Mitigation Program (FS 373.4137) providing regional long range mitigation planning, administered by the water districts, which prepare annual plans. State and Federal permit requirements are met by developing mitigation projects, or purchasing credits from a mitigation bank when more cost-effective. By 2018 about 51 acres of wetland impact were offset with credits from six mitigation banks.

**Purchases by Water Districts are Intended to Protect *Only* Water Resources**

State water management districts including that for southwest Florida (SWFWMD) are noted for being controlled by "land speculators" who spout "endless platitudes about the balance between the environment and the economy" to claim that development of habitat areas, or paying ranchers to continue ranching is "the best result possible" [168 below].

168. *A brief history of Florida environmentalism*, Farrago, Counterpunch, 11/10/2007

State water management districts are allocated 30 percent of Florida Forever funds under FS 259.105(3):

The proceeds shall be distributed by the Department of Environmental Protection in the following manner:

(a)   Thirty percent to the Department of Environmental Protection for the acquisition of lands and capital project expenditures necessary to implement the <u>water management districts' priority lists developed pursuant to s. 373.199</u>. The funds are to be distributed to the water management districts as provided in subsection (11). A minimum of 50 percent of the total funds provided over the life of the Florida Forever program pursuant to this paragraph shall be used for the acquisition of lands.

The referenced FS 259.105(11) divides funds among water districts, 25 percent to SWFWMD, which therefore gets 7.5 percent of all Florida Forever funds, of which at least 50 percent must be spent for land acquisition versus easements or management.

Florida statute 373.139 permits water districts to acquire land for water management or "conservation and protection of water resources":

(2)   The governing board of the district is empowered and authorized to acquire in fee or less than fee title to real property, easements and other interests or rights therein, by purchase, gift, devise, lease, eminent domain, or otherwise for <u>flood control, water storage, water management, conservation and protection of water resources, aquifer recharge, water resource and water supply development, and preservation of wetlands, streams, and lakes</u>. Eminent domain powers may be used only for acquiring real property for flood control and water storage or for curing title defects or encumbrances to real property owned by the district or to be acquired by the district from a willing seller.

(3)…(c)   The Secretary of Environmental Protection shall release acquisition moneys from the appropriate account or trust fund to a district following receipt of a resolution adopted by the governing board identifying the lands being acquired and certifying that such acquisition is consistent with the 5-year work plan of acquisition and other provisions of this section. … The Secretary of Environmental Protection may withhold moneys for any purchase that is not consistent with the 5-year plan or the intent of this section or that is in excess of appraised value. …

(7)   The districts have the authority to promulgate rules that include the specific process by which land is acquired; the selection and retention of outside appraisers, surveyors, and acquisition agents; and public notification. <u>Rules adopted pursuant to this subsection shall be submitted to the President of the Senate</u> and the Speaker of the House of Representatives, for review by the Legislature, no later than 30 days prior to the 2001 Regular Session <u>and shall become effective only after legislative review</u>. In its review, the Legislature may reject, modify, or take no action relative to such rules. The districts shall conform such rules to changes made by the Legislature, or, <u>if no action was taken by the Legislature, such rules shall become effective.</u>

Note that the purposes of acquisition by water districts *do not include* general conservation purposes, but only "conservation and protection of water resources." Obviously, this does not include buying any land anywhere to ensure that rain continues to fall. Water districts are *not*

1  *authorized* to make up their own definitions of conservation in general, and spend public funds

2  designated for conservation in general, independent of the scientific evaluation, ranking, and

3  selection process set up under FS 259.105 (Florida Forever Act). All water district funding for

4  conservation is strictly for "conservation and protection of *water resources*."

**Purchase Required Scientific Evaluation But Water District Circumvented This**

6  The decision of SWFWMD to purchase the Carlton Ranch shows intent to abuse FS

7  373.139 with the pretense that it had authority to purchase lands for conservation purposes other

8  than water resource conservation, circumventing the state process for conservation land

9  acquisition. The 11/26/2007 SWFWMD proposal by Eric Sutton, which was approved, argues

10  falsely (p.1) that its board had only to "designate" the Carlton land and easements "as having

11  been acquired for conservation purposes" to demand payment from Florida Forever funds:

> The staff recommendation also requests the Board accept the appraisals, authorize the
> merging interests between the District and County, approval of a resolution requesting
> funds from the Florida Forever program and the designation of these parcels as having
> been acquired for conservation purposes.

17  But clearly neither the original Carlton easement, the purchase of title to that land, nor the

18  easement on the adjacent Carlton ranch, had any effect on rainfall, water flow, drinking water

19  supply, pollution reduction, or any other means of conservation of water resources.

20  The SWFWMD decision was not merely a mistaken interpretation of the law, allowing it

21  to circumvent the state evaluation and acquisition process for other conservation land.

22  SWFWMD knew that it had no authority to demand FF funds for other conservation purposes,

23  never bothered to have an independent scientific evaluation of conservation value, and never

24  proposed that the project be evaluated by FNAI, ranked by ARC, and selected by the BOT for

25  general conservation purposes. Nor did it propose to the BOT that it approve such a purchase

26  directly, as did other water districts. It had merely done a pollution study ("environmental site

27  assessment") of the Carlton ranch that same month which makes no mention of any conservation

28  goal. When the adjacent Walton and Longino ranches ("Myakka Ranchlands" FF project) had

29  been evaluated that same month, they had *the lowest possible scores* in conservation value. So

30  SWFWMD knew very well that there was no conservation value in the Carlton ranch

31  whatsoever. SWFWMD abused FS 373.139 to circumvent the state process of scientific

1    evaluation of the conservation value of lands to be acquired with Florida Forever funds, and the

2    process of project reviews and approvals by the ARC and the BOT.

3         The SWFWMD also proved its complete lack of concern for conservation, either of water

4    resources or other "Low" value conservation purposes, by its concurrent granting of rights to the

5    Carlton ranch to *continue ranching* on the parcel to which title had been *purchased*, despite the

6    known degradation of water supply and wetland species caused by ranch pollution. If SWFWMD

7    had any intention to restore native habitat, it would have reforested the land purchased, and it

8    would have used the funds spent on an easement, to purchase and reforest more land. Clearly

9    SWFWMD defrauded the DEP and the public that the expense was "for conservation purposes."

10        SWFWMD fraudulently abused its authority under FS 373.139 by falsely claiming that a

11   mere easement there allowing ranching to continue, the principle local cause of pollution, would

12   somehow conserve water resources. They made up their own project, claimed that it was

13   consistent with their own 5-year plan (submitted to the landowner herself as President of the

14   Senate, and approved by her dependents there) and demanded money from DEP for the Carltons.

15        Wealthy ranchers with longstanding "close relationships" with SWFWMD, such as the

16   Carltons, Waltons, and Longinos, advocated and rewarded a very loose definition of the

17   "conservation and protection of water resources" effects of an easement, such as water

18   conservation = ranching. And a rich rancher who happened to be President of the Senate to

19   whom the SWFWMD plan was submitted, and those whose careers and budgets she controlled,

20   did not to object to its rules or its 5-year plan. Neither did the political Carltons object to being

21   paid tens of millions from state conservation funds by pretense of misunderstanding the law.

22        The Carltons' "close relationships" with SWFWMD eliminated the need to persuade

23   anyone that an "easement" that merely allows their own ranching to continue is somehow

24   suddenly worth tens of millions of state conservation funds. They simply produced public

25   relations statements from their "conservation" organizations about the wonderful conservation

26   effects of the ranching that destroyed the natural habitats there, and used payments, promises,

27   and happy-talk to persuade SWFWMD and county officials to go along with the charade.

28        It is not yet known whether DEP paid FF funds to SWFWMD under FS 373.139 or under

29   a false interpretation of authorities delegated to DEP by the BOT to make small funding

30   approvals without specific BOT review. More than 50 acts of delegation have been made by the

31   BOT since 1980, reaffirmed on 9/21/2004 and corrected on 2/16/2015. Typical delegations gave

DEP authority to prepare sales documents (DSL 1 and 36), impose fines (DSL 42), lease parcels (DSL 43-45), settle survey discrepancies (DSL 46), acquire certain small parcels by eminent domain (DSL 48), and acquire parcels under $100,000 (DSL 49). There appears to be no BOT delegation of authority to DEP or water districts to acquire large parcels with FF funds.

BOT meetings through the date of purchase show no consideration of any SWFWMD proposal for FF funds for the Carlton ranch easement. Many far smaller issues were considered by the BOT during this period, such as leases of bottomlands to marinas, transfers of parcels as small as ¼ acre, with values as low as $11,000. But the subject $20 million purchase was never sent to the BOT for approval. Approvals of purchases that were not FF projects include:

> 9/7/2005 approval of a purchase of 80 acres for $300,000 (item 6)
> 1/31/2006 approval of a purchase of 14.9 acres for $200,000 (item 4)
> 1/31/2006 approval of a purchase of 11 acres for $10,700 (item 6)
> 4/4/2006 approval of a purchase of 17.7 acres for $324,700 (item 3)
> 12/19/2006 approval of a purchase of 3.55 acres for $520,000 (item 8)
> 12/19/2006 approval of a purchase of 8.18 acres for $280,000 (item 9)

The larger non-FF land acquisitions approved specifically by the BOT were:

> 8/1/2006 approval of a purchase of 900 acres for $9,020,000 (item 2)
> 10/3/2006 approval of a purchase of 481.7 acres for $2,601,000 (item 5)
> 10/31/2006 approval of a purchase of 77.6 acres for $360,000 (item 2)
> 2/13/2007 approval of a purchase of 1286.7 acres for $10,060,000 (item 2)
> 6/12/2007 approval of a purchase of 73.8 acres for $996,000 (item 3)
> 6/12/2007 approval of a purchase of 1163.29 acres for $2,800,000 (item 4)
> 8/14/2007 approval of a purchase of 34.88 acres for $870,000 (item 1)
> 12/4/2007 approval of a purchase of 22.49 acres for $526,000 (item 1)
> 1/31/2008 approval of a purchase of 1652 acres for $11,651,000 (item 1)

Therefore the 12/20/2007 purchase of Carlton ranch land and easement for $20,135,000 for any conservation purpose other than water conservation, certainly would have been required to be approved by the BOT, not by SWFWMD itself.

[Florida statute 373.199 "Florida Forever Water Management District Work Plan" requires water districts to submit a five-year "work plan" in 2001 and annual reports thereafter.
(7)    By June 1, 2001, each district shall file with the President of the Senate, the Speaker of the House of Representatives, and the Secretary of Environmental Protection the initial 5-year work plan as required under subsection (2). By March 1 of each year thereafter, as part of the consolidated annual report required by s. 373.036(7), each district shall report on acquisitions completed during the year together with modifications or additions to its 5-year work plan. Included in the report shall be:

(a)    A description of land management activity for each property or project area owned by the water management district.

(b)    A list of any lands surplused and the amount of compensation received.

(c)    <u>The progress of</u> funding, staffing, and resource management of <u>every project funded pursuant to former s. 259.101(3)</u>, Florida Statutes 2014, <u>s. 259.105, or former s. 373.59(2)</u>, Florida Statutes 2014, for which the district is responsible.

The secretary shall submit the report referenced in this subsection to the Board of Trustees of the Internal Improvement Trust Fund together with the Acquisition and Restoration Council's project list as required under s. 259.105.]

[Note that the BOT approved 5/16/2006 (item 6(2)) "acceptance of the updated land acquisition procedures of the SWFWMD as meeting the standards necessary for acquisition by the Board of Trustees pursuant to section 259.041(17), F.S." which provides that

(17)    Title to lands to be held jointly by the board of trustees and a water management district and acquired pursuant to the procedures set out in s. 373.139 may be deemed to meet the standards necessary for ownership by the board of trustees, notwithstanding any provisions in this section or in related rules.

That approval appears to be merely the acceptance of SWFWMD procedures as preliminary to BOT approval, but it also might be falsely used by SWFWMD to <u>substitute its judgment for that of the entire FNAI, ARC, and BOT</u> review process, so long as title is held jointly by the BOT and SWFWMD and acquisition accords with FS 373.139 (above).]

**Federal Funding of Conservation Purchases was Mixed with State Funding**

Federal funding of the U.S. Fish and Wildlife service and the U.S. Forest Service provides grants to state agencies for wildlife management and endangered species protection.

About $3 billion is spent annually under the federal Clean Water Act for mitigation measures to achieve habitat protection or restoration. The Land and Water Conservation Fund (LWCF) of up to $900 million annually provides matching funds to state and local governments used to acquire over seven million acres of park lands and easements.

The Florida FWC receives about 22 percent of its budget from federal funding for conservation research, surveys, species and habitat management and monitoring, planned in a state Comprehensive Wildlife Conservation Plan. The Wildlife Restoration Program (WR Act, 1937) provides funds to restore and manage wildlife and habitats. The State Wildlife Grants Program also funds programs to conserve wildlife and habitats. The Multistate Conservation Grant Program (MSCGP) funds wildlife restoration priority projects via the Association of Fish and Wildlife Agencies (AFWA).

1      Federal Farm Bill funding is also available to landowners through the Conservation

2  Reserve Program, Wetlands Reserve Program, and Wildlife Habitat Incentive Program to protect

3  wetlands, grasslands and other wildlife habitat.

4      State and local funding of land and easement purchases for conservation is therefore

5  blended with federal funding wherever strict separation of state or local funds is not accounted.

6  Wrongful expenditure of such blended state or local funds is therefore a violation of federal law.

7  **Diversion of Federal Funding**

8      The funds diverted to the defendant landowners and public officials by the defendant

9  state and county include substantial federal funds. As admitted by the Florida FWC website:

10  Annual appropriations from the federal budget provide the core funding for all the federal
11  agencies responsible for managing natural resources--from the U.S. Fish and Wildlife
12  service to the U.S. Forest Service. These appropriations are also a major source of grant
13  funds to state and tribal agencies in support of wildlife management and endangered
14  species protection.
15
16  The FWC receives Federal Aid funding through various grants. Overall, grants accounted
17  for 22 percent of the FWC budget in 2007-08, and most of those come from the federal
18  government. Included in those grant programs are the following:
19
20  Wildlife Restoration Program
21  The Wildlife Restoration Program (WR) provides grant funds for projects to restore,
22  conserve, manage and enhance wild birds and mammals and their habitats. ...The
23  Program is authorized by the Wildlife Restoration Act (Pittman-Robertson PR) of 1937.
24  The WR Program is the nation's oldest and most successful wildlife restoration program.
25
26  Multistate Conservation Grant Program
27  The Multistate Conservation Grant Program (MSCGP) provides funding for wildlife and
28  sport fish restoration projects identified as priority projects by the Association of Fish and
29  Wildlife Agencies (AFWA). These high-priority projects address problems affecting
30  states on a regional or national basis.
31
32  State Wildlife Grant Program
33  The State Wildlife Grants Program provides federal grant funds for developing and
34  implementing programs that benefit wildlife and their habitats... Grant funds must be
35  used to address conservation needs, such as research, surveys, species and habitat
36  management and monitoring, identified within a state's Comprehensive Wildlife
37  Conservation Plan/Strategy.
38
39  These rationales are so vague as to be applicable to any land within 100 miles of existing habitat.

40  Therefore the funds diverted by the defendants include substantial federal funds granted in

41  careless or deliberate violation of the conditions and intent of the federal grants.

**OATH AND CERTIFICATE**

  I, the undersigned Plaintiff John S. Barth do hereby certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. I further certify that on this date a copy of the foregoing document was served electronically via ECF on all counsel of record.

Date:  7/28/2025

               John S. Barth, Plaintiff, pro se

    P.O. Box 88, Springvale, ME 04083 Jbarth@gwi.net  207-608-1741