**District Court of the United States**
**District of Columbia**

-------------------------------------------

|                                     | Case No. 1:25-cv-01136-DLF
John S. Barth,                        |
       Plaintiff | 
v.                                    | **Memorandum of Law 3**
Mabry Carlton Ranch, Inc., et al.     |
                                      | **FRAUD**
     Defendants | In State and County Land Purchases,
_____|  in Conservation Value, Appraisal, and Approval


## Contents

AUTHORITIES ................................................................................................................ 3
ARGUMENT OF FRAUD IN APPRAISAL AND CONSERVATION VALUE OF LAND ....... 5
  Observations On Florida Racketeering And Conservation ............................................ 5
  Fraudulent Appraisals in Conservation Purchases ....................................................... 7
    Valuation of Ranch Land in Sarasota County .......................................................... 8
    False Appraisals of Carlton Parcel 2 (Easement 1998 and Balance 2007) ............................ 9
    False Appraisals of Carlton Parcel 3 (Easement Only) ........................................... 11
  False Claims of Conservation Value Were Typical of Florida Land Sales Fraud ................... 12
    The Alleged Long Term Conservation Plan is of Minimal Value to the State ..................... 12
    The Problem of Efficient Use of Conservation Funds .......................................... 14
    Claims of Public Benefit in Costly Easements v. No-Cost Regulation Were Fraud ............ 14
    Ranching Has Only Damaging Environmental Effects ............................................ 16
    Claims of Public Benefit in Keeping Land in Ranch Use Were Fraud ............................... 17
    Claims of Land Migration Corridors of These Species in These Areas Were Fraud ............ 18
    The Easements and Purchase Timing Do Not Serve a Long Term Conservation Plan ......... 20
    Pattern of Purchases Shows Intent to Defraud the State and County ............................... 20
    Marginal Ranchers Misrepresented the Facts to Cash In on Conservation Easements ......... 21
    State Was Fully Aware of Such Land Sales Fraud Schemes ................................................ 23
    County Was Fully Aware of Such Land Sales Fraud Schemes Throughout Its History........ 24
  Specific Frauds By Landowners and Public Officials to Cause the Purchases ....................... 24
    Fraud by Landowners to Deceive Public Officials ................................................. 24
    Fraud by Advisors and Public Officials of the State ................................................ 27
    Fraud by Advisors and Public Officials of the State Water District SWFWMD.................. 28
    Fraud by Advisors and Public Officials of the County ................................................ 31
    Conclusion On Fraud to Deceive Public Officials .................................................... 35
  Statutes and Ordinances Were Violated By The Subject Conservation Purchases ................. 35
    State Agencies Blur the Meaning of Conservation to Rationalize Useless Easements ......... 36
    1992 County Resolution 92-272 States Later Ordinances' Criteria for Acquisitions........... 36
    1998 County ESLPP Program Purposes Were Violated........................................... 37
    1992-2007 County Sold Large Areas of Its Own Habitat Land for Development ............... 38

2004 County "Comprehensive Plan" Evades Stated Goal of Habitat Restoration ................ 39

2004 County "Land Management Plan" Provides No Action Toward Conservation Goals . 42

Conclusion: Subject Land and Easement Purchases Violated Statutes and Ordinances........ 44

The Funds Misused: Funding Sources for Purchase of Subject Land and Easements .............. 46

Federal Funding for Conservation Purchases........................................................................ 46

Funding of Carlton Ranch Easement and Purchase ............................................................. 47

Funding of Walton Ranch Easement and Purchase ............................................................. 47

Funding of Longino Ranch Easement and Purchase............................................................. 47

Argument of Judicial Fraud by the Defendants ....................................................................... 47

On the Issues of Concealment and Denial.................................................................................. 48

Concealment of Fraud Delays Investigation and Period of Statutory Limitations ............... 48

Victims of Fraud Must be Encouraged to Admit Rather Than Deny Errors......................... 49

Tracing Corrupt Influence .................................................................................................... 50

CONCLUSION............................................................................................................................ 50

## AUTHORITIES

### Honest Services Fraud Cases

19.129. <u>Shushan v. US</u> 117 F.2d 110, 114 (5th Cir 1941)
20.130. <u>US v Dixon</u>, 536 F. 2d 1388, 1499 (2d Cr. 1976)
21.131. <u>US v. Rauhoff</u>, 525 F.2d 1170, 1175 (7th Cir. 1975)
22.132. <u>McNally v US</u>, 483 US 350, 365 (1987)
23.133. Sorich v. United States, 523 F.3d 702, 712 (7th Cir. 2008); Hasner, 340 F. 3d 1261, 1269; United States v. Lopez-Lukis, 102 F.3d 1164, 1169 (11th Cir. 1997); United States v. Sawyer, 85 F. 3d 713 (1st Cir. 1996); United States v. Bryan, 58 F.3d 933, 940 n.1 (4th Cir. 1995).
24.134. Weyhrauch, 548 F.3d, at 1244.
25.135. United States v. deVegter, 198 F.3d 1324, 1328 (11th Cir. 1999) (quoting U.S. v. Lopez-Lukis, 102 F.3d 1164, 1169 (11th Cir. 1997).
26.136. United States v. Siegelman, 561 F.3d 1215, 1219, 1227, 1229 (11th Cir. 2009)
27.137. United States v. Newell, No. 07-80121 (S.D. Fla. Aug. 9, 2007)
28.138. United States v. Masilotti, No. 06-80158 (S.D. Fla. Oct. 30, 2006)
29.139. Skilling v US, 130 Sup.Ct. 2896, 2926, 2934 (2010)
30.140. US v. Skilling, 2011 WL 1290805 (5th Cir. Apr. 6, 2011)

### Constructive Taking of Property

34.     Penn Central Transportation Co. v. New York City 438 U.S. 104 (1978)

### Statutes of the United States

18 USC §§ 1951-1968 (Chapters 95, 96) Racketeering, including the Racketeering Influenced and Corrupt Organizations Act (RICO)

### Related Ordinances of Sarasota County

Resolution 92-106: creates Environmentally Sensitive Lands Advisory Board (later ESLOC) to develop criteria to identify lands and methods for acquisition.
Resolution 92-272: establishes criteria to identify and rank environmental lands.
Ordinance 94-009: establishes policies for environmental lands not publicly owned. (Sarasota County Environmentally Significant Lands Protection Ordinance)
Resolution 94-236: establishes Myakka River Planning Advisory Board (now MRPAC).
Ordinance 98-025: provides management plan for a 220-foot protection zone as part of the Myakka River Protection Plan
Ordinance 98-096: increases ad valorem tax to .25 mils for 20 years and authorized bonds to $53,000,000, subject to referendum, to acquire and manage environmental lands.
Ordinance 99-004: sets up ESLPP and creates Environmentally Sensitive Lands Oversight Committee (ESLOC) to submit proposed land or easement purchases to the Board for approval.
Ordinance 2005-*** extends the ad valorem tax through 2019
Ordinance 2007-211 sec 1.3 extends the ESLOC and defines its authority to propose land purchases and uses, and requires that members comply with the state Code of Ethics.

**Statutes of Florida**

**Reference Works**

150. *Manual for Complex Litigation*, MCL 4th, Federal Judicial Center 2004
151. *Criminal RICO: 18 U.S.C. §§1961-1968, A Manual For Federal Prosecutors*, 2016, U.S. Department of Justice, Organized Crime and Gang Section
152. *A Study of Public Corruption in Florida and Recommended Solutions*, First Interim Report, Nineteenth Statewide Grand Jury, 2010

**Other References**

160. Teresa M. Becvar, *When Does Sleaze Become A Crime? Redefining Honest Services Fraud after Skilling v. United States*, 88 Chi.-Kent. L. Rev. 593 (2013). (available at: http://scholarship.kentlaw.iit.edu/cklawreview/vol88/iss2/16)
161. *Ecology and Economics of Florida's Ranches*, Univ. Fl. IFAS Extension, 2004
162. *Things to Know Before Buying a Ranch*, Winder, Schmedt, Noble Research Inst., 2000
163. *Trade-Offs Among Ecosystem Services and Disservices on a Florida Ranch*, Swain, Boughton, Bohlen, and Lollis, Society for Range Management, 2013
164. *Florida and Metro Forecast*, Inst. for Economic Competitiveness, Univ. of Florida, 2018
165. *Closing the Gaps in Florida's Wildlife Habitat Conservation System*, Fl FWC, 1994
166. *Conservation Easement Program,* Florida DEP, Div. of State Lands, 2012
167. *Coller FAIRR Protein Producer Index*, environmental assessment of ranches, www.fair.org

**ARGUMENT OF FRAUD IN APPRAISAL AND CONSERVATION VALUE OF LAND**

Racketeering is prohibited by 18 USC §§ 1951–1968 (Ch. 95, 96) including the Racketeering Influenced and Corrupt Organizations Act (RICO, §§ 1961–1968), where income therefrom is derived from or used to control, or it is engaged in by persons associated with, an enterprise engaged in or affecting Interstate Commerce. Violators are subject to compensatory and treble punitive damages as well as criminal penalties.

**Observations On Florida Racketeering And Conservation**

Residents of Florida know that few people rise or succeed in business in here without being a member of the predominating political party. Government office in Florida has long been a spoils system, where party influence is irresistible, and this is broadly accepted. No one can expect to be appointed, hired, or promoted in state or local office unless they join and follow the requests of the predominant party. Therefore political officials of the defendant state and county are necessarily operatives of the predominant political party, using government office to direct public funds to party advantage, a process which can readily cross the line between political scheming and criminal enterprise.

Rogue elements of any party or faction in government office can readily influence large state grants to benefit the party, such as those of Florida's $400 million annual purchase of conservation lands, for example by purchasing wasteland and "conservation easements" from those likely to contribute some of the funds to the party. In this way public funds are diverted to political campaigns to maintain predominance. Plausible rationales can be manufactured for conservation projects, because even well-intended rationales are often hypothetical, strategies are flexible, little evidence of need or effectiveness is expected, professional dissent can be silenced, and the credentials of malleable professionals can be used to silence critics.

For example, the decline in numbers of the Florida Panther due to declining forested habitat led to its classification as an endangered species. About one hundred panthers remain, concentrated in the sparsely populated far southwestern counties. Efforts of the Florida Fish and Wildlife Conservation Commission (FWC) from 1980 to the present to track panthers and identify signs of their presence, such as roadkill, predation, scat, confirmed interactions, and

telemetry tracking, have allowed the state FWC to map their natural range.[1] There is no evidence whatsoever that panthers have lived in or even ventured to Sarasota county or any adjacent county, except for rare incursions into far southeast Charlotte county.[2] Therefore one would expect that projects purporting to protect their habitat would concentrate on areas within or near their known habitat,[3] not in Sarasota county.

But instead, priority zones for habitat protection were assigned within Sarasota county, about thirty miles from the nearest rare evidence of panthers, and over fifty miles from any areas of regular panther activity.[4] Almost all of the intervening land is open, non-forested land such as farms and ranches, not habitable by panthers, and any paths that might be created between Sarasota county and panther habitat are blocked by several rivers that panther are not known to have crossed.[5] There is no evidence that panthers cross large rivers between habitat areas. There is no evidence that panthers migrate along narrow corridors between habitats of sufficient size; indeed the only known corridor-like habitat is along a midstate valley that does not lead to a larger habitat and is not crossed by rivers, and that is little used. The state FWC has not even designated any of the intervening land as significant for habitat preservation,[6] nor have they proposed a panther migration corridor to Sarasota county. Yet the state FWC and county officials have consistently claimed that the land purchases in Sarasota county constitute a "migration corridor" connecting existing habitat far away with public land in Sarasota county.[7]

The grants made for purchases of land in Sarasota county, and for conservation easements, contain no provisions requiring the land to be reforested as needed for use by panthers, and in fact permit ranch activity to continue even on land purchased as panther habitat.[8] Therefore the grants and easements involve no cost to the rancher whatsoever, and no provide benefit to panthers whatsoever.

---

[1] see Exhibits Vol. 1
[2] Ibid
[3] Ibid
[4] Ibid
[5] Ibid
[6] Ibid
[7] Ibid
[8] Ibid

Furthermore, the entirety of public lands in Sarasota county, together with land designated important for panther habitat, is barely enough for a few panthers,[9] even if it were reforested. To create such a habitat, including even land of high value along Interstate 75 adjacent to rapidly expanding coastal towns and cities, would cost hundreds of millions of dollars, for the prospect of merely enticing a few panthers there. Purchasing the intervening land to connect to existing panther habitat, bridging the intervening rivers if possible, and reforesting all of the land would cost billions of dollars, all for a few hypothetical panthers. Such purchases would also introduce large carnivorous animals in proximity to high density residential areas.

It is unlikely that the people of Florida would approve such a project if they knew the facts. With a strongly anti-environmental state government (the governor recently prohibited use of the term "global warming" in official communications), it is unlikely that Florida would have funded large environmental programs without some benefit to an unstated group of people in or connected with the legislature. This "conservation" funding would not exist without the prospect of political insiders and legislator election campaigns getting the funds.

In fact, these funds for land purchases and conservation easements have been paid primarily to members of the predominant political party, by purchasing land of influential party members, and a substantial part of these funds have been used for political purposes.

Yet conservation projects are popular with the electorate, who wish to believe that expenditures to protect endangered species or habitats will be effective.

**Fraudulent Appraisals in Conservation Purchases**

Upon completion of discovery, documentation will be provided of (1) defendant relationships with appraisers of the subject properties, and who selected appraisers; (2) defendant relationships with public officials, party officials, and appraisers as friends and business dependents; and (3) prior appraisals by seller and prior appraisals by appraisers involved.

Rights to a parcel of land may be owned in full (fee title or "fee"), or limited rights called easements, for example a shared road or "access easement." Either may be shared, as between the county and SWFWMD. Rights to water or minerals only are called "subsurface" easements.

Land is valued at Fair Market Value "FMV", which is the price a willing, informed buyer would pay a willing, informed seller, when neither is under pressure to buy or sell, for

---

[9] Ibid

comparable property in a comparable location, such as ranch land in the same county. So actual FMV sales prices for comparable properties are used to determine the Fair Market Value of land.

Another method of appraisal is used for business property, which computes the highest mortgage-paying ability of the property, by finding the "capitalized" net operating income of the most profitable business likely to locate there (the "highest and best use"). So a ranch which is beginning to lose money consistently cannot pay any mortgage, and has no land value, unless a government entity is willing to purchase land that produces no income.

The property appraiser of the defendant county determines for each parcel and tax year both the Fair Market Value FMV and the "assessed" value which may be substantially lower. The county appraiser is a state certified appraiser and certifies to the state that the FMV values are accurate. But in every one of the subject land transactions, private appraisers were hired, much higher values were claimed, and much higher prices were paid, even by the county itself.

Most of the subject purchases were made in periods of high real estate prices, although a wise purchaser of conservation land would never do that. Those purchases made in recessions were made at boom-year prices, as in the 2011 purchases made at 2008 prices.

**Valuation of Ranch Land in Sarasota County**

1.  The fair value should not be determined by appraisers, who have been very unreliable sources of information. The basis for valuation should be an average of Fair Market Value FMV transactions of comparable properties and location, such as ranch land in the same county.

2.  A wise buyer of conservation land would purchase during recession years and when ranch businesses fail, so low prices are likely to represent the FMV for county and state conservation purchases. For ranch land in Sarasota county, the FMV is found from such transactions of low value per acre in recent years. This is adjusted to the year desired by the correct IPD as below. The value should be especially accurate for transactions involving the same or adjacent ranches.

**FMV Transactions of Ranch Land in Sarasota County in Economic Downturns**

| Date | Parcel | Acres | Amount Paid | Per Acre | 2012 Value |
|------|--------|-------|-------------|----------|------------|
| 1982 purchase from Carlton Ranch  (no deeds available on clerk website before 1990) | | | | | |
| [1994, SWFWMD purchase 4,800 acres of Mabry Carlton Ranch for  $2.4 million] | | | | | |
| 2007 | | 4,746 | $14,684,785* | $3,094 | $3,147 |

*this is the corrected 2007 total value determined in the example below.

The average 2013 value of Sarasota county inland land was $2,808 per acre, with inactive or unusable ranch land having lesser value. To find the overpayment, this is adjusted to the year of a transaction using the IPD as explained below.

3.   The amount paid in one year is adjusted to another year by the Implicit Price Deflator IPD of the U.S. Dept. of Commerce.[10] The original value is adjusted to the reference year (2012) dividing by the original IPD ratio, and then to the desired year, multiplying by that year's ratio. The adjusted value is the price that would have been paid then by the same process that resulted in the amount paid in the transaction year.

**Implicit Price Deflators for 1992-2017[11]** [2012=100]

| Year | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990 | 1991 |
|---|---|---|---|---|---|---|---|---|---|---|
| FINR* | 82.91 | 82.77 | 83.04 | 83.90 | 85.37 | 86.34 | 88.51 | 90.57 | 92.52 | 94.27 |
| Year | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
| FINR* | 93.96 | 94.16 | 94.90 | 95.85 | 95.27 | 94.74 | 93.25 | 92.31 | 92.72 | 92.35 |
| Year | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| FINR* | 91.86 | 91.16 | 92.06 | 94.44 | 96.75 | 98.31 | 99.83 | 99.18 | 97.42 | 98.56 |
| Year | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | (data available after each year) | | | |
| FINR* | 100.00 | 100.25 | 101.57 | 102.08 | 101.28 | 101.96 | (revised July 27, 2018) | | | |

*Implicit Price Deflator, private domestic investment, Fixed Investment, Non-Residential

4.   For example, for Carlton Parcel 2 (West of Myakkahatchee Creek) the 2007 payment was:

|  | Year | 1998 payment | 2007 payment | 2017 amount |
|---|---|---|---|---|
| Easement | 1998 | $2,299,774 | $ 2,686,897 | |
| Fee Title | 2007 | - | $11,997,888 | |
| Total | | | $14,684,785 | $14,972,607 |

**False Appraisals of Carlton Parcel 2 (Easement 1998 and Balance 2007)**

5.   Large areas of land in Florida are divided into "sections" of one mile square, in "ranges" of six sections square (36 sections), within larger "townships," so Section 3 Township 38S Range 21E may be written "Sec 03 Twp 38S Rng 21E" or simply "section 03 38S 21E." All of the subject parcels are in township 38S and consist of several full sections and parts of sections.

6.   Carlton Parcel 2 is county parcel 21-694-102 (Exhibits vol. 1), consisting of about 4,670 acres or 7.3 square miles (sections) including:

Twp 38S Rng 21E, Sections 10,15,22,27,34,35, part of Sec 3 (S of SR72), and parts of Sec 23, 25-26 and W ½ of Sec 36 which are SW of the FPL easement (Bk352 Pg539).

---

[10] *Implicit Price Deflators*, Table 1.1.9, Bureau of Economic Analysis, US Dept. Commerce
https://bea.gov/iTable/iTable.cfm
[11] Ibid
https://bea.gov/iTable/iTable.cfm

7.  SWFWMD purchased an easement over Carlton Parcel 2 in 1998 for $2,299,774, and purchased the balance of full title in 2007 for $11,997,888. The total paid without transfer taxes, adjusted to 2007 was $14,684,785 (see the above example, using IPDs). The amounts below will be presented upon completion.

| Twp-Rng-Sec | 2007 County Values | | 2016 County Values | |
|---|---|---|---|---|
| | FMV | Assessed | FMV | Assessed |
| County appraisal 1: | $**** | $ | $ | $ |
| County appraisal 2: | $**** | | | |
| Payment by county: | $**** | | | |

So the county paid several times the fair market value of the land for the easement alone.

8.  After the county purchased the land, its county clerk altered the appraised values of the land purchased, to fool citizens that the county had paid her *friend and protege* Lisa Carlton about the price that its own appraiser had determined. Note that the values per square mile are far higher than values shown for the identical adjacent parcels owned by SWFWMD, shown below. County parcels 10 and 15 were given 2018 values about four times those of the adjacent SWFWMD parcels, and the 2009 "assessed" values are over 32 times as much as the adjacent SWFWMD parcels:

| Twp-Rng-Sec | 2009 County Values | | 2018 County Values | |
|---|---|---|---|---|
| | FMV | Assessed | FMV | Assessed |
| Adjacent SWFWMD Parcels: | | | | |
| 03-38S-21E | $937,414 | $40,800 | | |
| 11-38S-21E | $931,556 | $43,425 | $747,700 | $72,700 |
| 14-38S-21E | $937,414 | $40,800 | $794,500 | $45,900 |
| 23-38S-21E | $937,414 | $40,800 | $747,700 | $43,200 |
| 25-38S-21E | $937,414 | $40,800 | $767,400 | $44,400 |
| County Parcels: | | | | |
| 10-38S-28E | $1,467,400 | $1,403,600 | $2,931,800 | $636,298 |
| 15-38S-28E | $1,472,000 | $1,408,000 | $2,886,800 | $626,489 |
| 22-38S-28E | $1,472,000 | $1,408,000 | $2,855,300 | $619,607 |
| 27-38S-28E | $1,472,000 | $1,408,000 | $2,925,000 | $634,834 |
| 34-38S-28E | $1,472,000 | $1,408,000 | $2,974,100 | $645,376 |
| 35-38S-28E | $1,472,000 | $1,408,000 | $2,880,000 | $625,024 |

So the county appraiser falsely claims that her employer the county made a good bargain in paying $15 million in 2007 for land of her friend Lisa Carlton that she then claimed was worth $11 million, although she appraised that year the identical adjacent land of her friend at about

half that price. Yet the water district SWFWMD paid about four times the county appraisal on the same day to the same seller, with all county officials and land administrators directly involved, for a mere easement on that identical adjacent land, Carlton Parcel 3.

**False Appraisals of Carlton Parcel 3 (Easement Only)**

9.  Carlton Parcel 3 is county parcel 21-694-103C (see Exhibits vol. 1), consisting of about 4,992 acres or 7.8 square miles (sections) including:

> Twp 38 Rng 21E Sec 11-14, 23-26, 36 and Rng 22E Sec 7-8, 17-18
> (less part of Rng 21E Sec 25, 26, 36 subject to prior easement)
> (less S 360 ft of the W half of Sec 36)

10. SWFWMD purchased an easement over Carlton Parcel 3 in 2007 for about $39,200,379. The 2017 value of this payment without transfer taxes is $40,615,915 (using IPDs as above).

11. The amounts paid by SWFWMD for this easement vastly exceed the county appraisal:

|  | 2007 County Values | | 2016 County Values | |
|---|---|---|---|---|
|  | FMV | Assessed | FMV | Assessed |
| Total values: | $11,014,340 | $575,896 | $8,939,650 | $729,906 |
| Paid for Easement: | $39,200,379 | | | |

So SWFWMD  paid about four times the fair market value of the land for the easement alone. The fair market value for 2016 reflects the loss in market value since the easement was sold in 2007, a total of $2,074,690 of value lost due to the easement. So SWFWMD paid for the easement about forty times what the county showed to be the real value of the easement. Even if SWFWMD had received full title to the land it would have overpaid $28,286,039 in 2007. If in 2020 SWFWMD seizes this land by eminent domain, it will still be owed over $30 million.

12. The following list of sectors and county appraisals is summed in the above total value:

|  | 2007 County Values | | 2016 County Values | |
|---|---|---|---|---|
| Twp-Rng-Sec | FMV | Assessed | FMV | Assessed |
| 11-38S-21E | $931,556 | $43,425 | $747,700 | $72,700 |
| 12-38S-21E | $925,632 | $59,740 | $799,200 | $90,367 |
| 13-38S-21E | $937,414 | $40,800 | $798,200 | $46,200 |
| 14-38S-21E | $937,414 | $40,800 | $794,500 | $45,900 |
| 23-38S-21E | $937,414 | $40,800 | $747,700 | $43,200 |
| 24-38S-21E | $937,414 | $40,800 | $789,600 | $45,600 |
| 25-38S-21E | $937,414 | $40,800 | $767,400 | $44,400 |
| *[26-38S-21E | $937,414 | $40,800 | $233,200 | $13,500] |
| 30% of Sec 26: | $281,224 | $12,240 | $ 69,960 | $ 4,050 |
| *[36-38S-21E | $937,414 | $40,800 | $461,400 | $26,700] |

| | | | |
|---|---|---|---|
| 46.4% of Sec 36: | $434,960 | $18,931 | $241,090 | $12,389 |
| 07-38S-22E | $937,414 | $49,800 | $814,300 | $72,800 |
| 08-38S-22E* | $931,556 | $58,545 | $804,400 | $97,000 |
| 17-38S-22E* | $937,414 | $71,925 | $785,900 | $77,100 |
| 18-38S-22E* | $937,414 | $57,180 | $779,700 | $88,200 |

* About 30% of Sector 26 and 46.4% of Sector 36 were deeded.

13. The water district SWFWMD paid about four times the county appraisal, with all county officials and land administrators directly involved, on the same day as the adjacent county purchase, for no land at all, but a mere easement to do nothing, that cost the seller nothing. That $39 million easement had no value in protecting water resources, no value toward other conservation goals, and the water district had no authority to expend funds for other conservation goals. The easement permitted the Carlton ranch to continue business exactly as before on the former habitat it had devastated, continuing to burn off native vegetation, pollute the wetlands, and deny habitat to the endangered species that the public was told the easement would protect.

See 253.025   Acquisition of state lands.—

**False Claims of Conservation Value Were Typical of Florida Land Sales Fraud**

This section argues in general that the subject purchases of land and easements were made on the basis of criminal acts of the defendants, including fraudulent statements. The facts and legal argument of unlawful influence upon public officials and abuse of public office, are presented in Appendix E *Unlawful Methods and Criminal Acts*, and Memorandum of Law 1 *Racketeering*.

Conservation issues are presented in Appendix D *Conservation Facts and Arguments*. Details for the specific defendant groups and purchases are provided in Memoranda of Law A, B, and C.

**The Alleged Long Term Conservation Plan is of Minimal Value to the State**

The scientific advisory body for state conservation land purchases is the Florida Natural Areas Inventory FNAI, which in its statewide report[12] ranked the *entire eastern section* of Sarasota county as having *little or no conservation value in any criterion*, apart from scattered spots of wetland, *potential* forest and minor surface water, mostly within the city of Northport. That broad evaluation proved correct later: FNAI evaluated the Longino and Walton ranches as having the lowest possible conservation value, both statewide and relative to the other projects.

---

[12] *Conservation Needs Assessment*, Florida Forever, FNAI, December 2000.

There are unstated assumptions in the SWFWMD and county plans to increase habitat for species such as the panther, which show the plans to be poorly reasoned at best:

a. Most of the animals called "Florida panther" are in fact South American panthers introduced to augment Florida panthers, as though there was a need for predation rather than species protection. These animals do not interbreed with Florida panthers, occupy a distinct area west of the Florida panther habitat (Exhibits vol. 1), and are in competition with genuine Florida panthers for habitat and prey. These non-Florida panthers are the only panthers whose habitat is anywhere near Sarasota county. The population of genuine Florida panthers is only about 30, and is probably endangered by the replacement panthers. So the very idea of expanding habitat for Florida panthers is a marketing illusion without foundation in science, sold to create popular support for land purchases and easements that do not serve real conservation needs.

b. The protection of top level predators such as panthers does not in fact serve any conservation goal, but is instead media propaganda exploiting the notion that sports team symbols should somehow govern conservation policy, that the public should be especially sympathetic with large predators while completely ignoring literally millions of other species. No one has argued that preservation of genetic diversity requires top level predators at all, and they do not contribute anything to the biological food chain, merely slaughtering lower animals that would otherwise proliferate and die of natural causes. Those concerned about the causes of death of animals, do not advocate that they be devoured rather than starve.

c. The stable population of humans in the United States is unlikely to expand its *residential* land uses to the point of endangering other species. Movement of population to Florida generally corresponds to movement away from other states, reducing residential land use there. Further, states with warm climates such as Florida are more energy efficient for residential use than northern states, and should expand residential land use. This will free similar areas of northern land for use as habitat. Therefore interstate population movements should not be restricted by unlimited expansion of southern habitats for endangered species. Only critical habitats should be protected, especially for non-essential species.

d. The evidence of panther population in existing habitat areas shows that the population has slowly increased from 100 to 140 panthers [Exhibits vol. 1]. Therefore the supply of prey animals is more than sufficient. The panthers circulate in large arcs within their large existing habitat (Exhibits vol. 1), showing no tendency to move over larger distances. There is no

evidence of migrations over distances exceeding twenty miles, and no movement at all along "corridors" of open land. Therefore expansion of habitat would not improve conditions for panthers, and any plan to declare "corridors" of open land to distant forested habitat has no conservation value at all.

**The Problem of Efficient Use of Conservation Funds**

While some argue that the purchase of any random area of land is somehow conservation, simply because rain falls there and species can be found there, such purchases do not efficiently apply limited funds to meet conservation goals. Those enthusiastic about conservation forget that there is a subculture of scammers perfectly willing to spout conservation-talk to get the money. Giving limited conservation funds to scammers is the surest way to prevent conservation activity.

While some argue that isolated ranches have remnants of wetland or forest that support native species, in fact ranching destroyed the balance of the habitat on ranches, and continuation of ranching is not conservation activity. Endangered species do not go to the registry of deeds to determine whether there is an easement on a ranch. Isolated ranches are unlikely to lose wildlife without purchases of land and easements using conservation funds, so such purchases have no conservation effect, and the funding is far better used to conserve threatened habitats.

The remnants of wetland or forest on isolated ranches are ignored as wasteland by ranchers, are not threatened, and are not preserved by ranching activity. So the purchase of land or easements on isolated ranches does not serve conservation goals, unless the native habitat is *restored*. Where no habitat restoration is planned or required, such purchases have no conservation effect. The selling of ranch easements as habitat preserved by burning off native species is beyond the absurd, an outright sales fraud scheme that should insult conservationists.

The subject parcels were ranked with the lowest possible scores in conservation priority by the state conservation scientific advisory group FNAI, but were purchased anyway by a corrupted political process that stole conservation funds and interfered with conservation goals. Such misuse of public funds should be reversed and penalized, or the land seized and reforested.

**Claims of Public Benefit in Costly Easements v. No-Cost Regulation Were Fraud**

1. In these cases, there was no public benefit in acquiring an easement that does not restrict the established land use, which prevents its use as habitat for the species to be protected. None of the

easements required reforestation as habitat, none of them restricted ranching or agriculture which prevents use as habitat, and the county even *permitted ranching* on lands that it had purchased.

2. In these cases, no public funds had to be expended to prevent further development:

a. The subject parcels are located remotely, far from the coastal population centers and amenities that attract new residents; therefore had no foreseeable value in residential or commercial use, and no existing fair market value any other use, greater than their value as farms or ranches;

b. The owners had previously stated that they had no wish to allow further development than the existing ranch or farm use (App. A-E);

c. Hence the owners had no claim of any "reasonable investment-backed expectation of value" of development in any proposed new land use, so they could not have a basis of claim of regulatory taking of property under *Penn Central* [34], if the state or county had simply passed laws or regulations limiting further development; see argument at *No Easement Compensation Was Required Under Federal or State Land Use Law*.

d. Therefore the state or county could have simply prohibited further development at no expense at all to the public, by means of zoning ordinances or land use statutes, and chose instead to grant large sums to wealthy political insiders and contributors with no public benefit whatsoever.

3. Had the same or similar public funds been expended with intent to restore habitat as claimed by the defendants, the same or similar land parcels could have been purchased for their market value as farms or ranches, for similar or lesser amounts than were paid for easements, and restored as forest habitat. Instead the same funds were paid out to political insiders with no public benefit whatsoever, and no adverse affect upon the insiders.

4. There are no examples of similar purchases of easements for the tens of thousands of small properties subject to zoning ordinances that restrict future development; therefore the taxpayers of the defendant county were denied the equal protection of law in land use, and furthermore were taxed to give money to wealthy ranchers, with fraudulent claims of conservation goals.

5. The county and state lawyers, and officials (mostly lawyers) concerned with land use law, certainly knew that no payment for restriction of further development was needed, for these are the most elementary provisions and most prominent precedents of land use law.

6. Therefore the officials involved, and the defendant direct or indirect beneficiaries of the payments, were knowingly causing expenditure of public funds without public benefit and with direct or indirect private benefit for themselves, and with intent to defraud the public, falsely

15

representing this expenditure as necessary to conservation goals, and thereby obtaining funds from the public, including the Plaintiff. These were acts of fraud (Exhibits vol. 1).

**Ranching Has Only Damaging Environmental Effects**

Florida cattle ranches are primarily located in central Florida north of Lake Okeechobee, nearly all at least 20 miles inland from the coasts, in areas of minimal residential development. The ranches produce calves sold at weaning, and hay is grown for feed in the off season. Most of the land was forest or prairie, and was cleared, drained, and planted with forage grasses for use as improved pasture. Any wetland remaining was useless and was ignored, neither preserved nor protected, and is somewhat polluted and modified in species from natural wetland.

Ranches disrupt wildlife movement, burn or replace native plants, increase invasive species, and have damaged environments by fertilizer, herbicide, and antibiotic contamination as well as being a greater source of greenhouse gas emissions than transportation [163 below].

> Disservices… include pasture management (fertilization, drainage, etc.), introduction of invasive species, the potential negative effects of grazing, and increased carbon emissions… The presence of cattle poses… higher risks of introducing diseases and nonnative animal pests… Herbicides are used regularly to treat invasive plants.[163]

Ranches are ranked as high risks to the environment due to lack of "management of sustainability" and "routine use of antibiotics." [167] The livestock sector contributes "nearly 14.5% of global greenhouse gas emissions," more than the entire global transport sector, but does not report pollution. Far from protecting water supplies, ranches are large water consumers, using about half of Florida water consumption.

Many ranches harbor Florida's worst invasive trees, the Brazilian pepper (*Schinus terebinthifolius*) and melaleuca (*Melaleuca quinquenervia*). Many "nonnative plants that are present are invasive, and represent a significant disservice" [163] requiring the use of herbicides, many of which are lethal to some species such as bees, and leave carcinogenic residues.

> Pastures with invasive plants such as cogon grass (*Imperata cylindrical*), smut grass (*Sporobolus indicus*), and tropical soda apples (*Solanum viarum*) require repeated herbicide use (although tropical soda apples are now also reduced by an introduced biocontrol leaf-feeder [*Gratiana boliviana]*). Natural areas, less vulnerable to invasion, still require herbicide use for species such as climbing fern (*Lygodium microphyllum*) in forested wetlands. West Indian marsh grass (*Hymenachne amplexicaulis*) now occurs in wetlands… in wetlands within seminative pastures the invasive plants are positively associated with higher nutrient status [163 below]

Fertilizer is typically applied on improved pastures, although discontinued in some areas, leaving high phosphate residues in soil, and run-off phosphate is five to seven times higher than normal decades later, the major cause of eutrophication in ranch wetlands and downstream.

Although touted as a major contribution to conservation, the wetlands on ranches are in no way served or preserved by ranching, and in fact are not of the quality of other wetlands:

> Wetlands in improved pastures, when compared to wetlands in seminative pastures, have lower plant diversity, more less-palatable species, more nonnative plants, and more homogenous plant communities.[163 below]

The rancher who claims that leftover trees and polluted wetlands he did not destroy in ranching still serve a few birds and frogs, and that the denuded land still serves a few squirrels and crows, and that therefore ranching serves conservation purposes despite destroying native habitat and species, does not have a claim upon public funds to continue burdening the environment. There was no conservation value in purchasing land or easements that permit ranching to continue on the subject lands, and the ranchers and others who made such claims knew this very well. The claims of the ranchers that these purchases served conservation goals were acts of fraud.

Because the sun still shines, rain still falls, wetlands still reduce frosts, and some native species can still use any trees or wetland remaining, ranches are falsely credited by ranchers with positive effects on water quality, climate, and rare species. But in fact ranching does nothing for these natural processes at all, and at best limits its own degrading effects on the environment.

**Claims of Public Benefit in Keeping Land in Ranch Use Were Fraud**

1. State agencies including the DEP have sought to validate this fraud by conflating the legislated purpose of small buffer areas around habitats, with large purchases of random non-habitat land. The DEP published in 2012 a "white paper" *Conservation Easement Program* [***] that shows poor thinking and deception throughout. The paper admits the legislated purpose of easements:

> "a conservation easement is … appropriate… if the property is contiguous to an existing conservation land and can serve as a buffer or is part of an ecological wildlife corridor connecting other conservation lands together."

But then it claims vaguely that simply because the panther occasionally strays short distances onto open land before returning to its forest habitat, that it will now "use rural agricultural lands

in addition to intact natural habitat" so as to rationalize large purchases of random non-habitat land easements nowhere near the forest habitat. This is deliberate fraud.

1. The state advisory body of environmental scientists FNAI (Florida Natural Areas Inventory) evaluated the subject parcels and determined that they had the lowest possible value to state conservation goals (Exhibits vol. 1) and the lowest possible value among other land parcels available for purchase or easements (Exhibits vol. 1) in the years they were selected by the ARC.

2. None of the land was current habitat of the subject species, and little was potential habitat. If the subject lands had been habitat for endangered species, any higher use would have prohibited the Endangered Species Act and would have been penalized. Therefore plainly the defendant officials were fully aware that this was not habitat, that keeping the subject lands in non-habitat use specifically prevented its use or recognition as habitat, and that their claims of conservation purposes in making these payments were fraud, and are *prima facie* evidence of fraud.

3. No requirement of reforestation or restoration of habitat was made in the easements (Exhibits vol. 1). Therefore the easements had no foreseeable conservation effect whatsoever.

4. The same agencies allowed even the land purchased to continue to be used for ranching by the sellers, eliminating any future use as habitat, and any future conservation value (Exhibits vol. 1).

5. Therefore the officials involved had no intention whatsoever that the land be used as habitat for endangered species as claimed, and willfully acted to prevent such use, for personal gain. Therefore their representations that such easements would serve conservation goals (Exhibits vol. 1) were acts of fraud.

**Claims of Land Migration Corridors of These Species in These Areas Were Fraud**

The concept of a land migration "corridor" is unsupported by the facts of the species to be protected, and is limited to a few other species in a few unique areas. Most migrating species are birds or ocean species, with unobstructed movement in air or water enabling them to migrate seasonally over long distances. Migrating species use widely varying paths regardless of legal "corridors" so that the mere declaration of legal right of such use has no effect whatsoever.

Movements of land species along mountain ranges or river valleys reflect only the shape of those geologic features, seldom amount to migration, and few of them move along narrow paths elsewhere. Very few land species migrate long distances; and they do not use "corridors" to do so. The few migrating land species such as buffalo cross large areas of non-habitat land,

but of course they do not go to the registry of deeds or use GPS, maps, or road signs to determine what "corridor" to use.

None of the subject species (Florida Panther and Black Bear) claimed to be offered "migration corridors" are migrating species. The subject species have been tracked for many years, and the evidence of their presence (scat, prey, and carcasses), confirmed sightings, and GPS tracking data have been mapped and are available on the state FWS website (Exhibits vol. 1). Black bears are not endangered, live further South and East than panthers, have had no presence near Sarasota county, and are therefore immaterial.

There are two species of panther in Florida, about 20 to 30 of the original Florida Panther inhabiting lowlands Southeast of Okeechobee and perhaps 100 of a South American species imported to replace diminishing numbers of true Florida panthers, which inhabit primarily the "pine flatwoods" land of far southwest Florida. They require forested land for cover and game, so as to survive. They appear to wander around within overlapping habitat areas of about 100 sq. miles, driven by territorial conflicts and the pursuit of prey. There is no evidence of their presence more than a mile or so outside of their established habitat. They have never been found in Sarasota county or any adjacent county, except for a very few tracking points in the far SE corner of Charlotte county in (Exhibits vol. 1).

The panther habitat area closest to Sarasota county is thirty miles SW of the nearest potential habitat in Sarasota county, and the intervening land is primarily cleared agricultural or ranch land with minimal forested borders and wetlands (Exhibits vol. 1).

State agencies including the DEP have at times sought to rationalize fraudulent purchases of non-habitat land remote from forest habitat, by selling an invented concept of migration "corridors" for non-migratory land species. The world still awaits any evidence of lengthy panther migrations across non-habitat land.

Therefore officials involved are fully aware that any declaration of "migration corridors" for these species for long distances across non-habitat land has no conservation meaning or value whatsoever. They might just as well declare that these are migration corridors for Russian submarines across ranches: they don't do that, and they are not going to do that if given permission in the county registry of deeds, regardless of who is paid to allow this. These acts of the defendants were acts of fraud (Exhibits vol. 1).

**The Easements and Purchase Timing Do Not Serve a Long Term Conservation Plan**

If the state sought to connect existing habitat of panthers to the south, with distant habitat such as the Carlton reserve, it would seek to *purchase* the intervening lands furthest from the desirable coastal residential areas, and *reforest* those to serve as habitat. While easements restricting land uses might be an intermediate stage of land purchase, limiting the value for future purchase, in fact the state can condemn critically important land as needed for government purposes, and pay the actual value. There is no need to gamble with future land prices, or to drive up the price by making a commitment to purchase later at an unknown price.

If the state had intended to purchase the land for public benefit, it would have done so during recessions when land value is low, because the purchases are done by issuing bonds. Instead most of the land was purchased during real estate booms, and the land and easements purchased during recessions were purchased at prices typical of the preceding real estate booms, because the intent was to maximize the money given to insider landowners. The identical problem has emerged in negotiations to purchase former sugarcane lands in the Everglades, where paid-off politicians deliberately push out the purchases at the request of the landowners, to maximize the amounts to be paid.

**Pattern of Purchases Shows Intent to Defraud the State and County**

The 2007 Carlton purchases and Longino-Walton purchase approval were made during an historic peak of real estate prices, when investors knew that the bubble would soon burst, and therefore deliberately violated any prudent strategy of acquisition. Conservation land should be purchased with a long term plan, picking up large parcels when prices are low or when businesses fail. The 2010 Longino-Walton purchase was made in a severe recession, but at prices from the historic price peak, and the $37.4 million paid was a large fraction of the state land budget for that year, violating prudent strategy and simply throwing truckloads of scarce funds at insiders. Therefore the pattern of purchases shows intent to defraud the state and county of funds.

The pattern of state and county purchases of lands for "conservation" clearly shows intent to purchase land with no conservation value, to abuse public office and deceive the public as to the purpose of the purchases, and to pay the highest possible price for the land. These acts clearly show fraud by the public officials and insiders involved.

**Marginal Ranchers Misrepresented the Facts to Cash In on Conservation Easements**

Since public funding became available for purchase of lands and easements necessary to preserve natural habitat and endangered species, the owners of failing and marginal ranches of Florida have widely advertised their false claims that ranches serve those purposes, and that the public should pay them just to continue ranching, the principal destroyer of Florida habitat.

The native interior lands of Sarasota county consisted largely of pine flatwoods or wetlands at lower elevations, and pine or hardwood forest at slightly higher elevations, much of which was cleared and drained in the late 19th and early 20th centuries to form citrus orchards, farms, and ranches. Citrus orchards declined due to frosts and are now mostly agricultural. Areas near the coast have been developed as population increased. Population growth has slowed [164], and overbuilding during "baby boom" retirement years will reduce future growth. While residential development absorbed farms and ranches near the coast during the late 20th century, primarily west of I-75 and a few miles farther inland near the city of Sarasota, ranches inland and further from the nearest cities have no foreseeable prospect of residential development.

Land in ranch use has declined with lower cost imports and reduced consumption of beef. The state university notes [161] that "the number of ranches and the amount of land in cattle ranches decrease every year" because "ranching produces a net gain only in some years" and "the cattle market is cyclical" producing long periods of loss. The Florida Cattle Ranchers mission is therefore "to *bring back to Florida* consumers homegrown beef" (see FCR website). Fewer than ten percent of ranches can compete in non-meat or dairy protein production [167] and therefore see declining value in ranch land.

Like other Florida real estate, the value of ranches is systematically inflated by sellers, who "exaggerate" the livestock supported and the value of production, and understate costs, to inflate the net income and value of ranches, and thereby cheat the "unsuspecting buyer" [162].

> If land prices are high, it is unlikely that potential for net profit exists. Typical annual gross income per cow is $190 to $340. Annual costs per cow are $300 to $400. Thus, little profit margin exists. Only the most efficient producers have a chance to realize profits each year.

Not surprisingly, ranch owners want to sell ranches, and look at every option to make a losing industry look valuable, including the systematic exploitation of substantial conservation funds.

State conservation goals have focused on preserving habitat, not restoring it, and there is no need to preserve ruined forest habitat such as ranch pasture, or the native habitat such as

marsh, swamp, and woodland that remains here and there on ranches [161]. Therefore ranchers have used every opportunity to "sell" illusions to the public, of "conservation value" in ranches.

By 2004, the distressed ranchers had led the state FWC to claim that ranches serve conservation purposes. Although in fact ranches and farms are the principal cause of destruction of native habitat for forest species, and actively prevent its recovery with controlled burns, the FWC falsely suggested that the survival of patches of habitat on ranches somehow makes ranching beneficial to native species: "more than 50% of habitat used by Florida panthers exists on privately owned land, most of which supports cattle ranching" [161 below]. Of course this means only that the rest of their former habitat was destroyed by the same ranches, and that their habitat cannot be restored while ranching continues. Ranching obviously does not help these species.

In addition, ranchers promoted the concept of "controlled burning" used to prevent brush fires, with the pretense that because it helps them prevent reforestation, they deserve grants of conservation funds. Why would we pay to *prevent* reforestation of native habitat ruined by ranches? Because ranchers declared ranches to be the new "native habitat" to be preserved!

> The US Forest Service and Florida Forest Service began campaigns against burning in the 1920s, but Florida cattlemen continued to burn rangeland, pastures, and woods, and they fought restrictions with observations like those of S. W. Greene "that controlled woods burning [is of] very great value to the production and conservation of forest and game in Florida." [163]

Here we see the adoption of conservation terminology by ranchers to equivocate the destruction of habitat, and its maintenance as non-native pasture, with "preservation" of whatever remained, until at last the "vital role of fire" on ranches was "recognized by authorities" [163] whom they had placed in state offices. Of course, elsewhere forest fires are controlled by clearing "fire breaks" only between sections of forest to limit the spread of fires. But in Florida, money talks to public officials, often through their political campaign funds, so forests must now be cleared and kept burned down at public expense to "preserve" forest habitat.

Ranchers have defrauded the state and county to pay them more than the ranches are even worth, just to have them continue ranching and burning native habitat, without even selling the land. This is classical Florida land sales fraud, taken to a new level to steal conservation funds.

**State Was Fully Aware of Such Land Sales Fraud Schemes**

Florida has a very extensive history of collusion of public officials and developers, perhaps the dominant theme of state history, long before conservation funds were available. Conservation theft often involves bribery of a public official by the beneficiary:[13]

> An engineering consultant, Dan Shalloway, engineered the $190 million land deal for the Palm Beach Aggregates rock pit to be used for "water storage". He is now facing a professional-misconduct complaint…Shalloway lied to the district in 2001 about his relationship with Palm Beach Aggregates… trying to sell… rock pits to the district for water storage. …Shalloway wrote … "We were merely pointing out to water available to the public as good citizens." Shalloway and (Palm Beach County Commissioner Newell) made arrangements as far back as 1998 to share the profits from any sale of the pits…The outrageous purchase price was justified for its "environmental benefit": in fact, it was a price pushed by corruption. Period.

So common is Florida political corruption in theft of conservation funds, that its elimination dominated the wish list of state environmentalists for 2007:[14]

> Florida's agencies charged with protecting public health and the environment shall abandon predetermined outcomes based on political expediency…
> When the state purchases environmentally sensitive land, the beneficiaries — whether corporate or private — shall be required to disclose any campaign contributions...
> Public agency managers shall never intimidate, pressure or reassign public employees for fulfilling job responsibilities that conflict with special interests…
> State government agencies, such as the water-management districts, shall be prohibited from spending public money for public relations, education and outreach in defense of policies that can be proved to be driven by politics and not science.

Even the Water Resources Development Act WRDA of 2000 to advance Everglades restoration after a decade of litigation of sugar industry pollution, assigned project management to the SFWMD board dominated by "land speculators, Big Sugar, and the Growth Machine" so that:

> projects now undertaken under a "green banner" would always be skewed to… special interest domination, pressure and insider politics...
> But it has always been that way in Florida on the environment. Audubon… has been pleased enough to be the… token presence on blue ribbon panels… special interests that control the Florida legislature … got what they wanted: the ceaseless growth of suburbs into wetlands, protected crops like sugar … destroyed aquifers, and water quality, and they got environmentalists to agree it was the best result possible.[15]

---

[13] *This is Florida: epicenter of… public corruption*, Farago, Counterpunch, 9/14/2007
[14] *Florida environment: A wish list for 2007*, Farago, 2007
[15] *A brief history of Florida environmentalism*, Counterpunch, 11/10/2007

**County Was Fully Aware of Such Land Sales Fraud Schemes Throughout Its History**

As noted above, there is no state and no county in the nation more acutely aware of, or more intimately involved in, real estate fraud and government corruption, the habitat of a predatory native species, the Florida land sales racketeer. The history of Florida and of the county consists largely of land sales fraud schemes, beginning in this county with Sarasota itself. The Florida land fraud "panther" proliferated in the 1920s, selling empty tracts as "cities" to faraway buyers, left forlorn and bankrupt in the great Depression. In the 1960s the nearby fake cities of Northport and Rotonda were sold by the later-bankrupted GDC as retirement lots unbuildable without utilities, tens of thousands of which were abandoned by cheated buyers and resold for decades by the defendant county itself, which could not be more aware of the problem.

Local environmental regulation is a primary restraint of the primary state industry, real estate development, and is the focus of efforts to neutralize regulations and divert funds to developers, landowners, and public officials.

> In Miami-Dade… commissioners…don't get selected for sensitivity to the environment... the most… anti-environmental commissioners are assigned to the… commission chair. Natacha Seijas…isn't the continuous chair of the county environment committee because she loves manatees. County managers... foster what the Growth Machine wants.[16]

Nothing could be more natural for Sarasota ranch owners than to wave their arms and wail to the public that skyscrapers were about to be built all over their ranches, and that the people must pay them to continue ranching so as to "preserve" us all from this delusion. No such scheme could be more familiar or more obviously fraud to the defendant county, which was still selling GDC lots in 2003-2007 as it began buying worthless ranch land easements to generate large political payoffs from ranchers. But this time, it would be left not with free empty lots to sell, but with only the useless right to prohibit lots where no one could live, for massive payments to insiders.

**Specific Frauds By Landowners and Public Officials to Cause the Purchases**

**Fraud by Landowners to Deceive Public Officials**

1.  The marginal ranch owners of eastern Sarasota county knew in the 1990s that their land had little or no conservation value. The state scientific advisory body FNAI (Florida Natural Areas

---

[16] *Ibid*

Inventory) in its statewide report[17] ranked the *entire eastern section* of Sarasota county as having *little or no conservation value in any criterion*, apart from scattered spots of wetland, potential forest and minor surface water, mostly within the city of Northport (see below). So ranch owners knew that a "conservation" project proposed to FNAI would not get past the ARC and BOT, because the FNAI board is scientific and independent. That prediction proved correct later: FNAI evaluated the Longino and Walton ranches ("Myakka Ranchlands" project) as having the lowest possible conservation value, both statewide and relative to the other projects.

2.   But there was another route: the local water district SWFWMD could draw about the same annual funding for land purchases with *no scientific review at all*, and SWFWMD permitted ranchers to serve on local boards developing "long term relationships" to "advise" them on conservation purchases! Of course ranchers called themselves "exemplary stewards" of land, despite having devastated the native habitat, and claimed that they should be paid great sums to continue allowing rain to fall and water to feed rivers. And the ranchers could afford lots of benefits for SWFWMD officials willing to make vague PR statements that such payments were somehow "for conservation" without explaining anything at all to the FNAI, ARC, or BOT.

3.   SWFWMD is a regional agency for state control of water supply, quality, conservation, and flood protection, through water use permits and stormwater (surface water) discharges, for 16 counties including Sarasota County, and is divided into nine "basin boards" along watershed boundaries. The Manasota Basin Board includes Sarasota and Manatee counties.

4.   Water "authorities" do the actual storage, treatment, and supply of water for multiple counties, with county commissioners as directors. The PRMRWA (Peace River Manasota Regional Water Authority) serves a coalition of counties including Sarasota county.

5.   The large Sarasota ranchers such as Carlton and Longino and their "friends" have been SWFWMD *directors* and county commissioners *themselves*, as well as members of the Manasota Basin Board (of SWFWMD), the Peace River Manasota RWA (of county commissioners), and the county Environmentally Sensitive Lands Oversight Committee ESLOC (appointed by county commissioners), forming a small social group completely controlling the conservation decisions of SWFWMD and Sarasota county. Some were officials of the Nature Conservancy and CFGC, serving as advisors and *actual agents* of the county and SWFWMD in government negotiations

---

[17] *Conservation Needs Assessment*, Florida Forever, FNAI, December 2000.

and purchases of their own land and easements. These positions allowed them to create the fraudulent illusion of independent advisors and agencies that they in fact controlled.

6. The ranchers were interested parties in all of these decisions, initially seeking primarily to prevent opposition to their ranching use of about half of the regional water supply [***]. After Mabry Carlton sold land to the county while serving as chairman of the county commission in 1982 for $31 million, and an easement to SWFWMD in 1998 for $2.3 million, and Longino sold a useless easement to SWFWMD and the county in 2002 for $2.1 million, the ranchers saw that most of their ranch profit came from conservation sales talk, and "diversified" their business to include the theft of conservation funds, netting another $89.4 million between 2007 and 2010.

7. The first easements showed the ranchers that conservation-talk pays and could pay better:

> Longino [demonstrated] the potential for… ranchers to earn money from… their land… Longino hopes his projects will serve as an inspiration to other ranchers… [***]

These easements had absolutely no effect upon the ranches, and did inspire Lisa Carlton to a "political career" that within eight years had brought another $89.4 million to the ranch families, over one quarter of the entire state conservation budget for the years affected despite dozens of real conservation projects waiting years for action, and with no cost or effect upon their ranching whatsoever, and with no conservation value whatsoever, as everyone knew had already been certified by the FNAI. By then they were trustees of conservation NGOs that made pretty PR talk to the press to "explain" how deforested land shown as green areas on the map would provide "critical habitat" for "endangered species" never found there or in any adjacent county.

These interests led Carlton's sister Kimberley (Carlton) Bonner, a corrupt state judge, to abuse public office three years later, for several years, to disrupt this racketeering investigation by denying due process to the Plaintiff. It is not surprising that Bonner listed Longino as a character reference in applying for that appointment and invisibly "elected" judgeship [115].

1. The theft of public funds on this scale required the influence of the Longinos and Carltons not only upon the water district SWFWMD ($21.3 million) and the county ($34.1 million), but also the influence of Lisa Carlton upon the ARC ($37.1 million). This required influence was gained by personal relationships and the dependence of careers and campaigns upon the Carlton/Longino money, through political party "donations", political "fixers" who arrange bribes through shell corporations, as well as career promotions for such "exemplary" service, as noted in Appendix E. Fraudulent representations were essential throughout this process.

2.   These acts of the defendant ranchers and "friends" to influence public officials of the state, water district, and county to purchase land and easements from themselves under false pretenses, and to abuse public office themselves, constitute organized fraud, perjury in official proceedings, unlawful influence of public officials, abuse of public office, racketeering under state law, and denial of honest services; together these crimes constitute racketeering under federal law.

**Fraud by Advisors and Public Officials of the State**

1.   The subject lands were well known by the state to have little or no conservation value, while many other projects had great conservation value, and were pre-empted by the subject projects.

8.   The state scientific advisory body FNAI (Florida Natural Areas Inventory) in its report[18] ranked the *entire eastern section of Sarasota county* as having little or no conservation value in *any* evaluation criterion, apart from some scattered spots of wetland, and some potential forest and minor surface water within the city limits of Northport:

> a. Scattered low-priority habitat conservation areas for rare species (exhibit 10);
> b. Some small medium-priority "strategic" habitat areas (exhibit 11);
> c. No areas with more than Low biodiversity resource value (exhibit 12);
> d. No under-represented natural communities at all (exhibit 13);
> e. No areas with more than Low resource conservation value (exhibit 13b);
> f. No forest; some forest potential within Northport city limits (exhibit 14);

So the state conservation officials and the property owners were fully aware that any argument of special conservation value of the subject properties was completely false and dishonest.

9.   The same FNAI report found that the entire eastern part of the county had little or no value toward the "conservation and protection of *water* resources" as required for the water district SWFWMD to purchase land or easements under FS 379.139(2):

> a.   There are no areas of more than low water resource value (exhibit 01);
> b.   There are no aquifer recharge areas at all (exhibit 03);
> c.   There are only low-priority surface water protection areas (exhibit 04);
> d.   There are only isolated wetland spots unlikely to be damaged (exhibit 05).

So the water district SWFWMD officials were also fully aware that any argument of special *water* conservation value of the subject properties was completely false and dishonest.

2.   The state FNAI specifically evaluated the "Myakka Ranchlands" project (Longino and Walton ranches, adjacent to the Carlton ranch parcels) as having the lowest possible conservation value, both statewide and relative to the other projects, but the ARC put it on the highest priority

---

[18] *Conservation Needs Assessment*, Florida Forever, FNAI, December 2000.

"Group A" list, and the BOT approved the purchase, all rushed through in the last weeks of project sponsor Lisa Carlton's term as Senate president and Budget Overseer, controlling the budgets and careers of everyone involved in the ARC decision.

3.   Aware that her Walton-Longino neighbors' ranches like her own had no conservation value, Carlton had pushed her own project through SWFWMD instead of FNAI and ARC, on the false premise that it served *water* conservation, to avoid the FNAI evaluation, for it was well known that FNAI had reported that the eastern county had no other conservation value; although FNAI had also reported that the eastern county had no *water* conservation value. But SWFWMD could claim "experts" who would vaguely state that vast payments to insiders were "for conservation," and SWFWMD was controlled by party "fixers" and ranchers like Carlton and Longino (see Appendix E *Political Corruption Facts*).

4.   So Carlton copied the plan for the 1998 Carlton and 2002 Longino easements, having the Carlton land and easement purchased by SWFWMD and the county in 2007, and in return for the Longino influence, pushed through ARC the worthless Longino-Walton "Myakka Ranchlands" project, all approved in her last weeks as Senate President, and purchased by the BOT in 2010. See below, *Fraud by Advisors and Public Officials of SWFWMD* and *Fraud by Advisors and Public Officials of the County*.

5.   Further detail of related frauds by state officials influencing ARC will be presented upon completion of discoveery.

6.   These acts of state officials and their advisors to influence public officials of the state, water district, and county to purchase land and easements from interested parties under false pretenses, and to abuse public office themselves, constitute organized fraud, perjury in official proceedings, unlawful influence of public officials, abuse of public office, racketeering under state law, and denial of honest services; together these crimes constitute racketeering under federal law.

**Fraud by Advisors and Public Officials of the State Water District SWFWMD**

10. SWFWMD is a regional agency for state control of water supply, quality, conservation, and flood protection, through water use permits and stormwater (surface water) discharges, for 16 counties including Sarasota County, and is divided into nine "basin boards" along watershed boundaries. The Manasota Basin Board includes Sarasota and Manatee counties. SWFWMD is governed by a Board of nine Directors; the Manasota Basin Board consists of "volunteers."

11. Water "authorities" do the actual storage, treatment, and supply of water for member counties, handling payments between suppliers and users, with county commissioners as directors. The PRMRWA (Peace River Manasota Regional Water Authority) is a coalition of Sarasota, Manatee, DeSoto and Charlotte counties formed in 1982, and supplies about 28.2 mgd.

12. The large Sarasota ranchers such as Carlton and Longino and their "friends" have been SWFWMD directors and county commissioners *themselves*, as well as members of the Manasota Basin Board (of SWFWMD), the Peace River Manasota RWA (of county commissioners), and the county Environmentally Sensitive Lands Oversight Committee ESLOC, forming a small social group completely controlling the conservation decisions of SWFWMD and Sarasota county. They also were directors and donors of the Nature Conservancy and CFGC, serving as advisors and *actual agents* of the county and SWFWMD in government valuations and purchases of their own land and easements and those of their "friends."

1.  The state scientific advisory body for conservation project evaluation is the Florida Natural Areas Inventory (FNAI), which noted in its report on conservation priorities[19] that in eastern Sarasota county where the subject lands are located:

> e.  There are no areas of more than low water resource value (Exhibits vol. 1);
> f.  There are no aquifer recharge areas at all (Exhibits vol. 1);
> g.  There are only low-priority surface water protection areas (Exhibits vol. 1);
> h.  There are only isolated wetland spots unlikely to be damaged (Exhibits vol. 1).

Therefore this area did not have priority for SWFWMD to expend substantial Florida Forever funds for the "conservation and protection of *water* resources" under FS 373.139(2), and its assertions of such priority are acts of fraud.

2.  Even if SWFWMD had authority to purchase land and easements with FF funds for *other* conservation purposes, it knew very well that there was close to zero other conservation value in the entirety of eastern Sarasota county, as shown by the FNAI report,[20] and by the FNAI evaluation of the Longino-Walton "Myakka Ranchlands" project, pushed through by Lisa Carlton in the very last weeks of her term as Senate President and Budget Overseer.

3.  If the project had other conservation value, it would have been proposed as an FNAI project. Instead Lisa Carlton arranged for their own land and easement to be purchased by SWFWMD and the county, and pushed through the ARC approval of the worthless Longino-Walton project.

---

[19] *Conservation Needs Assessment*, Florida Forever, FNAI, December 2000.
[20] *Ibid*.

Statements by the SWFWMD officials who wrote the easement deed to Carlton Parcel 3 show intent to defraud the public that it had conservation value, when in fact they circumvented the scientific evaluation required by state law, knowing it would have the lowest possible score. The deed falsely states that the land is:

- a. "largest remaining intact cattle ranch" in county.
    Fact: preserving ranches is not a lawful basis for purchase, and is a highly suspect goal.
- b. "approved as a Protection Priority Site" of ESLPP by county commissioners.
    Fact: the county relied upon advice of SWFWMD, which has no conservation authority.
- c. "will support protection of endangered species" by "providing land uses that will not conflict with maintenance activities" and will "aid in the movement of wildlife"
    Fact: no endangered species are present nor move through the land.
    Fact: ranch "maintenance activities" destroy the habitat of the claimed species.
- d. claims to protect rare species (white ibis, American kestrel, sandhill crane, wood stork)
    Fact: the white ibis is common throughout the state, even in residential areas.
    Fact: the SE American kestrel is common throughout the hemisphere in open habitats.
    Fact: the Florida sandhill crane is not endangered, and is the most common crane,[21] found "in many inland wetlands of Florida."[22]
    Fact: the wood stork is no longer endangered, and is unaffected by an easement.
    Fact: FNAI reported no rare species or significant habitat in this area.
- e. claims that the land *could be* habitat for the American alligator, little blue heron, snowy egret, and tricolored heron.
    Fact: all of these species are common throughout the state.
    Fact: the tricolored heron prefers coastal waters.
- f. claims that ranching "contributed to the conservation of certain natural resources."
    Fact: ranching and farming are the primary causes of habitat loss in Florida.
- g. claims that an easement will promote "sustainability of core conservation lands."
    Fact: the land serves no purpose in county conservation unless habitat is restored.
    Fact: FNAI reported no significant water or other conservation value in this area.
- h. claims the goal of protecting the "ecological and hydrological integrity" of the land.
    Fact: rain and rivers do not suddenly stop without "easements" to continue ranching.
    Fact: FNAI reported no significant water or other conservation value in this area.
- i. claims that easement without public access preserves public "scenic enjoyment."
    Fact: the public cannot see the ranch unless they fly over; there is only a ranch to see.
- j. claims that "conservation of the protected property" is "strongly supported through the statutes, codes, and policies" of state and county.
    Fact: state law does not authorize SWFWMD to make general conservation purchases, and requires scientific evaluation of conservation land, which SWFWMD circumvented, knowing the ranch would receive the lowest possible scores, like the adjacent ranches.
    Fact: FNAI reported no significant water or other conservation value in this area.

The deed throws together vague verbiage with no conservation rationale, when in fact:

---

[21] Nature Conservancy website; Florida page.
[22] *Sandhill Crane, Grus canadensis*, National Wildlife Federation

(1) there is no presence or habitat there of panthers or any other endangered species,

(2) the four "special concern" species found there are very common throughout the state, and

(3) the four species not there that *could* use habitat there are common throughout the state.

The deed itself[23] claims that the purpose was "protection of endangered species" never found there, but admits in its own Baseline Documentation Report (prior to the purchase) that no endangered species were in fact found there, nor even habitat usable by any endangered species. The deed itself is an act of perjury and fraud by the public officials of SWFWMD and the county, extensively claiming satisfaction of the criteria of state and county conservation statutes and ordinances, while admitting the complete violation thereof.

7.   Details of collusion of SWFWMD officials in the misallocation of public funds will be presented upon completion of discovery.

8.   These acts of state officials of SWFWMD and their advisors to influence public officials of the state, water district, and county to purchase land and easements from interested parties under false pretenses, and to abuse public office, constitute organized fraud, perjury, unlawful influence of public officials, abuse of public office, racketeering under state law, and denial of honest services; together these crimes constitute racketeering under federal law.

**Fraud by Advisors and Public Officials of the County**

The Sarasota county Board of commissioners has been composed largely of ranchers and developers and their associates, and often were the very ranchers whose land or easements the county purchased, including Mabry Carlton and B.T. Longino. These commissioners also volunteered to be Directors of the Regional Water Supply Authority (Peace River Manatee WSA) and/or the Manasota Basin Board of SWFWMD, and thereby made themselves "advisors" to SWFWMD and the County, along with their friends, that truckloads of cash must be dumped on their ranches so that rain would continue to fall there, and rectangles on the map could be colored green, although these many miles of land remained cleared, and devastated as habitat.

State and county employees given conservation responsibilities, and other insiders linked by interest and influence including political party, including the owners of the property purchased, were involved in deception of the people and the county commissioners, that purchases of the subject land and easements would achieve the conservation goals required by

31

county ordinance 92-272 allowing the use of tax revenues. Insiders and officials are so closely related and mixed that no meaningful line can be drawn. In fact the advisers were all insiders, some connected directly to the landowners, and others connected by political "fixers" and political party and their control of election funds, appointments, promotions, or replacements (see Appendix E *Unlawful Methods and Criminal Acts* and Memorandum of Law 1 *Racketeering*).

For example, at the 11/27/2007 meeting of county commissioners, county conservation employees Amy Meese, George MacFarlane, Brooke Elias, and John Herrli claimed that the useless Carlton ranch purchases for $51 million, using up most of the entire future county ESLPP funding, would serve conservation goals. Eric Sutton of SWFWMD claimed that it was an important "addition to the assembled core conservation area" and he was promoted in 2011 to Dir. Habitat and Species Conservation at FWC. They all knew that continued ranching would have no conservation effect whatsoever, did not even propose a plan for conservation activity, and sought the mere illusion of progress created by extending "designated" land area. But they advised the commissioners that the judgment of experts familiar with the problem, was that the purchases should be made. Two of the five commissioners objected that the conservation value was unclear, but the purchases were approved anyway on this fraudulent advice and pressure.

A good example of fraud by county officials, of the kind referred to as "greenwashing" is the PR letter of Amy Meese [Exhibits vol. 1], then director of natural resources for the county, in reply to a 2015 inquiry by the Plaintiff:

> The fee simple and conservation easement acquisitions of the Mabry Carlton Ranch, Inc. link lands already protected by investments from the County and the District to the east and the County's Carlton Reserve to the west. This contiguous acreage provides the large scale habitat connections crucial to the needs of the Florida panther and Florida black bear. The survival of these two listed species depends on a system of wildlife corridors linking wilderness islands throughout the state. The purchase of the CE also protects the watershed and reduces risk of flood impacts & damage which aligns with ESLPP 'Water' criterion.

These statements are entirely fraudulent. There is no evidence whatsoever that the black bear has ever been present in Sarasota county or any adjacent county; it had long been removed from the endangered species list, and it was so abundant that a hunting season had been established. There is no evidence whatsoever that the panther has ever been present in Sarasota county or any

---

[23] *Deed,* OR 2007188021, MCRI to SWFWMD, 12/20/2007

adjacent county, except rare incursions in the far SE corner of Charlotte county, and it has never been observed to migrate. None of the county land to the east is panther habitat. There are no "wilderness islands" used by the panther and no "system of wildlife corridors" whatsoever, let alone "throughout the state" or "crucial to the... survival of these two listed species." Such terms do not even describe the actual forest habitat areas thirty to fifty miles south across non-habitat land. These are obvious, direct, and premeditated lies to the public, acts of fraud, abuse of public office, and denial of honest services. Similar statements were made to the commissioners.

Regarding the Meese statement that "the CE also protects the watershed" it is perfectly obvious that such an agreement has no effect whatsoever upon the watershed, nor does it require or facilitate any activity with such an effect, and no such program has been proposed there. The easement furthermore permits ranching which has adverse effects upon the watershed, and uses about half of the water supply. These are obvious, direct, and premeditated lies to the public. No rationale for these purchases could be produced by the county natural resources official. This was fraud as a favor to her now-wealthy sponsors, political "fixers" and political party.

Claims of conservation value in the purchase of rights to do nothing on isolated ranch land might be credible to a few adults having limited information or unconcerned with the issues, but government officials, employees, and advisers selected as experts have no such excuses. Motives for such deception include promotion or disfavor, false positive or negative performance evaluations, supply or denial of election funds, and often just social acceptance or ostracism, based upon specific favorable acts, or upon obedience to a faction, social group, or political party controlling such rewards or punishments, or its members, agents, or donors. Such arrangements may appear to unethical participants as ordinary business, but all public officials and professionals are bound by codes of ethics, as well as the law of fraud and abuse of public office.

Where a public official has been simply deceived, socially pressured, or brainwashed by a "groupthink" process to go along with a suspect narrative of conservation effects that serves an interested party, the official may only have proven a critical lack of skill or courage to serve the public. But every commissioner should have known that the Carlton and Longino purchases served insiders, and any one of them or their advisors could have informed the others that the entire eastern section of the county had already been found by the state scientific advisory group FNAI to have no real conservation value.[24] So it is unlikely that any commissioner was unaware

---

[24] *Conservation Needs Assessment*, Florida Forever, FNAI, December 2000.

that the conservation claims were at least highly suspect. Those who were aware of this were abusing public office on behalf of insiders. Those who were not aware of these facts were carefully defrauded by other public officials.

Those who have defended these purchases, even when confronted by evidence of zero conservation value, often appealed to the idea that the funds were "free money" that would "just go back" to the taxpayer if not given away to smiling rich "friends" pretending to be conservationists. However useless the devastated ranch land, however counterproductive the easement, however many important conservation projects were lost as a result, they would insist upon the false notion that "any expense for conservation was better than none." But in fact the expenses served no conservation purpose at all, and set back the cause of conservation statewide.

Where public officials had knowledge that the *value* of land or easements proposed for purchase is far less than an "advised" price, because the same county paid one-tenth that amount for a closely related easement just a few years earlier [App. D, E, 2007, 2010], or paid more for an easement than for full title to adjacent land purchased at the same time [App. D, E, 2007], or was purchasing land during a real estate price peak which could be purchased during a recession [App. D, E, 2007], or was purchasing during a recession for a price typical of the preceding real estate boom [App. D, E, 2010], or that the price was several times the fair market value sworn by the county appraiser [App. D, E], those officials were certainly aware or should have been aware that the "advised" price was far too high [App. D, E], and abused public office in approving such a purchase, to benefit insiders. Those who were not aware, were certainly carefully defrauded.

But the county and SWFWMD continue to map the areas of useless ranch easements in green, as a forest would normally be colored, to deceive the public that something was done. Aerial photos show these areas to be open pasture with minor wetland spots and narrow fringes of trees. Even the photos posted by the county and its purchasing agent CFGC show nothing but flat pasture land for miles where the forest habitat had once been. There was no conservation value in these easements whatsoever, and no conservation was planned, as established by the continuation of ranching there. The statements of county officials to county commissioners, news reporters, and the public were acts of fraud.

9.  Details of criminal acts of county officials will be presented upon completion of discovery.

10. These acts of county officials and their advisors to influence public officials of the county to purchase land and easements from interested parties under false pretenses, and to abuse public

office, constitute organized fraud, perjury, unlawful influence of public officials, abuse of public office, racketeering under state law, and denial of honest services; together these crimes constitute racketeering under federal law, as argued below.

**Conclusion On Fraud to Deceive Public Officials**

The purpose of the easements granted to the defendant wealthy ranchers was clearly to steal conservation funds under the pretext of conservation goals to be met by tax revenue paid by taxpayers of the state and county, including the Plaintiff. No easements were required to meet the statutory conservation goals, none of the declared habitat goals could possibly be met by means of the subject easements, and all acts of the defendant officials and ranchers in pretense thereof were clearly and knowingly fraudulent. The properties were willfully misrepresented. The appraisals of the properties were fraudulent, so that inflated prices were paid where purchased, and the easements served no conservation purposes.

These acts of the defendant ranchers and public officials to influence public officials of the state, water district, and county to purchase land and easements from interested parties under false pretenses, and to abuse public office themselves, constitute organized fraud in violation of FS 817.034(a), perjury in official proceedings under FS 837, unlawful influence of public officials under FS 838.016 and FS 838.021, abuse of public office under FS 838.15, with related crimes under FS 517 and FS 896, all felonies of the first degree under Florida law punishable by prison terms of one or more years, state racketeering offenses under FS 895, and denial of honest services to the public under 18 USC § 1341 and 1349. The acts of Kimberley (Carlton) Bonner to disrupt this racketeering investigation constitute abuse of public office in violation of 18 USC §§ 1503-1513. Together these crimes constitute organized crime in support of racketeering enterprise under 18 USC §§ 1952–1968 (see Memorandum of Law 1 *Racketeering*).

**Statutes and Ordinances Were Violated By The Subject Conservation Purchases**

Purchases of land and easements can achieve the conservation goals of preventing more intensive development or restoring native habitat, but where the native habitat is already removed by ranch or farm use, and no development is likely that would do any worse habitat damage, and no restoration of habitat is required or planned, especially where ranch or farm use is allowed to continue so that natural reforestation is prevented, no conservation goal is served.

The subject properties are in this category, and these purchases of land and easements violated the conservation goal requirements of the statutes and ordinances that provided the funds.

**State Agencies Blur the Meaning of Conservation to Rationalize Useless Easements**

A 1994 FWC report [165] identified lands needed by wide-ranging endangered species, and noted that the state could not purchase and manage all such lands, suggesting conservation easements to allow "low-impact" uses while "simultaneously protecting habitat values for listed species." This rationale presumes that continuing uses are of such "low-impact" that there was no habitat loss. So easements would be helpful only where development is likely, and because allowing agricultural uses is suggested, easements do not assist the native species displaced by agriculture. So conservation easements could not have significant effects in most areas.

The state DEP Division of State Lands describes its purposes in purchasing land easements in a 2012 paper [166] marked by carefully distorted reasoning. It rationalizes paying owners of land that is *not* "intact natural habitat" to continue ranching or farming *without* habitat restoration, simply because some species may occasionally use such lands somewhat "in addition to intact natural habitat." But of course the same would be true without purchasing easements.

The paper claims that a conservation easement can establish a "buffer" zone "contiguous to an existing conservation land" but fails to argue that large areas of non-habitat land could serve this function, especially where not contiguous to habitat, like the subject lands. It targets land that "needs no … management different from what is already occurring" so as to allow ranches to continue business as usual with no conservation effect whatsoever.

To determine the easement value "the property is appraised for its highest and best use as determined by the local … ordinances and current market conditions… then appraised a second time with all the conditions of the easement taken into account." But in fact the state has paid about the same amount per acre for ranch easements as for purchases of adjacent or similar lands, and none of the subject properties had greater value in other uses, so the easements were of no value at all. The DEP paper is a whitewash to divert public funds to insiders for bribes.

**1992 County Resolution 92-272 States Later Ordinances' Criteria for Acquisitions**

The county notes in its 2-page Land Acquisition Nomination form that the criteria permitted by Resolution 92-272 for acquisition of Environmentally Sensitive Lands are these:

Rarity: Sites containing rare community types, listed species, or other special features.

Connectedness: Sites adjacent to existing public lands or waterways.
Quality: Sites of high ecological quality with species diversity and ecosystem integrity.
Water Resources: Sites that maintain water quality in either a natural stream system, recharge area, or estuarine environment.
Manageability: Sites that have the potential to provide long-term viability and maintaining habitat functions.

Ranches and farms would always be disqualified from purchase, because their original habitat has been stripped away and the county had no plans for reforestation, so they could not meet three of the five criteria. Ranches and farms are disqualified in Quality as lacking their original "ecosystem integrity": these sites are cleared and drained and must be kept that way to remain in farm or ranch use. Ranches and farms are also disqualified in Rarity as lacking their original "rare community types" or listed species without restoration of the prior habitat for these species, which the county specifically planned to avoid. Ranches and farms are also disqualified in Manageability because lack of the prior habitat precludes "maintaining habitat functions."

The only criteria that could be met by ranches and farms without restoration of prior habitat, would be "natural stream system, recharge area, or estuarine environment" which is true of all land, in proximity to existing public lands or waterways. Therefore ranches and farms would be the worst candidates for acquisition under the county criteria for conservation land, and the subject ranches indeed had the lowest possible FNAI scores when considered by the state.

These criteria are required to guide land acquisition under the county ESLPP program (see below) under which public tax funding was used to purchase the subject land and easements.

Therefore statements and actions by ESLOC members, county commissioners, or other persons involved in these land or easement purchases, stating or implying that they met the county standards for conservation land acquisition, were false or fraudulent statements that caused major losses of tax revenue to the county, and losses to owners of property in the county.

**1998 County ESLPP Program Purposes Were Violated**

In 1998 Sarasota county passed ordinance 98-096 to permit tax revenues to finance bonds for large purchases of land or "easements" for conservation purposes. An ad valorem real estate tax up to .25 mils to finance bonds up to $53,000,000 was authorized. Ordinance 99-004 set up the Environmentally Sensitive Lands Protection Program (ESLPP) and its oversight committee (ESLOC) to submit proposed "protection sites" for approval by the county commissioners. This created massive incentives for opportunists to volunteer for the ESLOC offices that "advise"

37

those payments, to claim pleasant-sounding conservation purposes for massive payments to themselves and their wealthy friends, despite a complete absence of conservation effects of such purchases, and to seek office or influence county commissioners to approve such purchases. ESLOC members simply sign up on the county website, and are selected without meaningful public knowledge or input. The ESLOC members are authorized by county ordinances such as 2007-211 section 1.3 to:

> a. Submit all proposed protection priority sites to the Board for review;
> b. Work with staff to develop a work plan for each site on the protection priority list;
> c. Approve the work plans prior to forwarding them to the Board;
> d. Verify that the property proposed for purchase under the ESLPP meets the criteria set forth in 92-272 prior to the Board's execution of any contract;

Note that "work plans" are merely plans to sign purchase documents, not to do anything about conservation. Section 5.5 requires that "All members shall comply with the Code of Ethics" requiring disclosure of conflicting interests, registration of lobbyists, prohibiting the offer or receipt of benefits for official actions, prohibiting misrepresentation of assets, and providing for voiding contracts made in violation of the code of ethics.

Note that none of the subject ranch properties proposed by the ESLOC for purchase of land or easements met the required criteria established in ordinance 92-272 (above). Therefore those who knew or were owners of large ranches, were able to volunteer to "advise" massive payments to themselves or their associates for nothing but making false claims, that merely continuing their ranching somehow achieved a conservation purpose. In doing so, they violated the state Code of Ethics in many ways, and the resulting contracts can be voided. They also committed extensive fraud in so doing, felony crimes under state and federal law, which meet the criteria of racketeering activity under state and federal law.

The defendant landowners and their admitted friends and associates, were the same public officials, or influenced those, who "advised" and decided to grant them tens of millions of dollars of public funds for land use "rights" having no public conservation value.

**1992-2007 County Sold Large Areas of Its Own Habitat Land for Development**

Even while the county owned about eight square miles (20,000 lots of 0.25 acres) of forested land, in the form of repossessed "house lots" in undeveloped northern Northport and elsewhere, it did not impose any deed restrictions to preserve forest habitat. The county allowed

this remaining habitat to be destroyed by clearing for construction, an admission that it had no goal of preservation of forest habitat, even upon land that it owned, that it considered worth foregoing the sale thereof at the value of ranch land. This violated its stated conservation goals.

Therefore the assertions in county documents that it sought to advance preservation of habitat, by spending similar amounts per acre for land and easements with *no native forest habitat remaining*, and with *no plan to restore* the native habitat, were false statements intended only to divert public funds to insiders in violation of public duty, an admission of fraud.

**2004 County "Comprehensive Plan" Evades Stated Goal of Habitat Restoration**

**Florida Law Requires a County Comprehensive Plan to Meet Environmental Goals**

Florida statute 163.3164 (Community Planning Act 1975-2011) grants counties the "power and responsibility" to adopt comprehensive plans to guide future development, and to implement such plans by land development regulations (163.3167(1)(b),(c)) designating a local planning agency to prepare the plan ((163.3174(1)(4)(a)). The "comprehensive plan" must include "principles, guidelines, standards, and strategies" for land development, and "shall contain programs and activities to ensure comprehensive plans are implemented" (163.3177(1)).

A comprehensive plan must designate proposed land uses including commercial, agriculture, and conservation uses (163.3177(6)(a)) and provide for the "conservation, use, and protection of natural resources" including "environmental resources" (163.3177(6)(d)). The conservation plan must identify "wildlife… and vegetative communities, including forests, … species present and species listed by federal, state, or local… agencies as endangered, threatened, or species of special concern" (163.3177(6)(d)1.e). A comprehensive plan must provide guidelines and standards for conservation that "protects… wildlife habitat, and… restricts activities known to adversely affect… endangered and threatened wildlife" (163.3177(6)(d)2.e) and "designates environmentally sensitive lands for protection" (163.3177(6)(d)2.h).

Comprehensive plans are to be implemented and enforced by local regulations "as required by this act" (163.3201) and each county shall "enforce land development regulations" (163.3202) that "implement the adopted comprehensive plan" and protect water wellfields and ensure "the protection of environmentally sensitive lands" (163.3202(2)(e)).

Florida statute 163.3194 provides that all actions taken by governmental agencies "shall be consistent with such plan" (163.3194(1)(a)) and that *in legal action* the comprehensive plan "shall be construed broadly to accomplish its stated purposes and objectives" (163.3194(4)(b)).

**Sarasota County Comprehensive Plan Did Not Require the Subject Purchases**

Pursuant to F.S. § 163.3167 et seq above, the county prepared a Comprehensive Plan of 2004[25] under ordinances Ch. 94 Article III (revisions since 2004 do not appear to have changed the sections quoted). Note that the county could achieve most conservation goals by regulation, and did not need to purchase land or easements on isolated ranches to preserve any remaining habitat there, but only to restore forest habitat.

Chapter 1 (Environment) states the "Core Principles" and "Goals, Objectives, and Policies" as "the ways in which native habitats are preserved and conserved… and managed."

> Environmental Goal 1:
> Protect, maintain, and, where necessary, *restore the native habitats* and ecological systems of Sarasota County to ensure their continued high quality and critical value to the quality of life in the county.
> (emphasis added)

Despite the declared goal to "restore the native habitats" the goal is applied only in section 1.2 to wetlands, which are "preserved" anyway because they are useless for construction. In 1.3.10, habitat restoration on ranches is actually *prohibited* by requiring continuation of "practices such as prescribed burning" to keep the land deforested. In 1.3.11, ranches in need of reforestation are equated with "native habitat" and the county will even pay ranchers "incentives" to burn off habitat species. In 1.3.14, the goal to restore wildlife habitats is limited to public "management areas" and in 1.5.9 it is limited to county owned lands, not conservation easements. In 1.5.6 habitat restoration is limited to whatever seems "practical" disavowing any requirement to achieve the goal. The goal of habitat restoration is nowhere advanced and is generally prohibited.

The goal of habitat restoration is prevented on conservation easements on ranches, and ranch land purchases on which ranching activity is permitted to continue. So purchases of ranch land and easements cannot achieve any conservation purpose not achieved *without* an easement.

> Environmental Goal 2:
> Support native birds, fish, and wildlife through responsible stewardship of their habitats.

---

[25] *Comprehensive Planning*, Sarasota County, 2004 updated through October 2016

But here again there is no provision whatsoever to *restore* habitat. The county is already required to "coordinate with state and federal agencies" to protect listed species as required in 2.1.1 and makes no mention of other species to be protected except the Scrub-jay in 2.1.10.

Goals 3, 4, and 5 concern air and water quality, coastal ecosystems, and environmental education, rather than land animal habitats.

Environmental Goal 6:
Create and maintain a comprehensive and connected system of parks, trails, greenspace, native habitats, and environmentally sensitive lands.

This section is concerned with "urban greenways" or linear parks of connected "green spaces" to allow people to take long nature walks in cities. But section 6.1.2 presumes that protected forest species will take up similar fashionable recreational goals rather than their natural behaviors, and begin using lengthy unmarked "corridors" across non-habitat ranches between non-habitat ranches, simply because the county has designated ranches as "native habitat" despite actively burning off the forest habitat of the native land species. Because the subject ranch lands do not permit public access or provide usable habitat connections, this goal is not served by public purchases of lands and easements any better than it is served *without* public expense.

Under "Native Habitats In Sarasota County" the comprehensive plan lists primarily habitats associated with the coast, rivers, streams, or wetlands. One upland habitat, Pine Flatwoods, is described as the "predominant native habitat" suitable for "endangered species." But there is no mention of the Florida Black Bear or Panther which the public was told would be protected, only the common bald eagle, crested caracara, and the common sandhill crane.

Despite admission that forest ("canopy and understory vegetation") must be maintained or restored to preserve this habitat, the "Management Guidelines" for Pine Flatwoods suggest destruction of the forest by "controlled burns" that remove all but isolated trees.

a. Pine Flatwoods should be conserved in fulfilling open space requirements
b. Special emphasis should be placed on meeting wetland buffer requirements by preserving pine flatwoods adjacent to wetlands.
c. Canopy and understory vegetation shall be maintained in conservation areas and in wetland buffer preservation areas. A resource management plan for these conservation and preservation areas, based on best available technology, shall be submitted for review and approval by the County prior to or concurrent with the preliminary plan or site and development plan development review process.
d. Recognize fire as an important management tool in the maintenance of this habitat and may be limited in developed areas due to practical considerations.

It is not necessary to prevent reforestation to prevent forest fires: this is done by clearing "fire breaks" between adjacent forest areas so that fire cannot spread far before being controlled.

It is clear that the county did not intend in its Comprehensive Plan to restore native habitat or to restrict the existing ranch use of the subject lands. Therefore the county could have achieved its conservation goals on the subject lands by regulation without purchases of land or easements. If the county sought to provide habitat for endangered forest species such as the panther, which required reforestation, it would have specified this restriction in the subject conservation easements, and would not have permitted ranching to continue on lands purchased. Because no such restrictions were made, the county had no intention of achieving conservation goals by land and easement purchases, which would not have been achieved without purchases. The declared purposes of the subject land and easement acquisitions were therefore fraudulent.

**2004 County "Land Management Plan" Provides No Action Toward Conservation Goals**

By 2004, the county "Land Management Plan"[26] asserted that "land management necessarily follows the acquisition of natural environmental areas" with little argument that acquisition was necessary to prevent development, or that the forces of nature must be managed. The plan threatened that a lack of "management" would cause "land changes" leading to loss of "native habitat protection" and "public trust" and that finally the land would become "vulnerable to… detrimental uses." But it proposed no change whatsoever in conservation land management from ranching, the single activity most detrimental to native habitat protection.

The "plan" suggests no activity at all to restore habitat, control flooding, improve water supplies, or achieve any other benefit claimed by public officials extolling public land rights purchases. It merely suggests continuing activities to prevent brush fires and invasive species, admits no intent to change damaging activities where land or land rights are purchased, and then drifts off into unrelated park management plans.

The plan for "management" of conservation land was simply that it should not be allowed to "degrade" from neglect, vandalism, brush fires, or invasive species. But ignoring the fact that the ranch land proposed as conservation purchases was already fully "vandalized" by ranchers, this was translated to a ranch-management plan of controlled burns, removal of invasive plants, and occasional removal of junk along roads, to pretend that for-profit ownership is better. In fact,

the removal of litter along roads and invasive species would be ordinary wilderness management, and the "plan" made no case that the county should not reforest conservation land.

The plan notes that "restoration" of "preserves" as habitat requires "substantial financial investment" and therefore was *not planned at all*, and that "improved pasture and other highly modified agricultural lands" even when purchased *would continue indefinitely* in the same "highly modified" use that had eliminated its habitat value! So the "land management plan" consisted of no change of land use at all, nor any activity not already in effect. It offered no conservation benefit whatsoever over prior land uses, just sales talk for giving away public funds to wealthy ranchers with no public benefit whatsoever! The "plan" is fraud, an excuse for graft.

The "plan" proceeds to a section "Measuring Our Success" which states that the county will verify that "Hydrologic regimes of streams and wetlands closely track natural weather patterns" (meaning noticing that streams flow more after rainfall) and "more acres of fire dependent, native communities burned using prescribed fire" (so native habitat cannot be restored, because plants that are "dependent" upon the fires that destroy the habitat are suddenly "native communities"), despite which for populations in decline "a specific program of research driven action is in place to address decline." So the "research driven action" consists of doing nothing at all because "measuring our success" will show that rain still falls, streams still flow, and any plants persisting after years of deliberate burning of native forest habitat on ranches are now declared to be the real "native communities." Now "success" would be measured as whatever was there anyway, so the county need not manage anything. End of conservation plan.

None of the "goals" set forth would accomplish anything not already being done, nor any conservation purpose, and none of the "measures of success" consist of anything but the number of acres nominally designated for some purpose. Rather than measure success in protecting environmentally important lands, Goal 1 is merely "coordination of protection" as measured by number of acres so designated and cost-sharing agreements. Rather than measure success in protecting species, Goal 2 is merely to increase "biodiversity" measured solely by the number of acres designated for biodiversity purposes. Rather than measure success in protecting or restoring land or water quality, Goal 3 is merely to put invasive plants under "maintenance control" and conduct the "standard fire regime" as measured solely by the number of acres so

---

[26] *Land Management Master Plan*, Sarasota County, December 2004. See also *Land Acquisition Programs*, Sarasota County website 4/27/18, Parks and Recreation page

designated. Rather than change anything to improve the already copious county water supply, Goal 4 is merely to "provide retention and storage of surface water in naturally occurring storage areas" without any action at all to store water, move water, or prevent water from going somewhere else. The ranches would be allowed to continue using half of the available water! The remaining "goals" concern recreation and a few very small historic sites.

The "Plan" was to actually prevent habitat restoration by extending controlled burning and allowing cleared areas of former habitat to continue in use as ranches or farms even after being purchased by the county, and to prevent an increase of public water supply by allowing ranching to continue using 49% of the available water. No new conservation activity or effect whatsoever was planned by the county. The only action would be to "designate" acreage for some conservation purposes, while doing nothing at all to achieve those purposes. This "land management plan" is evidence of intent to deceive the public, a systematic fraud.

The 2004 plan of the county to take no conservation action beyond allocating acreage to goals, and its plan to *not restore* damaged habitat despite claiming that goal, is an admission that its subsequent purchases of the subject lands and easements were not intended to take any substantial conservation action that would not have occurred without such purchases. The failure to plan for habitat restoration, and the plan to continue ranching, is an admission of fraud.

**Conclusion: Subject Land and Easement Purchases Violated Statutes and Ordinances**

The purchase of conservation lands with state funds under F.S. Ch. 380 requires proof that a regulation having the same conservation effect would be a taking of property requiring compensation. But state and county conservation goals for the subject parcels required no taking of any "reasonable expectation" of present value in any use of higher value, and therefore could have been met by regulation alone. Therefore the subject purchases and agreements of land and easements were fraudulently presented as serving conservation goals requiring expenditure of public funds. Where state and county goals included habitat restoration, no such plan was made, and agreements for purchases and easements precluded restoration of native forest habitat.

F.S. Ch. 259 provides for land and easement purchases by evaluation of FNAI, advisory selection by ARC, and approval by the executive Board. It requires management to "protect, and preserve… resources" failing which the possession is "subject to termination by the board."

County resolution 92-272 for acquisition of Environmentally Sensitive Lands establishes the criteria for such purchases referenced in subsequent ordinances. Ranches and farms are disqualified because they were deforested and drained and are kept that way in farm or ranch use, and the agreements and management plans excluded reforestation, so they lack their original ecosystems (Quality) and original rare or listed species (Rarity), which also precludes "maintaining habitat functions" (Manageability). No action to improve or prevent degradation of water quality was proposed (Water Quality), and none of the subject parcels provided habitat connections (Connectedness). The reforestation that might eventually have restored habitat was specifically excluded from the management plans and agreements. Therefore purchase of the subject parcels and easements violated the county requirements, and resulted from fraud.

The county Ordinance 99-004 which set up the Environmentally Sensitive Lands Protection Program (ESLPP) and its oversight committee (ESLOC) to advise the county commissioners, created massive incentives for opportunists to simply volunteer on the county website to claim conservation values to "advise" massive tax-financed payments to themselves and their wealthy friends despite a complete absence of conservation effects, and to seek office or influence county commissioners to approve such purchases. The subject parcels and easements were purchased with such fraudulent advice and influence, without public benefit.

The county Comprehensive Plan under F.S. 163.3164 is required to provide land development plans and "programs and activities" that protect "wildlife habitat, and… wildlife" and to designate and protect "environmentally sensitive lands." All actions taken by governmental agencies "shall be consistent with such plan." But the county Comprehensive Plan merely states conservation goals including habitat restoration and then explicitly precludes reforestation. Every goal related to the subject purchases is either achievable without the purchases, or is specifically precluded by the plan itself. The 2004 county Land Management Plan included no conservation actions beyond "allocating" acreage, and planned to prevent forest habitat restoration, an admission that the purchases of the subject lands and easements were not intended to achieve the stated goals, or the purposes of county Ordinance 99-004.

The defendant county and SWFWMD had no need to restrict land use, and therefore no need to purchase land or easements for conservation purposes, unless their goal was to restore forest or other habitat. While that goal is expressed as Goal 1 of the Comprehensive Plan, it was not translated as required to specific goals or management plans, and was specifically prevented

45

by the management plan of controlled burns. Therefore the purchases of lands and easements were unnecessary to any public purpose, and were unlawful agreements and expenditures of public funds. The false representations made to advise and secure such grants were acts of fraud, and knowing acts of public officials toward these grants were acts of fraud, criminal acts comprising a pattern of racketeering.

In legal action the comprehensive plan "shall be construed broadly to accomplish its stated purposes and objectives" (163.3194(4)(b)). Therefore the stated goal of the comprehensive plan to "restore… native habitats" should be held to be violated by the plan of controlled burning to prevent reforestation, and by the terms of the subject purchases and agreements that continue ranching and fail to restore habitat. The provision of FS Ch. 259 that purchases and agreements that fail to "protect, and preserve… resources" are "subject to termination by the board" should be held to void such agreements and subject such properties or payments to forfeiture.

### The Funds Misused: Funding Sources for Purchase of Subject Land and Easements

The normal local, state, and federal funding sources for conservation purchases are detailed in Memorandum of Law 2. This section summarizes the abuse thereof by the defendants.

### Federal Funding for Conservation Purchases

Federal funding of the U.S. Fish and Wildlife service and the U.S. Forest Service provides grants to state agencies for wildlife management and endangered species protection.

About $3 billion is spent annually under the federal Clean Water Act for mitigation measures to achieve habitat protection or restoration. The Florida FWC receives about 22 percent of its budget from federal funding. Unfortunately the funding rationales are so general as to be applicable to land even 100 miles from existing habitat. State and local funding of land and easement purchases for conservation is therefore blended with federal funding wherever strict separation of state or local funds is not accounted. Therefore the funds diverted by the defendants include substantial federal funds granted in careless or deliberate violation of the conditions and intent of the federal grants. Wrongful expenditure of such blended state or local funds is a violation of federal law.

**Funding of Carlton Ranch Easement and Purchase**

The Carlton Ranch easement funding was shared between the SWFWMD conservation land acquisition program using state FF funds, and $31.6-million from the county ESLPP, nearly all of its remaining funding limit.

The county "partnered" with the Sarasota Conservation Foundation (SCF) to "assist."

After the $51 million payment, the Carltons held a "celebration picnic" to thank those who "worked to make the agreement happen" including staff from SWFWMD Land Resources Department and Ken Harrison, "a longtime friend and ranching associate of the Carlton family" and their mortgagee on his 2002 land purchase from them,[27] and *a member of the SWFWMD Peace River Basin Board* who "led attendees on a tour of the property." The land was denuded of forest, no longer panther habitat, and not located anywhere near known panther habitat, there was no plan to restore it as habitat, and the county had even agreed that it would not be restored, and would be kept permanently cleared for use as a ranch. The county even agreed that the land *purchased* outright could continue to be used as a ranch by the seller! There was no conservation effect at all. But there was a *vision*! The county land resources director Eric Sutton was there, and stated that "ranch land owners… can play a vital role in achieving the vision" of conservation, without achieving any specific result at all. These statements are knowing and willful acts of fraud by public officials.

**Funding of Walton Ranch Easement and Purchase**

The details of Walton Ranch easement funding relationship to SWFWMD conservation funding will be presented upon completion of discovery.

**Funding of Longino Ranch Easement and Purchase**

The details of Logino Ranch easement funding relationship to SWFWMD conservation funding will be presented upon completion of discovery.

**Argument of Judicial Fraud by the Defendants**

**Judicial Abuse of Discretion**

---

[27] *Partnerships Will Protect and Preserve*, Water Matters Magazine of SWFWMD, May 2008

Protected judicial discretion is limited to the application of fixed legal principles in a manner which in fact serves and does not defeat the ends of substantial justice.

> The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles. It is not a mental discretion, to be exercised ex gratia, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. …If, on the contrary, we are satisfied beyond a reasonable doubt that the Court below has come to an erroneous conclusion, the party complaining of the error is as much entitled to a reversal in a case like the present as in any other. Transit Ads, Inc. v. Tanner Motor Livery, Ltd. 270 Cal. App. 2d 275 citing Benjamin v. Dalmo Mfg. Co. (1948) 31 Cal. 2d 523, 526, quoting from Bailey v. Taaffe 29 Cal. 422 (1866)

The US Fourth Circuit court in Sloas v. CSX Transp., Inc., 616 F.3d 380, 388 (4th Cir. 2010) noted that a district court

> …necessarily abuses its discretion when it makes an error of law.

Under these standards of federal law, defendants Kovacevich and Bonner abused the discretion of judicial office to facilitate a partisan racketeering enterprise. These abuses are within the executive and administrative capacities of judicial office, in which misconduct is not protected by judicial immunity, as noted I Fact Appendix F (Bonner, state).

**On the Issues of Concealment and Denial**

**Concealment of Fraud Delays Investigation and Period of Statutory Limitations**

Concealment of fraud and racketeering substantially delays victims in reaching the point where they "should have known" of their injury. The victims of fraud by government officials often have no way of knowing the full nature and extent of damages, and are usually unable to make a full time investigation over a period of years, to determine the structure, scale, and participants of racketeering activity. Where the racketeering crime involves influence peddling and infiltration of government offices, distortion of facts upon which decisions are based, and complex networks of individuals exercising influence, considerable evidence must be discovered by a victim to cause sufficient suspicion to investigate the complex structure of crime, and the investigation must proceed far before the victim knows enough or "should have known" of the extent of injury done and the identity of the defendants. This is the beginning of the time period of the statute of limitations upon racketeering complaints. A racketeering investigation must

proceed even further before it can be actually filed in court with sufficient facts to rise above mere allegations that might be dismissed.

**Victims of Fraud Must be Encouraged to Admit Rather Than Deny Errors**

Victims in fraud cases find that the admission that they have been duped is personally challenging. The defense claims that it was the victim's fault for being duped, and a jury is tempted to blame the victim by appeals to selfish impulses. Of course there is no such defense in fraud, for the victim is unaware or is deceived to act against their will. In this case, all taxpayers were deceived by the maze of documents and processes, and soothing claims that at last environmental progress would be made. They are not to blame, for it was not their duty to know all of the details; that was the job of government officials and environmental activists.

In this case, some officials and conservation activists questioned at times how the lack of any plan to restore habitats, or any other large scale conservation action, would achieve conservation goals, and some are reluctant to admit that nothing was achieved by the easements, or land purchases that allow ranching to continue. They were fooled by false promises, soothing verbiage about protecting the environment, pretty photos of real scenes, and vague notions of hypothetical future risks, actions, or benefits. Victims of fraud fear the mockery and disownment of the outside world. Those who are innocent deserve the relief of our understanding that such things happen to all of us. They deserved more of their fellow officials and activists and citizens.

Mass media were involved as well, unwilling to do investigative reporting to challenge the administration of a popular conservation program, or to question scientists who described environmental problems to be solved, but who assigned the lowest possible conservation value to the subject properties. The mass media knew that environmentalism is a popular category of news stories, and were unwilling to turn that into a massive investigation of subtle corruption in state and county government. Some were aligned with officials involved, or political parties through which payments elected those officials. So some citizens heard rumors of investigative reporting on conservation land purchase fraud elsewhere in Florida, but little or nothing emerged in SW Florida. The public and some of its officials were deceived, and could not find the facts until circumstances drove victims of racketeering to make the investigation.

**Tracing Corrupt Influence**

The rewards or threats of punishments that motivate violations of public duty, as in recommendations for purchase of land without conservation value, are difficult to trace. Cash flows may be hidden with digital currency, offshore accounts, favorable purchases of real estate, securities, or art and antiques by family members through third parties, or simply envelopes of cash never seen by others. Only the clumsy bribe among many has any chance of exposure. Rewards to a political party whose members violate public duty to grant special benefits, via "donations" by recipients of the benefits, must be presumed to be payments.

A political party systematically coordinates rewards of public officials and employees for acts of "loyalty" to whatever policy goals its leaders may conceive. If its leaders advocate misappropriations that cause "donations" to the party, all of their public officials must obey to receive campaign funds and appointments, and all of their state employees and managers must do as advised to receive jobs and promotions. All are subject to "influence" by campaign funds or job promotions to do so, and all are subject to threat of financial "harm" by denial of campaign funds or non-promotion if they do not. Whether or not that influence or threat is corrupt, and thereby violates state laws (F.S. 838.016-16) and constitutes racketeering under 18 USC § 1961(B), depends solely upon whether the actions so directed are "in violation of public duty" and direct benefits to party members or donors. Therefore any set of actions by public officials and employees "in violation of public duty" must be presumed to be caused by "corrupt influence" and "threat of harm" by a political party, where the officials, employees, and beneficiaries of the actions are members of the same party, and there is evidence that the party or public officials received funds from the beneficiaries, directly or indirectly.

When a legislator acts to benefit donors to his/her political party, as by advocating legislation or rules conferring financial advantages to an industry, the legislator accepts a "corrupt influence" if the actions are in violation of public duty. Donations to the political party or "committee" of the legislator from that industry must be presumed to represent solicitation and acceptance of "corrupt influence" to gain the benefit of the legislation or rules.

**CONCLUSION**

Wherefore the defendants acted in collusion in fraud, an "unlawful act" in interstate commerce under 18 USC § 1961 (RICO), and racketeering by "connection with the conduct of

an enterprise," by willful direct or indirect involvement in criminal activity comprising "a substantial factor in the sequence of responsible causation" of damages to the Plaintiff, and inevitably "anticipated as a natural consequence" thereof, and/or in conspiracy to commit racketeering, in clear and deliberate violation of 18 USC § 1952 – 1968.

These defendants are jointly and severally liable for full compensatory and mandatory triple damages, and should be enjoined from all future related activity.

Plaintiff is prepared to argue these issues in Court with the law of Racketeering [1 - 18].

**OATH AND CERTIFICATE**

    I, the undersigned Plaintiff John S. Barth do hereby certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. I further certify that on this date a copy of the foregoing document was served electronically via ECF on all counsel of record.

Date:    7/28/2025                                  
John S. Barth, Plaintiff, pro se
P.O. Box 88, Springvale, ME 04083 Jbarth@gwi.net   207-608-1741